IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
           vs.                 )   No. 09-CR-5022-RED
                               )
ROBERT JOOS,                   )
                               )   January 11, 2010
                Defendant.     )   Springfield, Missouri



CRIMINAL JURY TRIAL
BEFORE THE HONORABLE RICHARD E. DORR
UNITED STATES DISTRICT JUDGE


VOLUME 1



APPEARANCES:

FOR THE PLAINTIFF:             MR. JAMES J. KELLEHER
                               ASSISTANT U.S. ATTORNEY
                               901 E. St. Louis, Ste. 500
                               Springfield, MO  65806


FOR THE DEFENDANT:             MR. DARRYL B. JOHNSON, JR.
                               JOHNSON & JOHNSON, LLC
                               2731 S. Meadowbrook Avenue
                               Springfield, MO  65807


COURT REPORTER:                MS. JEANNINE RANKIN,CSR,CCR,RPR
                               U.S. COURT REPORTER
                               222 N. Hammons Parkway
                               Springfield, MO  65806


Proceedings reported by stenography; transcript produced by
computer.

I N D E X

                                              Page No.

JANUARY 11, 2010 – DAY 1 – VOLUME 1

RECORD . . . . . . . . . . . . . . . .    6

INSTRUCTION NOS. 1–7 READ . . . . . . . .   30

OPENING STATEMENTS BY MR. KELLEHER . . . . .   30

                GOVERNMENT'S EVIDENCE

WITNESSES:

        TRISTAN MORELAND
        Direct Examination by Mr. Kelleher  . .   36
        Cross-Examination by Mr. Johnson . . .   54
        Redirect Examination by Mr. Kelleher . .   63
        Recross-Examination by Mr. Johnson   . .   69

        JAMES PATTERSON
        Direct Examination by Mr. Kelleher  . .   72
        Cross-Examination by Mr. Johnson . . .   93
        Redirect Examination by Mr. Kelleher . .   98
        Recross-Examination by Mr. Johnson   . .  103
        Ctd. Redirect Examination by Mr. Kelleher  105
        Ctd. Recross-Examination by Mr. Johnson .  107

        DAVID WHITTAKER
        Direct Examination by Mr. Kelleher  . .  108
        Cross-Examination by Mr. Johnson . . .  113
        Redirect Examination by Mr. Kelleher . .  116

        FRED BRADFORD
        Direct Examination by Mr. Kelleher  . .  116
        Cross-Examination by Mr. Johnson . . .  118

        ANTHONY PUPURA
        Direct Examination by Mr. Kelleher  . .  119

        DAN FRIDLEY
        Direct Examination by Mr. Kelleher  . .  123
        Cross-Examination by Mr. Johnson . . .  126
        Redirect Examination by Mr. Kelleher . .  127

Case 3:09-cr-05022-MDH    Document 80    Filed 04/09/10    Page 2 of 134

INDEX (Continued)                          Page No.

        LONNIE NANCE
        Direct Examination by Mr. Kelleher   .  .  127

JANUARY 12, 2010 — DAY 2 — VOLUME 2

WITNESSES:

        DONALD HAMPTON
        Direct Examination by Mr. Kelleher   .  .  135
        Cross-Examination by Mr. Johnson  .  .  .  140

        NANCY MANIRE
        Direct Examination by Mr. Kelleher   .  .  140
        Cross-Examination by Mr. Johnson  .  .  .  144
        Redirect Examination by Mr. Kelleher .  .  146

GOVERNMENT RESTS   .  .  .  .  .  .  .  .  .  .  147

DEFENSE MOTION   .  .  .  .  .  .  .  .  .  .  .  147

                DEFENDANT'S EVIDENCE

WITNESSES:

        ROBERT JOOS
        Direct Examination by Mr. Johnson    .  .  152
        Cross-Examination by Mr. Kelleher  .  .  .  198

DEFENSE RESTS   .  .  .  .  .  .  .  .  .  .  .  214

DEFENSE MOTION   .  .  .  .  .  .  .  .  .  .  .  217

INSTRUCTION RECORD  .  .  .  .  .  .  .  .  .  220

INSTRUCTION NOS. 8–18 READ   .  .  .  .  .  .  .  231

CLOSING ARGUMENT BY MR. KELLEHER   .  .  .  .  .  233

CLOSING ARGUMENT BY MR. JOHNSON    .  .  .  .  .  241

CLOSING ARGUMENT BY MR. KELLEHER   .  .  .  .  .  245

RECORD  .  .  .  .  .  .  .  .  .  .  .  .  .  251

VERDICTS   .  .  .  .  .  .  .  .  .  .  .  .  254

INSTRUCTION NO. 19 READ   .  .  .  .  .  .  .  .  256

3

INDEX (Continued)                          Page No.

DEFENSE MOTION   .   .   .   .   .   .   .   .   .   .   .   .   258

FORFEITURE VERDICT   .   .   .   .   .   .   .   .   .   .   .   259

REPORTER'S CERTIFICATE   .   .   .   .   .   .   .   .   .   264

                    *   *   *   *   *   *

                  INDEX OF EXHIBITS

| GOVERNMENT'S EXHIBT | | OFFERED | ADMITTED |
|---|---|---|---|
| No. 1-30 | Firearms/Ammunition/Explosive | 83 | 84 |
| No. 31 | Bag with Documents | 85 | 85 |
| No. 32 | DOC Documents | 84 | 84 |
| No. 33 | Documents/CR294-494FX | 90 | 90 |
| No. 34 | Documents/04MC-CR01375 | 91 | 91 |
| No. 35 | DOC Documents | 91 | 91 |
| No. 36 | Fingerprint card | 129 | 129 |
| No. 37 | Photograph | 41 | 41 |
| No. 38 | Photograph | 48 | 49 |
| No. 40 | Photograph | 86 | 86 |
| No. 41 | Photograph | 87 | 87 |
| No. 42 | Photograph | 87 | 87 |
| No. 43 | Photograph | 88 | 88 |
| No. 44 | Photograph | 88 | 88 |
| No. 45 | Photograph | 88 | 88 |
| No. 46 | Photograph | 89 | 89 |
| No. 47 | Photograph | 89 | 89 |
| No. 48 | Photograph | 109 | 109 |

4

INDEX OF EXHIBITS (Continued)

| No. 49 | Photograph | 110 | 110 |
|---|---|---|---|
| No. 50 | Photograph | 111 | 111 |
| No. 51 | Photograph | 113 | 113 |
| No. 52 | Cart/19,0000 rounds of ammunition | 84 | 84 |
| No. 53 | Robert Joos letter | 213 | 214 |

DEFENDANT'S EXHIBIT:

| No. 1 | Motion | 147 | -- |
|---|---|---|---|
| No. 2 | Resume | 167 | -- |
| No. 3 | Letter | (voir dire) | |
| No. 4 | Yearbook | 157 | 157 |
| No. 5 | Motion | 217 | 217 |

\*  \*  \*  \*  \*  \*

5

```
 1                    USA v. ROBERT JOOS

 2                 CASE NO. 09-CR-05022-RED

 3                   CRIMINAL JURY TRIAL

 4                    JANUARY 11, 2010

 5                    *   *   *   *   *   *

 6          THE COURT:  All right.  Now, I wanted to have this

 7   conference here before we start the trial.  Mr. Joos --

 8          THE DEFENDANT:  Yes, sir.

 9          THE COURT:  -- I wanted to deal with -- you filed

10   some things and I know you know that you had Judge Smith for

11   awhile.  Judge Smith is in Kansas City with a different trial.

12   He indicated this case was ready for trial and it got

13   transferred to me to try the case, that's why I'm here today

14   on this.

15          Now, I've seen what you've filed.  I know you've had

16   several things that you filed and I want to cover some of

17   that.  One thing, you've talked about your prior convictions,

18   and if I can tell from some of those requests, you want to, I

19   guess, review the -- whether or not those are proper

20   convictions.  Can you tell me just what it is that --

21          THE DEFENDANT:  Yes, sir.  At the time I was

22   arrested, I was preparing to file in federal court for

23   judicial review of those two state convictions because I

24   believe they are false convictions and I can prove it, both --

25   in the record the evidence itself shows they're false in fact
```

6

1    and then in law they're also false convictions because I had

2    rights violated.  Speedy trial was one of them, the right to

3    present evidence and witnesses in my defense was another.  I

4    can prove in both cases the cops committed perjury from the

5    evidence that's actually available in the record.

6            THE COURT:  Did you appeal those cases in state

7    court?

8            THE DEFENDANT:  They were appealed and I lost my

9    appeals in both cases in the state court and I -- I think it

10   was like six months maybe before I was arrested that I had

11   exhausted my state appeals.  I had gone all the way through

12   the state appeal system.  Now, I won the one case, which was a

13   felony resisting arrest.  Southern District Court of Appeals

14   said there was no evidence on which to convict me on that

15   case, which was in conjunction with a driving without license

16   case.  Well, that right there is enough to show the jury's

17   prejudice against me.  That was one of the issues.  I wasn't

18   allowed proper voir dire to insure that people were --

19           THE COURT:  Let me just explain this to you.  This

20   case today charges you with being a felon in possession of

21   firearms and I believe explosive and that's basically the

22   issues here.  Now, the government is going to have to provide

23   proof to me of those convictions.  In terms of reviewing those

24   convictions, that's not something -- the detailed reviewing of

25   it that's going to be before this Court.  I understand you may

7

1    like for it to be, but that's not part of the charge here, if

2    they can show there's a conviction, a record of a conviction

3    in state court.  Now, I'm not saying there aren't other

4    avenues and maybe even through federal court to approach that,

5    but this is not the one.  Do you understand what I'm saying?

6         THE DEFENDANT:  Yes, sir, but I understand that if I

7    prove they're false -- in fact, I was even told by my attorney

8    if I could hire an outside attorney to file the case in

9    federal court and prove they're false convictions, this case

10   goes away.  That's my contention, they're false convictions,

11   not convictions.  It's, in fact, a crime that was committed

12   against me just like a false arrest is a crime --

13        THE COURT:  I don't know about what you might do in

14   a separate action, but what I have to deal with is what's

15   before the Court, what's been assigned to me to try today and

16   there would also be an appeal from here.  If you're convicted

17   today, you have the right to appeal in federal court to deal

18   with that as well.  Do you understand that?

19        THE DEFENDANT:  Yes, sir, but I thought I also had

20   the right to judicial review when there's a fact issue being

21   contested.

22        THE COURT:  You will have me here to make decisions

23   on matters that are properly before the Court with the issues

24   before the Court.  But in terms of us in this court reviewing

25   behind the convictions -- I don't know what the government is

                                   8

1  going to present to prove it, but if they have convictions and

2  records of convictions that have been final in state court,

3  that may very well be enough as far as this proceeding is

4  concerned.  I just want you to know that.

5           THE DEFENDANT:  Yes, sir.  Well, I tried to get them

6  reviewed by the grand jury but I wasn't allowed to speak to

7  the grand jury, which I believe is a violation of my

8  constitutional right to face my accusers.

9           THE COURT:  Those constitutional issues may very

10 well be raised in a different action, but they all can't be

11 reviewed here today and I -- you may have thought they could,

12 and if you did, I'm sure you're disappointed in that, but I'm

13 just telling you, we have procedural rules and what's before

14 this Court is just the trial on your felon in possession.

15          THE DEFENDANT:  Yes, sir.  I'd just like to inform

16 the Court that my understanding is that my rights are secured

17 by the Constitution and that's what I'm proceeding on.  I just

18 wanted the Court to know that.

19          THE COURT:  That's okay.  But I want you to also

20 understand, I may make some rulings contrary to what you think

21 they should be and you will have the right to appeal to the

22 Eighth Circuit Court of Appeals and present those things.  If

23 I'm wrong, then -- and you're right, then you'll get the

24 relief you ask for.  But I have to make decisions today on

25 that and apply law and consider issues and that's the way

9

1   we'll go through as far as this trial goes.  But I know you

2   understand -- because you seem to have some knowledge of it --

3   that any decision I make that isn't appropriate, if it turns

4   out that way, you'll have relief from the Court of Appeals.

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  Now, another thing that I noticed

7   indicated you -- I'm trying to understand.  Did I understand

8   that you indicated you want a different attorney, is that what

9   you're --

10          THE DEFENDANT:  Yes, sir.  Before we get into my

11  motion, I just need a few questions answered so I can make an

12  informed decision as to what I really need to do today.  Are

13  we on the record?

14          THE COURT:  Yes, sir.

15          THE DEFENDANT:  Okay.  Just a few questions.  If I

16  proceed on my own, in other words, remove the attorney,

17  proceed -- represent myself, now, that would -- of course, I'd

18  have to have an extension of time to prepare because I'm in no

19  way prepared for this today.  Would I be allowed to subpoena

20  witnesses for my defenses, especially character witnesses?

21          THE COURT:  Two things here.  I'm not going to

22  continue the case at this point because this is the third time

23  that it's come up for a continuance and -- yes, you've had two

24  continuances before.  One, you got a different attorney, next

25  one with Mr. Johnson you got a continuance.  Those were

                                10

1  October 15th of '09 and November 16th of '09.  So we're not
2  going to continue again.  And I can tell you for sure that
3  would be a mistake on your part if you're trying to have a
4  record protected for appeal because you need an attorney to
5  help you make that record.
6          THE DEFENDANT:  Okay.  Well, the question again was
7  I would still --
8          THE COURT:  In terms of subpoenaing witnesses --
9          THE DEFENDANT:  I would not be allowed to have
10  witnesses subpoenaed for my defense?
11         THE COURT:  I saw something that you indicated you
12  want to subpoena the witnesses identified by the government so
13  you can direct exam them; is that what I understood?
14         THE DEFENDANT:  That's one of them.  The other is
15  character witnesses, three attorneys out of St. Louis and the
16  prosecuting attorney out of Howell County.
17         THE COURT:  Let me just first say, if the government
18  is going to have witnesses here, then I would not authorize
19  subpoenas for those witnesses so you could direct exam.  You
20  want to be able to cross-examine witnesses.  That's by far a
21  better way to -- you can ask leading questions and do things
22  on cross-exam that you can't do on direct exam.
23         In terms of those attorneys, now, Mr. Johnson, did
24  you follow up on that?  What was the deal on that?
25         MR. JOHNSON:  Yes, Your Honor.  There was three

1    attorneys that Mr. Joos wanted me to contact.  First one was
2    Jack Pierson, and I found out Friday that Mr. Pierson was
3    murdered in August of 2009.  I contacted Larry Barker.  Larry
4    Barker is a practicing attorney.  He hasn't had any contact
5    with Mr. Joos in over 15 years.  I contacted Mr. Mike Nack.
6    Mr. Nack stated that he had contact with Mr. Joos about three
7    years ago, but the two attorneys I spoke to, as far as my
8    trial strategy, they wouldn't lead any credence or help in
9    behalf of Mr. Joos and what they could testify to.  Most of
10   what they could testify to would be when they knew him 15, 20
11   years ago.

12            THE COURT:  Were these people you went to school
13   with, Mr. Joos?

14            THE DEFENDANT:  Yes, sir.  One was my Explorer Post
15   advisor.  I didn't know he had been murdered.  He was -- I
16   grew up with him.  He was my Explorer Post advisor, assistant
17   scout master.  Mike Nack I grew up with.  I've stayed in
18   contact with him for years.  And Larry Barker I met in college
19   and worked for him for awhile.  He was in the administration
20   of the college I went to, and I maintained contact with him.
21   He's been down to the property and dealing with document --
22   this list of achievements and all my background prior to, you
23   know, my becoming an ordained minister.

24            THE COURT:  Well, some of that might be -- if you're
25   convicted, some of that might be more relevant towards

                                12

1    sentencing.  I don't know.  But, again, there will be

2    instructions, specific instructions that will deal with the

3    issues in this case that will be pretty much limited to did

4    these guns travel in interstate commerce, were you in

5    possession of them, and the explosive as well, and do you have

6    a prior felony conviction.  The evidence in this proceeding

7    will be pretty much limited to those issues.

8              THE DEFENDANT:  So the other -- quickly through

9    these other questions.  I would not be allowed to depose

10   government witnesses?

11             THE COURT:  To depose them?

12             THE DEFENDANT:  You can't depose government

13   witnesses?

14             THE COURT:  I'm not sure what you and your attorney

15   have discussed.

16             Mr. Johnson, is there something that I'm missing

17   here?

18             MR. JOHNSON:  No, sir.  He had asked for a

19   deposition of government witnesses and it's my understanding

20   that in criminal cases depositions are not permitted.  And the

21   government -- I've looked at all the evidence, gone through

22   this, I spoke to Mr. Ian Lewis, Mr. Joos' first attorney, as

23   well as Mr. Loge, their investigator on a couple of occasions,

24   and I'm convinced I've seen all the evidence, read it and it's

25   all there.

1          THE COURT:  Okay.  All right.

2          Mr. Joos, did you have another question?

3          THE DEFENDANT:  Yes.  Subpoena would -- I was not

4  allowed to subpoena records on appeal, the records from the

5  state cases.  Those are not allowed?

6          THE COURT:  Not in this case.

7          THE DEFENDANT:  Okay.  So that would include

8  evidence, then, in those cases would not be allowed; is that

9  true?

10         THE COURT:  Well, I don't know exactly what your

11  subpoena request is but what I am telling you is in terms of

12  those convictions, the issue before this Court is is there a

13  valid conviction that is a final judgment in state court.

14  Now, in terms of if there was some constitutional violation in

15  the trial that you had, that will have to be taken up in some

16  other forum, either in the state or a constitutional issue

17  here, but not in this case because this case the government

18  will prove the conviction part if they can prove to me that

19  you have one or more state court convictions that are final

20  judgments in state court.  Then the jury, I believe, will

21  still have to make a decision as to whether or not it's you

22  that is the subject of those convictions, I believe, but

23  that's the issue here.

24         THE DEFENDANT:  Okay.  So would I be allowed to

25  subpoena government files, all government files, ATF, FBI,

                                    14

```
 1    FEMA, Secret Service, IRS?  They've all got files on me.

 2               THE COURT:  In this case?  That relate to this

 3    case --

 4               THE DEFENDANT:  That relate to this case.

 5               THE COURT:  -- or other cases?

 6               THE DEFENDANT:  In other words, that would relate to

 7    my defense of this case.  My defense is based on 30 years of

 8    government persecution and I'd be able to prove persecution

 9    through all these records and files they've kept on me.

10               THE COURT:  It's hard for me to answer generally

11    like that.  It's my understanding that the files in relation

12    to this case, that your attorney has had a chance to review

13    that and I suspect you had a chance to review some of that.

14               THE DEFENDANT:  No, I haven't seen any of these

15    except for the ATF.

16               THE COURT:  Well, maybe not what you're referring to

17    but you --

18               THE DEFENDANT:  I'm talking about government files

19    on me.

20               THE COURT:  Yeah.  The issues and subpoenas in this

21    case would be limited to matters related to this case, not 30

22    years ago.

23               THE DEFENDANT:  Okay.  What about -- well, not just

24    30 --

25               THE COURT:  I'm just trying to give you an example.
```

15

1    THE DEFENDANT:  From now all the way back 30 years.

2  This ATF harassment has been going on for at least 20 years

3  that I know of.  I can subpoena witnesses that will testify

4  that they caught ATF agents searching property without a

5  warrant 15, 20 years ago.  It was deputy at the -- in fact,

6  the deputy and sheriff of McDonald County caught them.

7    Subpoena duces tecum for Rebecca Stevens who's a CI

8  in this case because I believe she has exculpatory evidence,

9  and I know there's stuff that wasn't in the discovery that she

10  has that she got from me.  In other words, it was exculpatory,

11  that's why it's not in the file, obviously.

12    THE COURT:  Is she somebody that's going to testify?

13    MR. KELLEHER:  No, Your Honor.

14    THE COURT:  Who is she?

15    MR. KELLEHER:  She was involved in this case.

16    THE COURT:  Here's what I would say to you is that

17  the government's going to have to make their case, apparently

18  not with this particular lady.  I just have to deal with the

19  evidentiary issues as they come up.  Mr. Joos, I'm not sure

20  what you're getting at there.

21    THE DEFENDANT:  Well, what I'm getting at, the

22  government is withholding exculpatory evidence.

23    THE COURT:  Well, I guess I would say present that

24  to me in some type of motion, talk with your counsel if there

25  is some, but it's hard for me -- until I hear what the

16

1  evidence is, it's hard for me to know what we're talking about

2  on that.

3          THE DEFENDANT:  I wanted a complete set of Revised

4  Statutes of Missouri 2004 for reference and --

5          THE COURT:  That would deal with your prior

6  convictions.

7          THE DEFENDANT:  -- in this case.  So that's a no on

8  that?

9          THE COURT:  Well, if you want to look at the books,

10  I'm sure -- is there a particular section you want to look at?

11          THE DEFENDANT:  Well, there are several sections

12  that deal with -- again, it's a fact issue.  The state is

13  claiming that I'm a convicted felon.

14          THE COURT:  Let me answer --

15          THE DEFENDANT:  I'm not a convicted felon.  I'm a

16  falsely-convicted felon.

17          THE COURT:  Let me answer something you just said

18  there.  See, you said it's a fact issue.

19          THE DEFENDANT:  Yes.

20          THE COURT:  That's what those cases had to deal with

21  in those cases.  They were probably jury trials, weren't they?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  The jury decided the facts in those

24  cases.  Now, to be quite honest with you, we're not going to

25  redo the facts of those cases in this court.  What I can --

                                17

1    the only thing I can -- I hope you can understand that, that

2    we can't retry those cases when we're trying to try a

3    different case here.  You may have relief -- I don't know

4    whether you have constitutional claims or not.  You may have

5    them because they reach pretty far, but they're not properly

6    presented in this case.  You may file something that brings

7    that to issue later on.  I don't know.

8              THE DEFENDANT:  I've already filed things trying to

9    get it presented in this case.

10             THE COURT:  No, no.  I'm talking about file a

11   petition or a complaint in federal court or a petition in

12   state court that's a separate action.  But in terms of this

13   case, those will not be an issue.  Now, if I'm wrong, the

14   Court of Appeals can tell me I'm wrong.  I have to make

15   decisions as we go through this case today as well.  But when

16   we get to the elements of the case, it will not get into the

17   facts of your prior convictions, it will just get into the

18   existence of your prior convictions and whether or not they

19   are final, valid judgments in state court.

20             THE DEFENDANT:  Okay.  The other thing I wanted --

21   which I didn't get my gag order on -- the press.  The first

22   thing this morning they're on there, white supremacist is

23   going to get a motion to get -- something about a motion to

24   have an extension of his trial.

25             THE COURT:  Now, I didn't see the -- was this in the

                                    18

1    paper?

2              THE DEFENDANT:  One of the guys in the pod said,

3    "Hey, you're on the TV."  I walked out there in the TV room

4    and there I am.  It's the same thing they always do to me,

5    poison the jury pool by weeks and weeks of advance news

6    claiming I'm a white supremacist --

7              THE COURT:  Well, now, I will --

8              THE DEFENDANT:  -- and a Nazi and a clan leader and

9    all kinds of other crap --

10             THE COURT:  Okay.

11             THE DEFENDANT:  -- that they use to poison the jury

12   pool so I can never get a fair trial.

13             THE COURT:  What you just said was -- we will take

14   that up because the next thing we're going to do is pick a

15   jury and I'll ask them if they know you.  But now tell me,

16   because I didn't know that it was in the press today, so

17   you're saying it was on TV this morning?

18             THE DEFENDANT:  It was on TV this morning.  I didn't

19   catch what channel it was on.  I wasn't paying that much

20   attention.  Obviously it was my picture and that's what they

21   were saying.  It's typical.  It's what they always do.  And

22   there's been references.  I've caught a couple other

23   references in the past when I've been up here for hearings

24   they've put it on the press.  Plus, there's over 100 websites

25   that list me as a domestic terrorist, a white supremacist and

                                 19

1  all kinds of other lies.

 2          THE COURT:  Well, I'll ask the jury about that.  If

 3  anybody has feelings about that, they won't be on the jury.

 4  And you know you and your counsel will knock off 10 people on

 5  whatever decision-making you want to, you understand that?

 6          THE DEFENDANT:  Yes, sir.  I wanted to access a law

 7  library but I can't get that either, can I?

 8          THE COURT:  Well, I guess it depends on what it's

 9  for.  If it's to go back and deal with these prior

10  convictions, we're not going to do that today.

11          THE DEFENDANT:  Well, it's to prepare defenses for

12  this case.  I've done the best I can with whatever I could get

13  my hands on.

14          THE COURT:  You have an attorney here, and my

15  suggestion is you talk with your attorney about those defenses

16  that you're talking about.  Now, I gather from some of your

17  writing that you think that you're subject to a different law

18  than what you're anticipating I think you are; is that right?

19          THE DEFENDANT:  No, I'm subject to the same law as

20  everybody else.

21          THE COURT:  Okay.

22          THE DEFENDANT:  But at the same time, so is the

23  prosecutor.  And one of the prosecutor's jobs is to see --

24  I've got a court case on this right here if you want me to

25  look it up, says the prosecutor's job is to see to it that

                                   20

1  innocent people aren't prosecuted.  And if he'd taken --

2  bothered to take the time to review these state cases, he

3  would have seen that they were false convictions.

4          THE COURT:  Okay.  Now, again --

5          THE DEFENDANT:  If they're false convictions, I'm

6  not a felon in possession.

7          THE COURT:  Okay.  I just have to remind you again

8  that the review of the underlying facts and procedure in those

9  state cases is something that is not going to be reviewed here

10 today in this case.  Anything else?

11         THE DEFENDANT:  Yeah, just one thing.  I want to

12 know if you're a Mason.

13         THE COURT:  If I'm a Mason?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  No, I'm not.

16         THE DEFENDANT:  Okay.  Thank you.  And based upon

17 this, what you've told me, since I have no other recourse,

18 there's nothing else I can do about this, I'll withdraw my

19 motion to remove the defender.

20         THE COURT:  Okay.  Well, that is accepted and I

21 think that's good advice on your part because your attorney

22 has been here before and has experience of not only handling a

23 case and examining witnesses but also in preserving your

24 claims for appeal, which from what I've heard here is

25 important to you here.

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  Okay.  Now, one other thing is my

 3     suggestion would be that you get different clothes on.  Are

 4     you interested in that?

 5              THE DEFENDANT:  I tried to get them to bring my

 6     clothes up from jail.  They wouldn't do it.

 7              THE COURT:  Well, let me ask the marshal, where are

 8     we on clothes?

 9              THE DEFENDANT:  Sir, I don't --

10              THE COURT:  Wait just a minute.

11              Are clothes available?

12              THE MARSHAL:  I spoke to St. Clair County this

13     morning.  St. Clair County said they were going to bring them

14     up and they were told no, that he wasn't going to go to trial,

15     he didn't need them.  They told them that so they didn't bring

16     them with him.  I have some -- a shirt downstairs, I have some

17     different things that I can try to put him into, make him look

18     a little bit better.

19              THE DEFENDANT:  I didn't tell them I wasn't going to

20     trial.  I said I'm going up there for a motion hearing to get

21     this trial extended.

22              THE COURT:  I'll --

23              THE DEFENDANT:  And I asked them about the clothing

24     and they said nobody told them to bring any clothes up here

25     with me.
```

1           THE COURT:  Okay.  Well --

2           THE DEFENDANT:  So then downstairs the marshal told

3    me -- or somebody told me downstairs that they're not allowed

4    to bring clothes from the jail.

5           THE COURT:  Okay.

6           THE DEFENDANT:  I don't wear clothes that are not

7    within the laws of God.  I mean, I wear these clothes under

8    duress --

9           THE COURT:  Well, what clothes would you --

10          THE DEFENDANT:  -- because they won't let me out of

11   my cell without my underwear.

12          THE COURT:  Let's get to the nitty-gritty here.

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  We will get you some clothes that would

15   be civilian-type clothes, a shirt and some pants and something

16   different than you've got on.  Will you wear it if they get

17   it?

18          THE DEFENDANT:  Not unless it complies with the laws

19   of God.

20          THE COURT:  Well, what kind of clothes --

21          THE DEFENDANT:  It's got to have fringe down the

22   sides and it's got to have a violet ribbon around the border.

23   It has to have fringe on the border.

24          THE COURT:  Okay.  Is that the only clothing you'll

25   wear?

1        THE DEFENDANT:  That's the only clothing I'll wear

2   other than underclothing.  That's not required to have it on

3   it.  Any surface clothing has to be in compliance with the

4   law.

5        THE COURT:  So unless it's got fringe down the --

6   what, down the whole outer seam, is that what you're --

7        THE DEFENDANT:  Yes.  Fringe on four corners, which

8   would be down the seams of the shirt and then around the

9   borders of the bottom with a violet ribbon around that.

10        THE COURT:  Well, I'm quite certain we don't have

11   that clothing available.  But I just want to be sure, now,

12   because we can get other clothing for you.  Are you telling me

13   that you will refuse to wear any other clothes?

14        THE DEFENDANT:  Yes, sir.  My religion prohibits

15   that.

16        THE COURT:  You'll be in court just like you are,

17   then.

18        THE DEFENDANT:  Yes, sir.

19        THE COURT:  All right.  Okay.

20        Now, we've got some other stuff to cover -- you can

21   go ahead and sit down because I want to get this covered here.

22   So, first of all, in regard to the picking of the jury, I will

23   conduct the questioning of the jury.  I've got the proposals

24   that each counsel has given to me and I'll go through that and

25   I'll give you a chance to tell me if you have any other

24

1 additional questions at one point and we'll deal with that.

2          When we get to the opening instructions, I will give

3 the standard instructions.  Both counsel has provided those to

4 me.  And just to tell you, there will be seven instructions.

5 The 1.01 will be the first instruction; No. 2 will be 1.03;

6 three will be 1.05; four will be 1.06; five will be 1.07; six

7 will be 1.08, and seven will be 1.09.

8          Does the government have any objections to those

9 instructions?

10          MR. KELLEHER:  No, Your Honor.

11          THE COURT:  Do you have any additional instructions

12 you want me to offer?

13          MR. KELLEHER:  No, Your Honor.

14          THE COURT:  And I'll ask defense counsel, do you

15 have any objections to those seven instructions?

16          MR. JOHNSON:  No, sir, Your Honor.

17          THE COURT:  Do you have any additional instructions

18 you want me to offer?

19          MR. JOHNSON:  No, sir, Your Honor.

20          THE DEFENDANT:  Sir, I'd like to consult with my

21 attorney.  I have some proposed jury instructions I'd like him

22 to go over before --

23          THE COURT:  Here's what I'm going to do is we won't

24 give the instructions until after we pick the jury.  You can

25 talk with your attorney, but do you understand that there is a

25

1   book of instructions that we get these from?

2              THE DEFENDANT:  Yes, sir, I do, and I got access to

3   some legal information and had suggestions in there what

4   instructions -- particularly in a firearms case -- that need

5   to be made --

6              THE COURT:  All right.

7              THE DEFENDANT:  -- in order to preserve for appeal

8   issues that have not yet been ruled on by the U.S. Supreme

9   Court but have conflicting rulings in the appellate courts.

10             THE COURT:  Keep in mind, these are opening

11  instructions, not closing instructions.  The closing

12  instructions set forth the elements of the --

13             THE DEFENDANT:  Oh, okay.

14             THE COURT:  -- offense --

15             THE DEFENDANT:  Okay.

16             THE COURT:  -- and I think that might be what you're

17  talking about.

18             THE DEFENDANT:  Yeah, that's the ones I'm talking

19  about.

20             THE COURT:  You talk with your attorney and he'll

21  make a record of -- and present, and I can make rulings on it.

22  But what we're talking about are just the opening instructions

23  about how the trial is going to proceed.  But if you have

24  some -- I'll just ask counsel to present the objections or the

25  additional instructions to me before we get ready to start

                                26

1  this case.

2          MR. JOHNSON:  Yes, Your Honor.

3          THE COURT:  Okay.  Now, opening statements will be

4  limited to 30 minutes.  Does the government want a warning on

5  your opening statement?

6          MR. KELLEHER:  I don't think there's any possibility

7  it will be anywhere near 30 minutes, Your Honor.

8          THE COURT:  So no warning?

9          MR. KELLEHER:  No, sir.

10          THE COURT:  Defense counsel, you want a warning?

11          MR. JOHNSON:  No, sir, Your Honor.

12          THE COURT:  Okay.  All right.  I think we're ready

13  to bring the jury up and pick them.  Is there anything else by

14  the government before we do that?

15          MR. KELLEHER:  I believe the defendant needs to be

16  unshackled before we bring up the jury.

17          THE COURT:  They'll take care of that.

18          MR. KELLEHER:  Not at this point.

19          THE COURT:  Defense counsel, do you have anything

20  else?

21          MR. JOHNSON:  Yes, sir, Your Honor.  I think the

22  Court needs to instruct the defendant when the case ensues the

23  objections will be mine; he's not to pop up and object and --

24  while this is going on.

25          THE COURT:  Mr. Joos, counsel made a good point, and

27

1   that is even though I've kind of -- we've had our
2   give-and-take here as if you're representing yourself, and
3   when we're outside the jury, I'm okay with that, but my advise
4   to you is when we're in trial and the jury's sitting here, you
5   talk with your counsel, let him present the objections or
6   anything you've got.  Okay?
7           THE DEFENDANT:  Yes, sir.
8           THE COURT:  I'm saying this for your own benefit,
9   getting your best foot forward that you can here with regard
10  to this jury pool we're going to have.
11          But in terms of his shackles there, the leg is okay
12  but --
13          THE MARSHAL:  We'll remove it.
14          MR. KELLEHER:  There's one thing that I have
15  neglected to mention.  Mr. Nance, Deputy Nance will be one of
16  the government's witnesses.  He took fingerprints from the
17  defendant.  Obviously, at some point there will be the rule on
18  witnesses.  I just want to make sure that there's no objection
19  by the defense to having him present in court.
20          MR. JOHNSON:  No, sir, no objection, Your Honor.
21          THE COURT:  Okay.  All right.  Anything else?
22          MR. KELLEHER:  No, sir.
23          MR. JOHNSON:  Nothing from the defense, Your Honor.
24          THE COURT:  Let me ask you this.  We're going to be
25  here for about another hour and a half before we take a break.

                                    28

```
 1   Mr. Joos, are you good for an hour and a half?

 2            THE DEFENDANT:  Yes, sir.

 3            THE COURT:  Okay.  Everybody else, be about five

 4   minutes before they get them up here, but if you need to take

 5   care of business, do it.

 6                 (Court stands in recess at 9:35 a.m.)

 7                 (Venire panel enters courtroom at 9:55 a.m.)

 8                 (Call to Order of the Court.)

 9                 (Voir dire.)

10                 (Court stands in recess 12:00-1:30 p.m.)

11            THE COURT:  Please be seated.

12            Are these the carts that you were talking about?

13            MR. KELLEHER:  Yes, Your Honor.

14            THE COURT:  It seems like you have covers there over

15   them and that's good.

16            MR. KELLEHER:  There's covers on the ones with the

17   guns on them and the other ones I've kept the ammunition as

18   concealed as I possibly can.

19            THE COURT:  I think that's fine.  That's a good way

20   to do it.

21            All right.  Are we ready to bring in the jury?

22            MR. KELLEHER:  Yes, Your Honor.

23            THE COURT:  Government counsel ready for the jury?

24            MR. KELLEHER:  Yes, sir.

25            THE COURT:  Defense ready?
```

29

```
 1            MR. JOHNSON:  Yes, sir.

 2            THE COURT:  All right.  Bring them in.

 3            (Jury enters courtroom at 1:32 p.m.)

 4            THE COURT:  Please be seated.  Looks like we got

 5   everybody back from lunch okay.

 6            All right, ladies and gentlemen, now I'm going to

 7   read some instructions to you and after that we'll have the

 8   opening statements by counsel and then we'll start the

 9   evidence of the trial.

10            Now, these instructions that I read to you, I'll

11   have some now, I may or may not have some during the trial,

12   and then I'll have some closing instructions.  And you may

13   hear me say something and think, I better write that down.

14   Don't worry about it, you're going to get the instructions

15   themselves.  So when I'm reading these, you don't need to

16   write it down because you're going to get the instruction

17   itself and you can look at it and review it all you want.

18            So we'll start with Instruction No. 1.

19            (Court reads Instruction Nos. 1-7 to the jury.)

20            THE COURT:  Is the government ready to proceed?

21            MR. KELLEHER:  Yes, Your Honor.

22            THE COURT:  All right.  Go ahead.

23            MR. KELLEHER:  Good afternoon, ladies and gentlemen.

24   As the judge told you earlier, my name is James Kelleher.  I

25   am an Assistant United States Attorney and it's my duty and
```

30

1    responsibility over the course of the next couple of days to
2    present the case against Robert Joos to you all.

3             To that end, in just a few minutes you will hear
4    from Special Agent Tristan Moreland.  Agent Moreland is an ATF
5    agent out of Arizona, and back on January 26th of 2004, he was
6    assigned to investigate the explosion of a package that was
7    detonated in the office of Don Logan who was at the time the
8    director of diversity and dialogue for the city of Scottsdale,
9    Arizona.  Mr. Logan suffered some injures as a result of this
10   blast and two other individuals were also injured.  Now, let
11   me stop right there.  This is not what this case is about.
12   The only reason I bring that up is because it explains how we
13   get to this point.

14            Now, Agent Moreland will explain that within a short
15   time he developed a couple of suspects in this explosion, two
16   individuals by the name of Daniel and Dennis Mahon.  As part
17   of this investigation he pulled the phone records of Dennis
18   Mahon.  They're called toll records.  What it essentially is
19   is a list of all the phone numbers that Dennis Mahon called at
20   or around January 26th of 2004.  And as best as Agent Moreland
21   could decipher these phone numbers, the very first person who
22   was called after this explosive device was placed was the
23   defendant, Robert Joos.  As a result of his information, in
24   early 2005 he was able to get a confidential informant close
25   to the Mahon brothers and that confidential informant gained

1   the trust of the Mahons and after a very short time the Mahons

2   told them about one of their associates who lived in southwest

3   Missouri, Robert Joos.  And over time the confidential

4   informant was able to make contact with Mr. Joos and in 2008

5   this informant traveled up to Missouri and briefly met with

6   Mr. Joos.

7           Once the informant had obtained Mr. Joos's trust,

8   the informant, along with two ATF agents, including Agent

9   Moreland, went up to Mr. Joos's compound here in McDonald

10  County, and you'll hear what took place during that initial

11  meeting.  Essentially, the defendant showed him around his

12  property, the defendant explained some of his views, he

13  explained the importance of having guns and ammunition and

14  having a stockpile of both at various locations within his

15  compound.  And when Agent Moreland was taken inside Mr. Joos's

16  residence there on that property, he was able to observe what

17  he believed were firearms.  Now, they are covered by blankets

18  and stuff but the butt stocks, the end of the guns, were

19  visible underneath the blankets.  And eventually Agent

20  Moreland got in contact with some local ATF agents and it was

21  determined that Mr. Joos had sustained a number -- two prior

22  felony convictions before this time.

23          Now, Agent Moreland came back again in February of

24  2009 and met with Mr. Joos again and during that meeting

25  Mr. Joos was apparently a little bit more comfortable with the

32

1    undercover agents being on his property and the guns were out
2    there in the open.  And, in fact, Agent Moreland will tell you
3    that he asked Mr. Joos about a shotgun, a Mossberg shotgun
4    that was in plain view, and Mr. Joos confirmed yes, it was a
5    Mossberg and, yes, it's mine.
6         Well, based upon all this information, in June of
7    2009 the Bureau of Alcohol, Tobacco, Explosives and Firearms
8    obtained a search warrant -- permission, if you will -- to go
9    onto Mr. Joos's property and take these guns, and on June 25th
10   of 2009 a number of ATF agents, assisted by the Missouri State
11   Highway Patrol, entered Mr. Joos's property.  Mr. Joos was
12   found inside of his residence and a search of that residence
13   uncovered 15 shotguns, rifles and handguns, almost all of
14   which were loaded, in various areas in his residence.  There
15   were a couple by the front door, one by the back door, some
16   more scattered about the main living area, there were some
17   upstairs, and they also found a very large quantity of
18   ammunition there in his residence.
19        The searchers -- and you'll hear from those other
20   individuals as well, but the searchers also in searching
21   another building on this property discovered gun powder, fuse
22   and electric blasting caps.  Now, like firearms, it's illegal
23   for felons to possess explosives and blasting caps are
24   explosives because they are considered both detonators and
25   they also detonate by use of a high explosive.  Consequently,

33

as a felon, Mr. Joos was not allowed to possess them.

You will also hear testimony from expert witnesses attesting to the fact that these blasting caps were explosives in their ability as expert witnesses.  You will also hear from a number of other individuals who will tell you about where the firearms were manufactured, where the blasting caps were manufactured.  That may not seem very important, but under federal law in order for a person to be convicted of this crime, the government must prove that the firearms, the ammunition, and/or the blasting caps all traveled in interstate commerce.  And I expect at the close of trial the judge will instruct you that if a given item, be it a firearm, piece of ammunition or blasting cap, was manufactured somewhere else and came into the state of Missouri, it traveled across an interstate line.

Long and short of it is, you will hear from two experts, one of whom will testify about the origin of the blasting caps and another expert will testify as to the origin of the firearms and the bullets.  For what it's worth, the firearms also, in many cases, have manufacturer's marks showing exactly where they're from.

Finally, you will also hear and see evidence that the defendant was a convicted felon.  He was convicted on two separate occasions, once for being -- for unlawful use of a weapon and he was convicted of the felony of driving while

34

license suspended.  And you will not only see the documents to
support that but you'll also hear from the defendant's
probation officer.  You will hear that the defendant was on
parole, actually, until 2009 and she supervised him after he
was released from prison.  Both of those felonies, unlawful
use of a weapon and driving while license suspended, are
punishable by more than one year in prison.  In fact, the
defendant was sentenced to serve more than one year in prison
as to each of those prior convictions.

      At the end of this trial, after seeing this rather
mountainous pile of evidence, hearing the testimony of the
witnesses, most of which will be undisputed, you will find
conclusively and beyond a reasonable doubt that the defendant
is guilty of possessing firearms and ammunition and explosives
all in the capacity as a convicted felon.

      Thank you.

      THE COURT:  Mr. Johnson.

      MR. JOHNSON:  Thank you, Your Honor.  Your Honor,
we're going to reserve our opening statement to the
presentation of our case.

      THE COURT:  All right.  That's fine.

      Is the government ready to proceed?

      MR. KELLEHER:  Yes, sir.

      THE COURT:  Call your first witness.

      MR. KELLEHER:  The government at this time calls

35

```
1    Tristan Moreland to the stand.

2    TRISTAN MORELAND, GOVERNMENT WITNESS, SWORN:

3                      DIRECT EXAMINATION

4    BY MR. KELLEHER:

5    Q    Sir, would you please introduce yourself to the ladies

6    and gentlemen of the jury?

7    A    Sure.  My name is Tristan Moreland.  I'm a special agent

8    with the Bureau of Alcohol, Tobacco, Firearms and Explosives

9    and I'm currently assigned to Phoenix, Arizona.

10   Q    How long have you been with ATF?

11   A    Just about 21 years, sir.

12   Q    Now, in your capacity as an ATF agent did you have

13   occasion to investigate the explosion of a package bomb back

14   on February 26th of 2004?

15   A    I did.

16   Q    Could you tell the ladies and gentlemen of the jury just

17   briefly what transpired in terms of that incident?

18   A    Sure.  The early afternoon hours in Scottsdale, Arizona,

19   a package was delivered through a city mail process in

20   Scottsdale to a black male who was occupied as a diversity

21   officer for the city of Scottsdale.  The package was addressed

22   to him.  It was opened in his work environment and exploded,

23   injuring him and two of his co-workers.  They were assistants

24   to him.  And as a result of the explosion, myself and some

25   other federal agents and local officers were summoned to the
```

1    scene to investigate the explosion.

2    Q    Now, after a time did you identify two primary suspects

3    in this incident?

4    A    I did.

5    Q    Could you tell us who those folks were?

6    A    Dennis and Daniel Mahon.  They're historically from the

7    Illinois area.

8    Q    Now, in connection with following up on the Mahon

9    brothers, what if anything did you do to pursue that lead?

10   A    Well, of course, many things were done, one of which was

11   we started by beginning to identify any and all associates of

12   theirs, looking at their schedules, time frames, opportunity,

13   the kind of standard motive issues and so forth and many

14   things.  We began by running phone toll records on their cell

15   phones that they were carrying at the time trying to identify

16   time lines as well as establish physical locations sometimes

17   through cell tower records and so forth.

18   Q    Through that investigation did you come across the name

19   of Robert Joos?

20   A    I did.

21   Q    Could you tell the jury how his name emerged in this

22   investigation?

23   A    Early on when we first pulled phone records there was

24   many significant things that came from the records but most of

25   which was the series of calls.  We had determined through the

                                37

investigation at this point that the bomb had been initially
placed or dropped off at a public library five days before the
explosion.  And looking at the morning that that occurred, we
were looking at the Mahons' phone tolls and looking at the
specific phone calls that occurred prior to the bomb being
left at about 10:15 in the library and then after, and it was
Mr. Joos' phone, one of two phones I believe he had, that was
the very first call of that morning from Dennis Mahon to
Mr. Joos.

Q    Now, beginning in early 2005 was a confidential informant
working for ATF able to make contact with the Mahon brothers?

A    Yes.

Q    And through that contact was the CI able to then make
contact with Mr. Joos personally?

A    That's correct.

Q    And could you tell the ladies and gentlemen of the jury a
little bit about how that took place?

A    Sure.  After initially meeting the Mahon brothers in
Oklahoma at the time where they were living, they had learned
of Mr. Joos through -- excuse me, CI had learned about
Mr. Joos through talking to the Mahon brothers and his name
had come up frequently in social and other conversation about
a property that they often went to to shoot and do other
training-type things and visit as well as a long history of
things that they had relationship with Mr. Joos.  And they had

38

1   talked extensively about Mr. Joos being an --

2           MR. JOHNSON:  Your Honor, I'm going to object on the

3   basis of hearsay.  Conversation is coming from another person.

4   Now, if this conversation were from Mr. Joos, I wouldn't have

5   any problem with that.

6           THE COURT:  As I understand it, this is background

7   to get to where the search is based?

8           MR. KELLEHER:  It is, Your Honor.

9           THE COURT:  So on that basis that it's offered.

10          MR. KELLEHER:  It's not offered for the truth of the

11  matter.  It's simply to establish the course and conduct of

12  the ATF.

13          THE COURT:  For that reason, the objection is

14  overruled.

15  A    So through these conversations Mr. Joos had been

16  identified as an associate of theirs and one that was an

17  expert in areas of survivalism and training and weapons and

18  explosives and things like this which was often the subject of

19  conversation between the informant and the Mahons, and the

20  Mahons had said often, you know, "You got to meet this guy.

21  He's great.  We'll take you out there to do some shooting.

22  You can visit him."  Through that initial contact they gave

23  phone numbers and maps to the informant from Mr. Joos and

24  encouraged that phone calls be made back and forth which began

25  occurring shortly after that initial meeting and then off and

                                39

1  on throughout the '05, '06, '07, '08, and '09 years.

2  Q    (By Mr. Kelleher) Eventually did this confidential

3  informant under your supervision ultimately make contact by

4  him or herself with Mr. Joos in McDonald County, Missouri?

5  A    Yes.

6  Q    And after that took place were you able to -- to arrange

7  to meet with Mr. Joos yourself?

8  A    I was.

9  Q    And, again, could you tell the ladies and gentlemen of

10  the jury how that happened?

11  A    In the beginning of 2009, I accompanied the informant

12  with another female undercover special agent for ATF and we

13  visited Mr. Joos personally on his property in Powell, Pine,

14  Missouri, near those towns, and we -- I don't remember the day

15  of the week but we began on one morning and over about a

16  three-day period visited him or hung out with him several

17  hours throughout each day and sometimes into the evening.

18  Q    Was this at his property?

19  A    Yes, other than the trips that we made together leaving

20  the property, we went to eat, we went to stores, post office,

21  you know, routine kind of run-around.

22  Q    I'll show you what's been marked as Government's

23  Exhibit 37.  Could you identify that photograph for us?

24  A    Sure.  It's -- I don't remember the altitude but a few

25  thousand feet above Mr. Joos' property, an aerial view of most

                                    40

1    of his property.

2            MR. KELLEHER:  Your honor, I'd move to admit

3    Government's Exhibit 37 at this time.

4            MR. JOHNSON:  No objection, Your Honor.

5            THE COURT:  Government's Exhibit 37 is admitted.

6    Q    (By Mr. Kelleher) Could you give us an idea of what the

7    landmarks here are?  For instance, could you tell us where

8    you actually entered the property?

9    A    Sure.  This area up here is up where the main gate that

10   we were referred to it as.  There's a long, long driveway that

11   comes from the access road and then you enter through a gate

12   down in this area that's a chain-link gate that just opens and

13   then you come down this road here, you're coming down a fairly

14   steep incline, across this area, which is a valley.  There's a

15   creek running through this area and this valley is mainly

16   salvage-type vehicles, cars.  There's also just general wood

17   and metals and things like that.  The main way to cross over

18   is the small creek there's kind of a concrete bridge, if you

19   will, and then you travel up into this area where his main

20   residence that he sometimes referred to as the office also is,

21   that main structure there.  Then there's several other

22   outbuildings.  There was one other occupant that I saw or knew

23   of living up in this area, mobile homes generally scattered

24   throughout there, a few RVs parked on the property, extended

25   back into this area not much beyond this point, mostly just

                                 41

1   salvage and same down to this way where the line was probably
2   out of view here but there's a fence line down in this area.
3   Q    Now, apart from the individual you noted at the gate
4   area, did you ever note any other inhabitants of this
5   property?
6   A    Yeah, the only other was the gentleman who I barely
7   caught a glimpse of one time but that seemed to be always in
8   the front area by the gate.  There was one mobile home and he
9   was described to me as Jeff and his wife.  And I did see his
10  wife come and go or coming out of the property once as we were
11  driving in but that was it.  There was nobody else I saw down
12  on the property or around the property.
13  Q    Now, did Mr. Joos show you around his property?
14  A    He did.  We toured extensively on more than one occasion
15  but we went I think virtually throughout the whole property by
16  the time the visits had ended.  We went into 10 or 20 caves,
17  numerous -- we didn't enter every RV or building but we
18  certainly were in the area of every building or salvage or
19  whatever.  We actually were working one day hauling some
20  salvage into the property and he basically toured the bluff
21  areas all over the property pretty extensively.
22  Q    You indicated you ran across some caves?
23  A    Yes.
24  Q    Were those notable for any reason or did Mr. Joos
25  indicate that they were notable for anything?

                                    42

1  A    Various things.  In -- consistent with his survivalism

2  and his general philosophy on how things might transpire in

3  the world and at some point, he talked extensively about using

4  the caves as defensive positions if there were ever some kind

5  of an assault on the property.  He talked a lot about the

6  government, you know, moving in on the population some day,

7  and the caves he talked about were going to be mostly

8  positions for persons to take up and defend themselves and to

9  stock with weapons and ammunition and water and food and all

10 the things that one would need in a situation like that if it

11 were to ever transpire.

12 Q    Now, on your tour of these caves did you ever see any

13 indication that he actually had materials stockpiled?

14 A    Yes.  In a couple of the caves there were ammo cans,

15 there were various containers that we did not open so I don't

16 know what was in them.  In one cave he represented that

17 ammunition was in some of the containers.  There were some

18 barrels that maybe stored water or some other things.  Vast

19 majority of the caves were empty.

20 Q    Now, could you give the ladies and gentlemen of the jury

21 an idea of how many caves you saw?

22 A    Yes.  And when I say cave, just to clarify, some of them

23 were caves in the traditional sense where you walk in and they

24 would wind back and forth and there were cave-like formations,

25 stalagmites and things, but the vast majority I would describe

43

1    as more like a bluff or a dug out area that might extend
2    anywhere from 10 to 30 feet back, sometimes 60.  So those
3    were -- when I say caves, I'm including both of those
4    categories.  And we probably either went into or saw 20
5    different caves of that nature.
6    Q    Did you get the impression that there were additional
7    caves that Mr. Joos did not show you?
8    A    Yes, both the impression and he specifically told us
9    there were caves that he wasn't going to show us and that we
10   weren't going to see.
11   Q    Did he indicate why he wasn't going to show you those
12   caves?
13   A    At least in one occasion he did.  He said that it was his
14   cave and this is where his main stockpile of survival, so
15   forth was and it was very secretive and obviously he couldn't
16   tell us because it would jeopardize the security of that
17   location.
18   Q    Now, during your first trip out to visit Mr. Joos, did
19   you engage in conversations with regard to firearms and
20   explosives?
21   A    We did.
22   Q    And could you give the ladies and gentlemen of the grand
23   jury kind of an idea of what you discussed?
24   A    If it's okay I'll maybe collectively just group many,
25   many conversations together.  But we generally just talked

                                    44

1    about anti-government beliefs, sometimes racist beliefs, and
2    we discussed what some people refer to as the movement in
3    general which meaning people that are like-minded and think in
4    terms of anti-government, racism and so forth and how we would
5    collectively defend or, you know, secure the movement's
6    position.  And so in those conversations we talked a lot about
7    things that happen, violence, bombings, the use of firearms,
8    how one would both defend and/or be an aggressor in certain
9    situations.  We talked about the type of weapons, the
10   calibers, what was more effective at doing what type of jobs.
11   We talked about historical incidents and their value in the
12   history of the movement.  A lot of different areas.
13   Q    Now, during these conversations did he make it clear to
14   you that he actually had firearms located there on his
15   property?
16   A    He did.
17   Q    Did he indicate to you why it was important for him to
18   have firearms?
19   A    Generally it clearly was part of his life.  He, again,
20   had many ideas on how the world was going to evolve and one of
21   the things he talked about was the fact that it's all going to
22   come down to whoever has the guns and money, and stocks and
23   all these other things aren't going to have any value and guns
24   are going to control food supplies.  So that was a primary
25   issue to him.  He didn't talk much about hunting even though

1  he mentioned from time to time that people did hunt the
2  property but he didn't himself discuss, you know, the use of
3  them for hunting.  I think it was primarily a tool of his
4  ideology, is how I would describe it.
5  Q    Now, did he also indicate to you that he had some
6  knowledge of the construction and use of explosives?
7  A    He did.
8  Q    Again, without getting into too specific terms, did you
9  have conversations where Mr. Joos admitted to building
10 explosives and actually using them?
11 A    Yes, we had several conversations.  He had a fairly
12 comprehensive and extensive knowledge of explosives, both
13 commercially available and clandestinely manufactured.  He
14 knew chemical recipes, he knew how certain fuels and oxidizers
15 when combined would function as explosives and clearly he
16 displayed what I would categorize as maybe untrained
17 specifically but clearly getting toward the expert area of
18 explosives and general knowledge of explosives.
19 Q    Did he admit to you that he kept on his property
20 materials that could be used to construct explosives?
21 A    He did.  Specifically, he talked about ammonium nitrate
22 which is an oxidizer used to make explosives.  He talked quite
23 a bit about black powder and using that to make pipe bombs.  I
24 remember those two off the top of my head.
25 Q    Okay.  Now, would it be fair to say that there were
                                    46

1  pretty extensive conversations about explosives and their uses

2  and such?

3  A    Yes, there were.

4  Q    Now, did Mr. Joos ever indicate to you whether or not he

5  was legally permitted to possess firearms and explosives?

6  A    He did.  I don't know that we specifically talked about

7  his ability to legally possess explosives as much as we

8  discussed in more detail firearms in general but he talked

9  about how -- the first time I met him he was on parole, I

10 think was the term he used, and that he had a period of time

11 before the parole would expire, and I think the first meeting

12 was, oh, early January, and it seemed to me later that month

13 or at some point he was going to be getting off parole and

14 that he talked about how he had two prior felony convictions

15 and that if he were convicted again he may be a third strike

16 candidate under Missouri law.  Generally those kind of

17 conversations.

18 Q    So he made it clear that he was not allowed to have

19 firearms, correct?

20 A    It was clear to me that he knew, yes.

21 Q    Now, during your first visit to the Joos compound were

22 you able to see for yourself whether he had what you believed

23 to be firearms present in the house?

24 A    I was.  Not a great view, but clearly I saw some

25 firearms, yes.

47

1    Q    Could you describe what you saw?

2    A    Yes.  In two areas of the front room in the office that I

3    showed in the overhead picture there were not bundles but four

4    or five -- two groups of four or five what I call long guns,

5    could be shotguns or rifles, that one could see a sheet or

6    something was draped over them and you could see the barrels

7    kind of under the sheet making the different heights and

8    formations.  They were pretty well covered at the top but near

9    the bottom the sheet was off of the butt stocks so you could

10   see clearly like a couple of butt stocks, one of which I

11   remember being a black plastic and the other one was a wood

12   configuration.  I didn't take the sheets off and examine them

13   any further but clearly you could see those.  Then there was a

14   group that was kind of by a little stair going up to a landing

15   that was a similar situated, four or five guns up against the

16   wall standing up with cloth over them.

17   Q    Now, before we go any further, you referred to this

18   residence as office and I'll show you what's been marked as

19   Government's Exhibit 38.  If you would, could you identify

20   this photograph for us?

21   A    Sure.  That's a picture of the office as one looks at it

22   standing in front of it looking at it.

23        MR. KELLEHER:  I'd move to admit Government's

24   Exhibit 38 at this time.

25        MR. JOHNSON:  No objection, Your Honor.

1          THE COURT:  Government's Exhibit 38 is admitted.

2    Q    (By Mr. Kelleher) Now, could you describe this

3    structure for the ladies and gentlemen of the jury as best

4    you can?

5    A    Sure.  This wood building is access.  There's a door

6    which one can maybe see over the top corner of the Jeep here

7    but that goes into like a shed area that's the length of the

8    building from front to rear, and then there's a small door

9    from within that shed that goes into the house left, and as

10   you get into that door, this front room here is the main

11   living room with the fireplace, and then as you turn right

12   from the front door, you go into the kitchen and back to an

13   office area in the rear, and then as you move left from the

14   kitchen toward this direction, you go into the hallway where

15   you cross straight over to a bathroom.  There was a closed

16   door to the left that I always thought was a bedroom but the

17   door was never opened.  Then the hallway went back to the

18   right from the bathroom down to the rear of the back of the

19   house.  This little area up here there's like a loft where

20   there was a spiral staircase in the back that went up to the

21   loft.  I never went up in the loft.  But from the front living

22   room area the loft stopped at the living room by the fireplace

23   and it was just open so it was a higher ceiling there and

24   there was a window to the front that was covered in a black

25   cloth or it could have been a drape but probably was a blanket

                                    49

1    or something that covered the window.  That's where that
2    little staircase I mentioned where the guns were standing by,
3    you could go up that little stairs to a little probably
4    2-by-12 board that served as kind of a landing to stand on or
5    sit on up in that area.
6    Q    Thank you.  And this meeting took place beginning on or
7    about January 5th of 2009?
8    A    That's right, sir.
9    Q    Did you make a return visit to Mr. Joos's compound?
10   A    I did.
11   Q    And when did that take place?
12   A    It was in February of that same year, about a month,
13   month and a half later.
14   Q    February 9, 2009, seem about right?
15   A    That's right.
16   Q    And what was the purpose of that visit, or what did you
17   tell Mr. Joos the purpose of that visit was?
18   A    We had been discussing with Mr. Joos how we were making
19   several stops around the country between the time we first saw
20   him and the second visit.  I don't know if he was aware but we
21   had notified him at some point that we were up in Illinois
22   visiting the Mahon brothers and that we were going to be
23   heading back to Arizona and we were going to come back through
24   his area to visit him on the way home from Illinois to
25   Arizona.

50

1   Q    Did you, in fact, pay him that visit?

2   A    We did.

3   Q    Could you tell the ladies and gentlemen of the jury what

4   transpired during that visit?

5   A    Basically, we entered the residence.  We picked up lunch

6   on the way to his property, told him we were in the area.  We

7   drove into the property and met him and we probably spent four

8   or five hours that day in the afternoon mainly just talking,

9   he had cut out some articles of local sales of guns from the

10  newspapers that we looked at and we discussed some of the

11  property management issues he was dealing with on some

12  collateral business he had going.  We watched a war movie for

13  the better part of two hours, maybe a little longer.

14  Q    Did he explain to you why he wanted you to see this

15  movie?

16  A    Yeah, he talked a lot about the movie.  It always slips

17  my mind but it's Mel Gibson and it's a -- somewhat of a

18  documentary-type film about a battle in the Vietnam era, and

19  he discussed how the movie was so close to reality on how one

20  could defend an attack by the U.S. government.  And we would

21  watch the movie and he would point out, you know, "See how

22  they're doing this tactic and that tactic, that's what would

23  have to be deployed."  It was sort of a training session, if

24  you will, on his views of, you know, how things might

25  transpire.

51

1   Q    Before I forget, how did you portray yourself to Mr. Joos

2   to get his trust that he was showing you and telling you these

3   things?

4   A    Well, myself personally to him, he was aware through me

5   or the informant that I was basically a clandestine gun

6   seller, that I was involved in some other businesses,

7   handyman-type work and property rehabbing.  He became aware

8   that I was involved in violence on behalf of the movement.  So

9   generally speaking, I'd say that's what he knew about me.

10  Q    Now, during the second visit did you have occasion to

11  discuss firearms yet again?

12  A    We did.

13  Q    Was it the same type of discussions you had earlier?

14  A    Yeah, same general type.  I mentioned the newspaper

15  articles.  He had cut out several ads where people were

16  selling guns because I had always talked to him about buying

17  and selling, you know, good deals, and he mentioned the same

18  thing, that if the prices were right of this gun, he'd pick

19  that up, or buy this ammunition or whatever.  And we also --

20  on that occasion as I came in the house there was a shotgun by

21  the front door that was in plain view this time.  I say plain

22  view, maybe that's a law enforcement term, but it was just out

23  in the open, nothing hiding it, standing right behind the door

24  against the wall, and we briefly just talked about it being a

25  Mossberg shotgun and, you know, that was generally about it

1    other than references during the movie about guns and ammo and
2    explosives and so forth.
3    Q    I'll show you what's been marked as Government's
4    Exhibit 1.  I know that you can't tell for certain, but does
5    this appear to be the make and model of gun that you saw at
6    his house?
7    A    It does.  I actually at one point had noted part of the
8    serial number best I could, but it looks identical to the gun
9    I saw that day.
10   Q    Where did you see this gun?
11   A    Behind the -- I'll describe it as the front door of the
12   residence or office but it's actually the second door.  I
13   mentioned one going into the shed and then the second door
14   going into the house, and as you entered that door, it was
15   behind that door standing against the wall.
16   Q    And, again, I apologize if I missed what you had to say
17   about it, but did you make a remark about the gun?
18   A    I did.  I had looked at it and I walked about 5 feet into
19   the kitchen and I said something like, "Is that your
20   Mossberg?" or, "Is that a Mossberg?" and he said, "Yeah,
21   that's a Mossberg," and 12-gauge I think was the only other
22   thing we might have mentioned.
23   Q    Did he essentially admit that it was his?
24   A    Oh, yeah.
25   Q    After concluding the February 9th trip, did you ever see

                                53

1  Mr. Joos again?

2  A    No.  I talked to him on the phone on a few occasions and

3  I don't think I've seen him -- I don't recall seeing him until

4  today.

5  Q    And do you see Mr. Joos in the courtroom today?

6  A    I do.

7  Q    Could you point him out, describe what he's wearing?

8  A    Sure.  He's the gentleman seated third at defense counsel

9  table with the long beard and hair and the orange top, white

10  sleeves.

11        MR. KELLEHER:  I don't believe I have any further

12  questions, Your Honor.

13        THE COURT:  All right.

14        Cross-exam.

15        MR. JOHNSON:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. JOHNSON:

18  Q    Is it Agent Moreland?

19  A    Moreland, yes, sir.

20  Q    Agent Moreland, you said the first time you went out

21  there was January of '09?

22  A    That's correct.

23  Q    And when you went out to the property you were referring

24  to his residence, his office or where he stays?

25  A    Yeah, the property in general and then, of course, yes,

                              54

1    the office residence, yes.

2    Q    And, sir, during your investigation did you find out who

3    is the owner of that property?

4    A    I did not.  I've heard who it is but I did not verify.

5    He represented himself and/or the church to own it to me.

6    Q    Okay.  Would you be surprised to know that his father,

7    Robert Neil Joos, and his mother, Joanna Joos, and his

8    brother, Devon Joos, are the owners of that property?

9    A    I wouldn't be surprised by that, no, sir.

10   Q    Did you bother to get a copy of the deed?

11   A    I did not but I know other agents did.

12   Q    Okay.

13   A    And they've reported that to me.

14   Q    When you testified about the church owning it, what are

15   you referring to, sir?

16   A    Well, he represented to me that the whole property was

17   owned by the church and that the elders, is what he referred

18   to, of the church were the owners or the deedholders or

19   whatever, but there was -- the elders were never identified by

20   name, just the term elders.  And he showed me the -- a bluff

21   that was going to be in the future, I think, the area where

22   church service would be held or something like that.

23   Q    Surely, sir, in your investigation you would have checked

24   the recorded deeds to find out that a church does lease the

25   property from Bob's parents, not Bob?  Did you check on that?

```
1    A    I did not, sir.  It wasn't --

2    Q    And the -- the residence or the office in I believe it

3    was Exhibit 38, the diagram, was that referred to as the

4    church office?

5    A    I don't know the diagram you're speaking of.  I drew a

6    diagram at one point.

7              MR. JOHNSON:  Your Honor, may I approach?

8              THE COURT:  Uh-huh.

9    A    Oh, the picture.

10   Q    (By Mr. Johnson) Yes, this diagram here.  I think it's

11   Government's 38 that's been admitted into evidence.

12   A    Okay, sir.

13   Q    Did he refer to this as the church office?

14   A    Mostly he just said it was the office, but he may have

15   said the church office together from time to time.

16   Q    And is that where you found or said that you saw the

17   Mossberg shotgun?

18   A    That's correct, sir.

19   Q    And in this I was unclear about your testimony, there is

20   an upstairs portion in this building, correct?

21   A    Yes, and I'll clarify that again.  There was a spiral

22   staircase that went up in the back to what appeared to be a

23   loft overhead.  I never went up there.

24   Q    You never went up there?

25   A    No.  In the front there was a landing that one could
```

56

```
 1   climb up a little staircase and stand on and look out the
 2   window.
 3   Q    So the January visit when you went out here, I believe
 4   you testified that you saw butts of weapons various places
 5   with blankets or sheets over them?
 6   A    Correct.
 7   Q    And you portrayed yourself as a buyer of guns or gun
 8   dealer?
 9   A    Yeah, I -- yeah, throughout the relationship, yes, he
10   knew I was buying and selling guns.
11   Q    Okay.  And you went by the name of Jimmy?
12   A    Yes.
13   Q    And isn't it true when you were out there for the January
14   visit you never saw Robert Joos fire any weapons?
15   A    That's correct.
16   Q    Never saw him hold any weapons?
17   A    I did not.
18   Q    And as a matter of fact, only weapons that you saw were
19   butts of weapons?
20   A    That's correct.  Well, other than, if you will, the
21   barrels, but there was something covering them but clearly you
22   could see from the butt it was consistent that the barrel ran
23   up the blanket from the area of the butt.
24   Q    But you never saw them other than --
25   A    Other than how I just described, yeah.
```

57

1   Q      You said he had 10 to 12 caves on the property and he

2   showed you several?

3   A      Yeah, there were at least 20 we saw but --

4   Q      And you never found any weapons in any of these caves?

5   A      Just the ammo cans that he said ammunition was in.

6   Q      But those -- and I believe you testified you didn't open

7   those cans so you're not sure what was in them?

8   A      No, but there were brass casings laying on the ground

9   where weapons had been fired at some point in history from

10  that area.

11  Q      And he didn't show you any automatic weapons?

12  A      No, sir.

13  Q      Didn't show you any bombs, clay bird bombs or anything?

14  A      Not specifically, no.

15  Q      Okay.  And so there again in these caves that you toured,

16  other than seeing boxes that were what you call ammo boxes,

17  you never looked inside to see what was inside of them?

18  A      The ammo boxes in the caves, I did not look in them, no.

19  Q      And I believe that the military movie that he sat down

20  and made you watch, was that We Were Soldiers by Mel Gibson?

21  A      I believe that is the name, yes.  Mel Gibson was the

22  primary actor.  I believe that's the name, sir, yes.

23  Q      And Bob is big into the military from your conversations

24  with him, did you gather that?

25  A      Yes.

1   Q    Were you aware of his military experience?

2   A    I know that he attended one of the academies for a period

3   of time.  I don't know how much outside of that.

4   Q    Did he tell you he attended the United States Air Force

5   Academy?

6   A    I can't remember if he told me that or if I knew that

7   from my own research but I won't deny that we discussed that

8   at one point or another.

9   Q    And I believe that you said the next visit was sometime

10  in February '09, correct?

11  A    Correct, sir.

12  Q    And in that visit there again you didn't pick up any

13  weapons yourself, physically pick them up, did you?

14  A    I handled that Mossberg shotgun.

15  Q    You handled that one?

16  A    Yeah.

17  Q    How about any other weapons?

18  A    No, I don't recall touching -- you're talking his guns?

19  Q    I'm talking about the guns on that property that you were

20  at.

21  A    Well, I had guns, but you're talking things that were not

22  brought by me?

23  Q    Correct.

24  A    Yes, I don't remember handling any other gun other than

25  the Mossberg.

1    Q    Sir, when you came out there and you introduced yourself
2    as one who's interested in guns, did you find it strange that
3    Bob never showed you any weapons to purchase?
4    A    No, not at all.
5    Q    Did you ask him to show you any?
6    A    No.  We discussed the newspaper articles and we discussed
7    possibly buying them out in the public but -- we actually at
8    one point discussed how he was expecting a shipment of
9    Mosin-Nagants in at $100 apiece and I asked him if those came
10   in maybe I could get a couple of those too.  That deal
11   apparently fell through, according to him.  But we weren't in
12   a relationship where I was buying or selling necessarily to
13   him other than as a favor or a friend.  We weren't in a
14   business relationship at all, in my opinion.
15   Q    Other than the Mossberg shotgun that's already been
16   offered into evidence, what other guns or bombs or explosive
17   devices did Bob show you?
18   A    Well, I'm not sure if I understand your question, but the
19   many long guns that I described earlier were still in the
20   apartment that second time but he didn't take me around and
21   say, Here's my this, Here's my that.  We just didn't do that.
22   Q    I'm confused.  When you say apartment, sir, what building
23   are you referring to?
24   A    I'm referring to this residence, I'm sorry, the office
25   that he had the bed in and the fireplace and kitchen.

60

```
 1    Q    And throughout your investigation -- I think it's been a
 2    number of years -- did you ever determine that in fact is a
 3    residence?
 4    A    I believe it is, yes.
 5    Q    Okay.  How so, sir?
 6    A    Well, he had a bed laying on the floor when we first came
 7    there, a single mattress that somebody was sleeping in in
 8    front of the fire.  He ate there.  He cooked there.  He
 9    watched TV there.
10    Q    Did you spend the night at all with him?
11    A    No.  We were there into the evening hours but we didn't
12    stay overnight ever.
13    Q    Okay.  And, sir, the Mahon brothers, have they
14    subsequently been convicted for that explosion, the bombing?
15    A    No, they're awaiting trial, sir.
16    Q    And as part of your job investigating with the Alcohol,
17    Tobacco, and Firearms any phone number that was on the Mahons'
18    list, I believe you said, you did investigate where that phone
19    number came from?
20    A    We --
21    Q    Or who was the owner?
22    A    It's in the thousands, but we have done virtually all
23    that's reasonable to do to identify.  Some were calling cards,
24    pay phones that came -- there were things that just were dead
25    ends but we did our best to identify all of the people that
```
                                      61

1   they communicated with -- or the numbers.

2   Q    And you testified that that morning the first phone call

3   that Dennis Mahon made was to a phone number registered to

4   Robert Joos?

5   A    Let me clarify that.  I don't know if it was registered

6   to him because the subscriber to the phones, one was to a

7   church, or the church, and another phone that we associated

8   with him I think was subscribed to by Jeff, the other guy

9   living on the property, but it was a phone that we talked to

10  him on regularly and that he answered, both of those lines at

11  one time or another throughout the case.

12  Q    And just to clarify for the jury and everything, Robert

13  Joos has been -- has not been indicted or any way connected to

14  that bombing in Scottsdale, Arizona; is that correct?

15  A    Not to the bombing itself.

16  Q    Okay.  And those are the only two trips you made out

17  there?

18  A    Correct.  Well, no, that's not quite correct.  Me

19  personally meeting him, January of '09 and February of '09.

20  Q    Yes, sir.

21  A    I was there on more than one occasion, one being when the

22  informant visited him I was, if you will, directing that

23  operation of her visit so I was present physically but did not

24  meet him.  And I think I may have been there one other time

25  independent of all this doing research but I can't recall at

                                    62

1  this point, so many places over the last five years.

2  Q    Okay.  Thank you.

3           MR. JOHNSON:  Your Honor, I have no further

4  questions.

5           THE COURT:  All right.  Any redirect?

6           MR. KELLEHER:  Just briefly, Your Honor.

7                    REDIRECT EXAMINATION

8  BY MR. KELLEHER:

9  Q    When you're operating in general in an undercover

10 capacity, could you tell the ladies and gentlemen of the jury

11 about the advisability to go opening cans and poking around

12 people's houses?

13 A    You don't do that.

14 Q    Why not?

15 A    You get hurt.

16 Q    Is that the reason why you didn't start lifting up

17 blankets and going into ammunition cans in Joos' property?

18 A    Yes.  It's disrespectful and it's a way to get yourself

19 killed.

20 Q    With regard to the other line of questioning, is there

21 also a similar reason why you don't ask these individuals

22 directly to show you their guns and bombs and explosives they

23 might have lying around?

24 A    Yeah.  These people -- when I say these people, I mean

25 people that are involved in the movement, anti-government

63

1   types, they're actually fairly sophisticated with respect to
2   law enforcement techniques and you have to be very careful
3   about how you interact with them and associate with them.
4   They know how we do business and they know that we can be
5   sometimes the guy with a little too much money or sometimes
6   the guy that's got too many answers and sometimes the guy
7   who's just a little too curious about the stuff that they
8   possess that might get them in trouble specifically.  So you
9   have to walk very carefully in the early stages of these
10  relationships so not to jeopardize your investigation by
11  revealing your law enforcement connections and also just
12  safety.  You just don't go down certain roads, especially
13  early on when getting to know somebody.
14  Q    Now, Mr. Johnson characterized this as some sort of
15  church.  There are lots of structures on this property.  Is
16  there anything that would even remotely function as a church
17  in the traditional sense?
18  A    Not in a traditional sense.  I've been in this line of
19  work a long time and I've actually seen mobile homes, you
20  know, used as a temporary church when there's been a fire or
21  something, but there was nothing on that property that
22  resembled a church or any type of practicing religion or any
23  type of events at all that appeared to be a congregation or
24  anything in the traditional sense that I know of.
25  Q    With regard specifically to this residence/office, now,

64

1  you've described to the jury that there was a kitchen, there

2  was a mattress on the floor in front of the fireplace,

3  television.  Were there prayer books, bibles, anything of that

4  nature in this particular structure?

5  A    I don't specifically recall seeing anybody -- or any

6  religious books.  There may have been a bible somewhere in and

7  around the area because there were hundreds of books,

8  bookshelves, books everywhere on the walls and most of them

9  did not appear -- I didn't see any even grouping of books that

10  appeared to be like religious in nature.  It was just about

11  every topic.  Some of them were fiction, non-fiction,

12  educational manuals, just everything in the world was in that

13  room so -- but nothing that I saw that was out of the ordinary

14  as more than anybody might have in their home, a bible or

15  something like that.

16  Q    Were there pews or any other seating areas that looked

17  like it was dedicated to church services?

18  A    Nothing.  It was real cluttered.  Hardly any room to have

19  any kind of service or anything.

20  Q    Were you there when -- during either a Saturday or a

21  Sunday where people might have shown up for religious

22  services?

23  A    I think we were there over one of the weekends in the

24  first visit in the three- or four-day period and there was

25  never any talk of it even.  It was -- the only time he ever

                                    65

mentioned was where I showed you the bluff -- or I discussed
the bluff, I should say.  He talked about that some day being
where they would hold church service but there was never any
sign of it or no mention that, Oh, Sunday I can't -- don't
come Sunday because we're going to have a service or
something.  That's the best I can tell you.

Q    Now, over the course of the days that you were on this
property, you indicated that you only saw one other person
other than Mr. Joos; is that correct?

A    That's correct.  Other than the man and his wife that --
well, I should say there was Jeff's wife I saw and Jeff I
think I saw up by his trailer at the entrance area.  Then when
we went out to pick up the frame of a mobile home that he was
buying for salvage, I believe, or it was being donated to him,
there was a man and wife that helped us tow that mobile home
frame onto the property.  So they were there for an hour or
two and then left.

Q    Apart from those individuals, was there anyone else who
ever came onto the property to your knowledge?

A    No.  Maybe one guy at the gate the day we were leaving
was selling him salvage but I think he just met him at the
gate and that was it.

Q    Now, were you present when Mr. Joos would hear the sound
of automobiles?

A    Yes.

1  Q    In the valley?

2  A    Yes.

3  Q    Could you describe to the ladies and gentlemen of the

4  jury how he would respond to the sound of just ordinary motor

5  vehicle traffic?

6  A    When we would be out on the property and sometimes we

7  would be out walking several hundred yards from the vehicles

8  or up toward the caves or the bluffs, but whenever there would

9  be an engine sound on the ground, not in the air, we would --

10 he would stop, and then of course we would stop, and he would

11 listen and then go through this process of identifying what

12 that vehicle was, where it was coming from.  Usually he would

13 refer to it as probably Jeff's tow truck but occasionally he

14 would say that's coming from this area over there and that's

15 probably so and so or -- but very conscious of those type of

16 sounds.

17 Q    With regard to the gate area as well as his

18 office/residence, considering the remoteness of this area did

19 he take any security steps that struck you or you noted while

20 you were there?

21 A    Yeah.  One of the things that I thought was unusual was

22 that he always locked that chainlink or barb wire-type gate,

23 metal gate.  Sometimes when we were just dropping him off we

24 would go through the gate, he would get out, he would lock

25 that gate just so we could take him down to the house and then

                              67

1 leave and then he would follow us back up to lock the gate
2 behind us. And it was -- for that area when -- I didn't grow
3 up on a property like that, but I can't imagine that -- the
4 driveway alone was like a mile and you could hear a vehicle
5 coming forever. It just seemed odd that that gate always had
6 to get locked day or night.
7 Q    So this wasn't the kind of church that you could just
8 walk in and out of? The gate itself just to the property was
9 locked?
10 A    Right. Yeah, you could walk, of course, through the
11 woods, I guess, but you'd be walking quite a ways to get down
12 into that valley from where I could tell. Yeah, it was -- as
13 a matter of fact, it was like -- it was uninviting, if you
14 will. It was -- going down in there was -- there was no like
15 welcome signs or anything like that. You clearly knew you
16 were going onto somebody's property and there wasn't any sign
17 that it was a public welcome type environment.
18 Q    With regard to his house and residence way on the other
19 side of the valley, how did he treat that in terms of
20 security?
21 A    Same kind of thing. We would leave just to go out on the
22 property maybe for an hour and he would padlock the door going
23 into the shed. I know he locked the inside door but I don't
24 remember if that had a deadbolt or whatever but we always kind
25 of had to do two locks to get in and out of the place. Seemed

68

odd.  We were going a couple hundred yards across the property

for 30 minutes and we were locking everything down, but that's

what he did.

Q    When you say padlock, we're talking about a --

A    He had like a Master lock or a keyed padlock type thing

that was on the -- I think they're called a hasp on the

outside door.  I don't remember what the inside door was

secured with.

Q    And as far as you know, was Mr. Joos the only one with

that key?

A    Yeah, that's the only person I ever saw open the gates,

the doors at all.

            MR. KELLEHER:  Thank you.

            MR. JOHNSON:  Real briefly, Your Honor.

            THE COURT:  Okay.

                    RECROSS-EXAMINATION

BY MR. JOHNSON:

Q    You didn't know if Jeff or his wife at the front gate had

keys, did you?  I believe your testimony was you may have seen

Jeff, you're not sure, but you did see his wife and you saw

another fella there?

A    Yeah.  I'm trying to -- I never saw either one of them

because their residence was, if you will, outside of the gate

that went down to his property and I never saw either one of

them go past that gate.  I guess in trying to answer your

                            69

1   question, I was trying to recall whether Mr. Joos told me if

2   they had keys to any of these properties.  The reason I'll say

3   no is because he had to meet us.  When we told him we were

4   coming each time, he would have to go to the gate and meet us

5   to unlock it.

6   Q    So to answer my question, sir, you really don't know if

7   anyone else had keys also?

8   A    No, I don't.  I'm surmising based on what I saw.

9   Q    Also about the building in Exhibit 38, isn't it true that

10  Bob, he described that as a church office, not where one would

11  go and worship?

12  A    He just said it was the office and maybe the church

13  office.

14  Q    And I think Mr. Kelleher asked you about you didn't go

15  around pulling up the sheets, looking around because that

16  would be rude and, plus, you've dealt with these type of

17  people for years, correct?

18  A    Yes, sir.

19  Q    Isn't it true that you were invited out there both times?

20  A    Yes, that's fair.

21  Q    And Bob didn't search you down to see if you had any

22  recording devices or weapons or anything on you, did he?

23  A    Not physically, no.  He clearly examined visually to the

24  extent he was capable.

25  Q    So he looked at you but he didn't search you or ask you

```
 1   to pull up your shirt or anything?
 2   A     No.
 3              MR. JOHNSON:  No further questions.  Thank you,
 4   Judge.
 5              THE COURT:  All right.  May this witness be excused?
 6              MR. KELLEHER:  Yes, Your Honor.
 7              THE COURT:  Mr. Johnson, may this witness be
 8   excused?
 9              MR. JOHNSON:  Yes, sir, Your Honor.
10              THE COURT:  You're excused.
11              MR. JOHNSON:  Your Honor, I didn't do it beforehand
12   but I thought we talked about it.  I do want to invoke the
13   rule against witnesses in this case.  Mr. Kelleher brought
14   that up.  The only exception would be Mr. Nance.
15              THE COURT:  All right.  And the case agent here, I
16   guess.
17              MR. JOHNSON:  Yes, sir.
18              THE COURT:  You understand that?
19              MR. KELLEHER:  Of course, Your Honor, yes.
20              THE COURT:  Okay.
21              MR. KELLEHER:  At this time --
22              THE COURT:  You know what, how long is this witness
23   going to be?
24              MR. KELLEHER:  It might not be a bad time for a
25   break, if that's what the Court is asking.
```

```
 1              THE COURT:  I was going to take it either now or
 2    three, and this helps my decision-making here.  We'll take
 3    about a 15-minute recess.  Be ready to come back in the
 4    courtroom at 3:00, then we'll go till five.
 5              (Court reads recess instruction to the jury.)
 6              THE COURT:  We'll be in about a 15-minute recess.
 7              (Jury exits courtroom at 2:45 p.m.)
 8              THE COURT:  Please be seated.  Ready?
 9              MR. KELLEHER:  Yes, sir.
10              THE COURT:  All right.  Let's get the jury.
11              (Jury enters courtroom at 3:08 p.m.)
12              THE COURT:  Please be seated.
13              Call your next witness.
14              MR. KELLEHER:  The government at this time calls
15    James Patterson to the witness stand.
16    JAMES PATTERSON, GOVERNMENT WITNESS, SWORN:
17                        DIRECT EXAMINATION
18    BY MR. KELLEHER:
19    Q    Sir, could you please introduce yourself to the ladies
20    and gentlemen of the jury?
21    A    James Patterson.
22    Q    Where are you presently employed?
23    A    Bureau of Alcohol, Tobacco, and Firearms.
24    Q    And how long have you worked for ATF?
25    A    Since August of 2001.
```

72

1    Q    Prior to coming on board ATF, did you have any prior law

2    enforcement experience?

3    A    Yes, sir.  I spent ten years as a police officer with the

4    Kansas City, Missouri, police department.

5    Q    I want to direct your attention to the latter part of

6    2008 and the first half of 2009.  During that time period did

7    you take part in an investigation of one Robert Joos?

8    A    Yes, sir, I did.

9    Q    Now, we've heard a bit of background information from

10   Special Agent Tristan Moreland.  During the relevant time

11   period were you briefed on this investigation and his

12   progress?

13   A    Yes, sir.

14   Q    Now, back in June of 2009, specifically on June 25th of

15   2009, did you participate in the execution of a search warrant

16   in McDonald County, Missouri?

17   A    Yes, I did.

18   Q    And were you told who occupied the property upon which

19   you executed that search warrant?

20   A    Yes.  It would be Robert Joos.

21   Q    And you would have been aware of the fact that prior to

22   the execution of the search warrant that Robert Joos was

23   alleged to have had some firearms and was in fact a convicted

24   felon, correct?

25   A    Yes, sir.

73

1   Q    Among other things, correct?

2   A    Yes, sir.

3   Q    Now, with regard to the execution of the search warrant,

4   could you tell the ladies and gentlemen of the jury exactly

5   how it transpired that you came onto the property -- the team

6   came onto the property of Mr. Joos?

7   A    Members of the Missouri State Highway Patrol SWAT team

8   and members of ATF SWAT team did a dynamic entry of the

9   residence in which they also cleared all the open fields and

10  exterior structures and Mr. Joos was detained by ATF agents

11  just inside the front door of his residence.

12  Q    Now, we're talking about a residence.  I'll show you

13  what's been marked as Government's Exhibit 38.  Is that what

14  you're talking about?

15  A    Yes, sir.

16  Q    He was located inside this residence?

17  A    Yes, sir.

18  Q    Once he was taken into custody, were there any other

19  occupants of the property at that time?

20  A    No, sir.

21  Q    Now, let me ask you this.  What time of day was the

22  search warrant executed?

23  A    In the very early morning hours.  The initiation of the

24  search warrant from SRT standpoint was during the hours of

25  darkness, just, as they would call it, first light.

74

1  Q    So it would be fair to say Mr. Joos was apprehended at

2  first light in this particular structure, correct?

3  A    Yes, sir.

4  Q    Once this compound was secured, what was your role?

5  A    One of my duties as an agent here in the Springfield

6  office is I'm an evidence custodian, so my job was for the

7  structure that you showed me to be the evidence officer and my

8  job was to package -- collect and package evidence listed on

9  the search warrant found inside that residence.

10 Q    Now, again, among other things, firearms and materials

11 associated with explosives and explosive devices were the

12 primary things you are searching for; is that correct?

13 A    Yes, sir.

14 Q    As well as ammunition?

15 A    Yes, sir.

16 Q    Now, in conducting the search, again, of the residence

17 that I've previously shown you as Government's Exhibit 38, did

18 you in fact discover some items of evidence?

19 A    Yes, we did.

20 Q    With regard to firearms, I direct your attention to this

21 cart that has a variety of firearms placed upon it.  Are you

22 familiar with the firearms that are on this cart?

23 A    Yes, sir.

24 Q    What firearms are those?

25 A    Those are the firearms that we recovered from Mr. Joos's

75

```
 1   residence on the date of the search warrant.

 2   Q    All of these firearms were located from this residence?

 3   A    Yes, sir.

 4   Q    And was that the same residence that Mr. Joos was located

 5   present in during the early morning hours during the execution

 6   of that search warrant?

 7   A    Yes, sir.

 8            MR. KELLEHER:  With the Court's permission I would

 9   ask Special Agent Patterson to step down from the witness

10   stand and identify each of these pieces of evidence rather

11   than me walking back and forth.

12            THE COURT:  That's fine.

13   Q    (By Mr. Kelleher) If you would, Special Agent, as you

14   identify the items, could you also note where in the

15   residence you obtained the firearms from?

16   A    Sure.  This was the first item that we took.  It's a

17   Mossberg shotgun.  It was located right by the front door of

18   the residence.

19            THE COURT:  Can we have an exhibit number referred

20   to because that'll keep our record clear.

21            THE WITNESS:  This is my No. 1 exhibit.

22            MR. KELLEHER:  There's an exhibit number on the back

23   side that has government's exhibit on it.

24            THE WITNESS:  It's Government's Exhibit No. 1.

25            THE COURT:  No. 1?  Okay.
```

76

1    Q    (By Mr. Kelleher) Now, was that particular item loaded?

2    A    Yes, it was.

3    Q    Did you take into custody the rounds that were --

4    A    Yeah.  Item No. 2 would be the four live shotgun shells

5    recovered from it.  Also setting right next to the shotgun on

6    the inside of the door on the interior residence was this

7    8-millimeter rifle.  That's No. 3.

8    Q    The ammunition taken from the shotgun was Government's

9    Exhibit 2.  Was this particular weapon loaded?

10   A    Yeah, it had four live rounds, and that's No. 4.

11         Then at the back door of the residence is where I

12   located this Westernfield shotgun, and it's Exhibit No. 5, and

13   it also was loaded with Exhibit No. 6, the five live shotgun

14   shells.

15         Then from there there were firearms located on the

16   first floor as well as the second floor, so I'm going to refer

17   to it as the front room.  That's the best way I can say where

18   the rest of these long guns were located.

19         This is No. 7 and this was a Harrington-Richardson

20   20-gauge.

21   Q    Again, do you recall if that particular weapon was

22   loaded?

23   A    Yes, that one was loaded with No. 8.  I don't think

24   you've got this one marked.

25   Q    That's marked as Government's Exhibit 8.

1    A    Okay.  And then this was a Winchester shotgun, No. 9, and
2    that would have been from the first floor front room area.  It
3    too was loaded.  Correction.  It should have been loaded.  No,
4    that one wasn't loaded then.
5            No. 10, it's a .22.  It also was recovered from the
6    front room.
7    Q    Was that weapon loaded?
8    A    I believe so.  Yeah, 16 live .22 caliber grounds.
9    Q    Does Government's Exhibit 14 contain those rounds?
10   A    Yes, sir.  This is another .22 caliber.  It's a
11   Remington.
12   Q    Is that Government's Exhibit 12?
13   A    Yes.
14   Q    Was that also loaded?
15   A    Yeah, I believe so.
16           I think we got this backwards, sir.  No. 12 would
17   have come from No. 11.  No. 14 -- they're both .22s -- would
18   have come from No. 13, that rifle.
19   Q    Just so the jury knows, would it be fair to say that
20   these have been numbered sequentially; that is, when a weapon
21   is loaded, Government's Exhibit 1, for instance, was loaded
22   with Government's Exhibit 2, and so on and so forth?
23   A    Correct.  Correct.
24           This was the last loaded long gun, Norinco 7.62.  It
25   was also recovered from the front room.  It's No. 14.  And

78

1    then No. 15 is the one live round that was in it.  And then

2    these last two firearms were recovered from the front room.

3    They were not loaded.  And Government's Exhibit No. 16 is -- I

4    can't pronounce it -- Mosin -- I can't say it.

5    Q    Is that a Mosin-Nagant?

6    A    Yes.  It's a 7.62 rifle.  And then Government's Exhibit

7    No. 17, which is a Harrington and Richardson single shot

8    12-gauge.

9    Q    Did you also locate a number of handguns?

10   A    Yes.  This Stallard 9-millimeter was also recovered from

11   the front room.  It's Government's Exhibit 26.

12   Q    Was it loaded?

13   A    Yes, with Government's Exhibit No. 27.

14        Government's Exhibit No. 24 was also on the first

15   floor, front room.  It's a Tanfoglio .380.  It also was loaded

16   with Government's Exhibit No. 25.  This was found in the ammo

17   canister in the floor of the kitchen.  It's an AMT backup

18   .380.  It also was loaded with firearms, Government's Exhibit

19   No. 22, and ammunition is Government's Exhibit No. 23.  And

20   the last two firearms were located on the second floor, front

21   room of the residence.  And Government's Exhibit No. 20 is a

22   Ruger .22 and Government's Exhibit No. 21 is the ammunition

23   that was taken from it.  And Government's Exhibit No. 18 is a

24   Astra 9-millimeter and it was also loaded with Government's

25   Exhibit 19.  Eighteen is the gun, 19 is the ammo.

79

1  Q    Now, before you go back on the witness stand, were you
2  also able to locate extra rounds of ammunition?
3  A    Yes, I was, throughout the residence.
4  Q    And I direct your attention to Government's Exhibit 52
5  which will be two carts over here.  Could you explain to the
6  ladies and gentlemen of the jury what is on those two carts?
7  A    In excess of 19,000 rounds of various caliber ammunition
8  recovered from the interior of the residence.
9  Q    You can step back on the stand.  Thank you.
10        Now, you indicated that there were 19 -- over 19,000
11  rounds of ammunition?
12  A    Yes, sir.
13  Q    That was all located in that residence?
14  A    Yes, sir.
15  Q    Okay.  And are you talking about a fairly large
16  residence?
17  A    No, it's small.  I can only guesstimate square footage.
18  I didn't measure the house.
19  Q    The rounds of ammunition that you recovered, were they
20  rounds of ammunition just specifically for these guns that you
21  recovered?
22  A    There were various calibers: 8-millimeter, 9-millimeter,
23  .380, .30-'06, 7.62 rounds, 12-gauge shotgun rounds.  There
24  were handgun rounds, .45, without going through each one
25  specifically, I couldn't tell you the exact breakdown in

1    numbers without looking at the back.

2    Q    And how do you know that there are 19,000 rounds of

3    ammunition on these two carts?

4    A    Per ATF and DOJ policy, when we recover them we have to

5    separate the ammunition into caliber and we have to count

6    every round as part of our policy for putting it into

7    evidence.

8    Q    So you counted all of the bullets over here?

9    A    Yes, sir.

10   Q    You indicated, for instance, that some of the ammunition

11   that you recovered was .30-'06, which is a specific caliber

12   ammunition, correct?

13   A    Yes, sir.

14   Q    And you also, when going through this, would it be fair

15   to say that you didn't recover a rifle that would fire that

16   caliber round, correct?

17   A    No, sir.

18   Q    Now, going in to do this search warrant, you were aware

19   that there were caves, correct?

20   A    Yes, sir.

21   Q    Were you specifically briefed about the cave that

22   Mr. Joos characterized as his personal cave that he kept

23   secret?

24   A    Yes, sir.

25   Q    Were there any caves that fit that description that you

                                81

1 were able to locate?

2 A     No, sir; however, on the search warrant I did not enter

3 any of the caves.  My function was at the residence.  But I

4 was not told any such cave was located.

5 Q     Based on your knowledge of the caves these are the guns

6 that were seized as a result of that warrant, correct?

7 A     Yes, sir.

8 Q     And this is the sum total of all firearms, correct?

9 A     Yes, sir.

10 Q     Okay.  Now, apart from firearms and ammunition, were you

11 also tasked with the duty of confiscating materials related to

12 explosives?

13 A     Yes, sir.

14 Q     And were you successful in that endeavor?

15 A     Yes, sir.

16 Q     Show you what's been marked as Government's Exhibit 28.

17 Can you tell us what this exhibit is?

18 A     It's an ammo canister.  It should contain a canister of

19 black powder or gun powder and some green cannon fuse inside.

20 Q     Can you check to make sure?  And that green length of

21 material, what it that?

22 A     It's called cannon fuse.

23 Q     Can you tell us what exactly that is in general terms?

24 A     You light it.  You could use it to -- you could make a

25 firecracker, you could make a pipe bomb.  You light it, it

82

1    burns down and it gives you time to get away from whatever you

2    lit.

3    Q    Show you next what's been marked as Government's

4    Exhibit 29.  Can you tell us what's in that bag?

5    A    Yes.  Inside this bag is also gun powder, Pyrex gun

6    powder.

7    Q    Would it be fair to say that gun powder has a variety of

8    uses but among those uses is the construction of explosive

9    devices?

10   A    Yes, sir.

11   Q    Show you what's been marked as Government's Exhibit 30.

12   Can you tell us what that is?

13   A    That's the safety fuse that was given to me by certified

14   explosive specialist Special Agent David Whittaker.

15            MR. KELLEHER:  Your Honor, at this time I would move

16   to admit Government's Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

17   11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25,

18   26, 27, 28, 29, and 30.

19            MR. JOHNSON:  No objection, Your Honor.

20            THE COURT:  All right.  Exhibits 1 through 30 are

21   admitted.  You had a 52 there.

22   Q    (By Mr. Kelleher) Now, apart from the items directly

23   related to firearms --

24            THE COURT:  Did you hear what I said?

25            MR. KELLEHER:  I'm sorry.

83

```
1              THE COURT:  You had one other, Exhibit 52.

2              MR. KELLEHER:  Oh, I'm sorry.  And 52.

3              MR. JOHNSON:  No objection, Your Honor.

4              THE COURT:  Exhibit 52 is admitted.

5   Q    (By Mr. Kelleher) Now, apart from the firearms,

6   ammunition and materials related to explosives, were you

7   also tasked with finding materials relating to ownership of

8   the residence and things of that nature?

9   A    Yes, sir.

10  Q    Okay.  And in connection with that, did you find some

11  articles that were issued to a Robert Joos from the Missouri

12  Department of Corrections?

13  A    Yes, sir.

14  Q    And I'll show you what's been marked as Government's

15  Exhibit 32.  If you could, tell us what those are.

16  A    This is paperwork, probation and parole paperwork that

17  Sergeant Roger Rinkin from the Missouri State Highway Patrol

18  recovered from the structure that they called the bunkhouse on

19  the property.

20  Q    And you took that into custody from?

21  A    Sergeant Roger Rinkin from the highway patrol.

22             MR. KELLEHER:  Your Honor, I'd move to admit

23  Government's Exhibit 32.

24             MR. JOHNSON:  No objection, Your Honor.

25             THE COURT:  Exhibit 32 is admitted.
```

84

```
 1   Q    (By Mr. Kelleher) Did you also locate some
 2   documentation concerning explosives?
 3   A    Yes, I did.
 4   Q    And were those seized as well?
 5   A    Yes, sir.
 6   Q    And I'll show you what's been marked as Government's
 7   Exhibit 31.
 8   A    This is a file that was marked -- written at the top
 9   Explosives that was located in a filing cabinet in the kitchen
10   area.
11            MR. KELLEHER:  Your Honor, I'd move to admit
12   Government's Exhibit 31.
13            THE COURT:  Any objection?
14            MR. JOHNSON:  What was that again, a file?
15            THE COURT:  You want to take a look at it?
16            MR. JOHNSON:  No objection, Your Honor.
17            THE COURT:  All right.  Exhibit 31 is admitted.
18   Q    (By Mr. Kelleher) This is actually a file that has on
19   the top of it Explosives and inside it has what appears to
20   be a recipe and pamphlet from the Department of Treasury,
21   Internal Revenue Service relating to commerce and explosives
22   and explosives list?
23   A    Yes, sir.
24   Q    As well as a second pamphlet entitled Questions and
25   Answers, Federal Law on Explosives Under Title XI of the
```

85

1  Organized Crime Control Act of 1970?

2  A    Yes, sir.

3  Q    Now, prior to taking most of the firearms into custody,

4  did you also document where they were located by way of

5  photographs?

6  A    Yes, photographs were taken inside.

7  Q    Show you first what's been marked as Government's

8  Exhibit 40.

9  A    That's a photograph taken from the front room of the

10  residence by the front door, an interior photograph where

11  Items No. 1 and 3, the Mossberg shotgun and an 8-millimeter

12  rifle, were recovered from.

13         MR. KELLEHER:  Your Honor, I'd move to admit

14  Government's Exhibit 40.

15         MR. JOHNSON:  No objection, Your Honor.

16         THE COURT:  Exhibit 40 is admitted.

17  Q    (By Mr. Kelleher) I direct your attention to the screen

18  and the two guns pictured -- and, again, I won't attempt to

19  do it.  You indicated that by the front door to this

20  residence?

21  A    Yes, sir.

22  Q    Next to the guns what are those items, in case the jury

23  can't make that out?

24  A    VHS tapes of various action movies, comedies.

25  Q    Again, this is taken from inside the residence, correct?

1  A    Yes, sir.

2  Q    I'd next direct your attention to Government's

3  Exhibit 41.  If you would, could you please identify that

4  photograph?

5  A    It's a photograph by the back door of the residence of

6  the Westernfield 12-gauge shotgun.

7        MR. KELLEHER:  Move to admit Government's

8  Exhibit 41.

9        MR. JOHNSON:  No objection, Your Honor.

10       THE COURT:  Exhibit 41 is admitted.

11 Q    (By Mr. Kelleher) Again, we're talking back door of the

12 same residence, correct?

13 A    Yes, sir.

14 Q    Besides the front door and back door, were there any

15 other doors?

16 A    No, sir, not to my knowledge.

17 Q    I'll next show you Government's Exhibit 42.

18 A    Photograph of a .22 rifle and shotgun as well as a BB

19 gun, which the air gun we didn't take.

20       MR. KELLEHER:  Your Honor, I'd move to admit

21 Government's Exhibit 42.

22       MR. JOHNSON:  No objection, Your Honor.

23       THE COURT:  Forty-two is admitted.

24 Q    (By Mr. Kelleher) Where was this photograph taken?

25 A    That's in the front room of the residence.

1    Q    And just so we're clear, the photograph shows three long

2    guns but the middle one is a BB gun; is that correct?

3    A    Right, it's air -- it's an air gun.

4    Q    Next show you Government's Exhibit 43.

5    A    That's a picture of the AMT backup .380 that was

6    recovered from the ammo canister in the floor of the kitchen.

7             MR. KELLEHER:  I'd move to admit Government's

8    Exhibit 43.

9             MR. JOHNSON:  No objection, Your Honor.

10            THE COURT:  Exhibit 43 is admitted.

11   Q    (By Mr. Kelleher) Government's Exhibit 44, what does

12   this depict?

13   A    Photograph of the Astra 9-millimeter handgun.

14            MR. KELLEHER:  Move to admit Government's

15   Exhibit 44.

16            MR. JOHNSON:  No objection, Your Honor.

17            THE COURT:  Forty-four is admitted.

18   Q    (By Mr. Kelleher) Government's Exhibit 45, if you would

19   identify that for me?

20   A    It's a .22 caliber pistol and then there's a second

21   firearm with it.  I believe it's a .380, have to look at the

22   actual gun.

23            MR. KELLEHER:  I'd move to admit Government's

24   Exhibit 45.

25            MR. JOHNSON:  No objection, Your Honor.

88

```
1              THE COURT:  Exhibit 45 is admitted.

2   Q    (By Mr. Kelleher) Government's Exhibits 46 and 47, if

3   you would?

4   A    I believe 46 is the picture of the Stallard and this is a

5   photograph -- it's a .380.  I would have to look at the gun to

6   compare it.  I believe it's the Tanfoglio.

7              MR. KELLEHER:  Your Honor, move to admit

8   Government's Exhibits 46 and 47.

9              MR. JOHNSON:  No objection, Your Honor.

10             THE COURT:  Forty-six and 47 are admitted.

11  Q    (By Mr. Kelleher) That's 46 and this is 47.

12             Were those firearms actually located in ammunition

13  cans?

14  A    Yes, sir.

15  Q    Okay.  Were those ammunition -- did those ammunition cans

16  actually contain ammunition?

17  A    Yes, sir.

18  Q    Now, in connection with your duties as a special agent

19  with ATF and in connection with this case, did ATF obtain

20  documentation establishing that Robert Joos was in fact a

21  convicted felon and therefore prohibited from possessing

22  firearms?

23  A    Yes, we did.

24  Q    Show you what's been marked as Government's Exhibit 33

25  and ask if you would identify that set of documents for me?
```

89

1    Specifically the second page, if you would?

2    A    It's a certified copy of the judgment and sentence of

3    Mr. Robert Joos.  Has his birth date of 12/25/52, Social

4    Security number of 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, for unlawful use of a weapon.

5    He was found guilty by a jury, it's a felony, and he was

6    sentenced to 33 months in the Missouri Department of

7    Corrections.

8    Q    Is that, in fact, an official document from the McDonald

9    County Circuit Court?

10   A    Yes, it has the seal on it.

11          MR. KELLEHER:  Move to admit Government's

12   Exhibit 33.

13          MR. JOHNSON:  No objection, Your Honor.

14          THE COURT:  All right.  Exhibit 33 --

15   Q    (By Mr. Kelleher) Next show you what's been marked

16   as -- I'm sorry, Judge.

17          THE COURT:  Give me a chance here.  Exhibit 33 is

18   admitted.

19   Q    (By Mr. Kelleher) -- Government's Exhibit 34.

20   A    It's a certified conviction document in the name of

21   Robert Neil Joos, birth date of December 25, 1952, for

22   operating a vehicle on a highway without a valid license,

23   felony conviction, ordered on 13th day of October, 2005.

24   Q    Does it indicate if he was sentenced to prison in

25   relation to that particular crime?

90

1    A    Yes, he was incarcerated Department of Corrections for
2    two years.
3    Q    And finally, I think, Government's Exhibit 35.  Could you
4    identify this set of documents?
5    A    This is what's referred to as a penitentiary pack.
6    Q    Could you just briefly explain to the ladies and
7    gentlemen of the jury what a pen pack or penitentiary pack is?
8    A    Missouri Department of Corrections, if you receive a
9    sentence and you go into the custody of Department of
10   Corrections, it's a record of you being present to include
11   fingerprints, photographs, they document alias names, what you
12   were sent to prison for, your religious status, your marital
13   status, emergency contact information.  It's to document your
14   time while serving your sentence in the Department of
15   Corrections.
16   Q    Is that, in fact, the pen pack of one Robert Neil Joos?
17   A    Yes, it is.
18   Q    Does it document his identifiers to include his date of
19   birth, alias information, Social Security number, have his
20   fingerprints as well as a photograph?
21   A    Yes, sir.
22        MR. KELLEHER:  Your Honor, I'd move to admit
23   actually both Government's Exhibit 34 and 35 at this time.
24        MR. JOHNSON:  No objection, Your Honor.
25        THE COURT:  All right.  Exhibits 34 and 35 are
                              91

1    admitted.

2    Q     (By Mr. Kelleher) With regard to the pen pack, it

3    actually has a picture of Mr. Joos, does it not?

4    A     Yes, sir.

5    Q     Now, in connection with your duties as a special agent

6    with ATF, do you often attend court hearings involving

7    criminal defendants?

8    A     Yes, I do.

9    Q     And would that include Mr. Joos?

10   A     Yes.  Yes, sir.

11   Q     Back in 2009 did you attend a court hearing where

12   Mr. Joos made an appearance in court?

13   A     Yes, I did.

14   Q     During that court appearance was Mr. Joos sworn in and

15   did he offer some testimony?

16   A     Yes, he did.

17   Q     During that course of testimony did he actually admit

18   that he was a convicted felon?

19   A     Yes, he did.

20   Q     Specifically, did he admit to being convicted of felonies

21   of driving without a license and unlawful use of a weapon?

22   A     Yes, he did.

23            MR. KELLEHER:  I have no further questions, Your

24   Honor.

25            THE COURT:  All right.  Cross-exam?

```
 1            MR. JOHNSON:  Yes, sir.  Thank you, Judge.

 2                      CROSS-EXAMINATION

 3   BY MR. JOHNSON:

 4   Q    Good afternoon, Agent Patterson.

 5            Now, the first time you went out to the land, the

 6   200 acres plus, was for the search warrant?

 7   A    That was the first time I was on the property.

 8   Q    You didn't go out there in any other capacity with Agent

 9   Moreland?

10   A    No, I never went with Agent Moreland out there.

11   Q    So the information that you testified to as to this

12   building was the residence or where Robert or Bob lived, this

13   information was coming from Agent Moreland?

14   A    It was coming from Agent Moreland, correct.

15   Q    And I believe you testified that it was a dynamic

16   entrance that you all made, or dynamic search?

17   A    Dynamic entry.

18   Q    Dynamic entry, that included a helicopter?

19   A    I don't know if they had a helicopter or not, sir.

20   Q    Do you know how many agents were involved?

21   A    I could only estimate.

22   Q    Estimate around a hundred?

23   A    That would be a fair assessment with the highway patrol.

24   Q    And do you know they were out there for approximately

25   three days?
```

```
 1   A    Yes, sir.

 2   Q    Now, you were told by Agent Moreland, probably other

 3   agents of law enforcement, what evidence that you all might

 4   find out there; is that correct?

 5   A    Yeah, Agent Moreland related to others that he had seen

 6   firearms inside the residence.

 7   Q    Okay.  And, sir, the firearms that have been offered and

 8   admitted into evidence that are leaning against this podium

 9   and as well as the tolls, these are all the firearms that you

10   all located?

11   A    Yes, sir.

12   Q    Now, sir, all these weapons, they are legal to possess;

13   is that correct?

14   A    Did you say illegal or legal?

15   Q    Legal.

16   A    As long as you're not a prohibited person, yes.

17   Q    Correct.  But there's no stolen weapons?

18   A    No, sir.

19   Q    There's no weapons that are sawed off below the legal

20   limit?

21   A    No, sir.

22   Q    And, quite frankly, looking at these weapons, they kind

23   of look archaic, old, wouldn't you agree?

24   A    Yeah.  The -- some of the shotguns and rifles are my age

25   or older.
```

1   Q    Okay.  As a matter of fact, every weapon –– the long guns
2   we'll call it –– these are all hunting weapons, shotguns, .22
3   rifles, .30-'06?
4   A    For the most part I don't think that –– I wouldn't
5   classify the SKS as a hunting weapon.  It's more a
6   military-style weapon.
7   Q    Which one, sir?
8   A    The SKS, if I could walk down.
9   Q    Yes, please.
10          MR. JOHNSON:  If that's okay, Judge?
11          THE COURT:  Yes.
12  A    This rifle right here.
13  Q    (By Mr. Johnson) Is that a .22?
14  A    No.
15  Q    7.62?
16  A    That's just a –– typical of military-style weapon.
17  That's solely my opinion, sir.
18  Q    And how old is that weapon?
19  A    I don't know.  I'm not an expert on the age of weapons.
20  Q    Well, sir, did you –– during your inventory and
21  everything did you discover if any of these weapons were
22  stolen?
23  A    No, none of the weapons that I was noted related that
24  they were stolen.
25  Q    None of these weapons were involved in any other criminal

95

1    activity?

2    A     Not to my knowledge.

3    Q     And, sir, were you quite surprised that you didn't find

4    any M-16s or AK-47s, any automatic weapons?

5    A     No, sir.

6    Q     So agents -- around a hundred agents out there for

7    approximately three days and this is all that was found?

8    A     Yes, sir.

9    Q     And you talked about the residence.  We talking about the

10   building --

11            MR. JOHNSON:  If I may approach, Your Honor?

12            THE COURT:  Yes.

13   Q     (By Mr. Johnson) Showing you what's been marked and

14   offered into evidence as Government's Exhibit 38, I believe.

15   Is this the building that you went into?

16   A     Yes, sir.

17   Q     And this was the building that you were assigned to as

18   far as the search?

19   A     Yes, sir.

20   Q     And, sir, does that building have an upstairs?

21   A     Yes, it does.

22   Q     And did you, in fact, go upstairs?

23   A     Yes, I did.

24   Q     And as far as any other structures on this property, you

25   didn't go to?

                              96

```
 1   A    No, sir.  I didn't go in -- this was -- there was a small
 2   out building out here that I went into.  It's like a storage
 3   shed.  But that was the only place that I went into.
 4   Q    You testified on more than one occasion that this was
 5   called the residence?
 6   A    Yes, sir.
 7   Q    And this was told to you by other agents?
 8   A    Yes, sir.
 9   Q    And since your function out there was to search that
10   building, you didn't bother to check to see who owns that land
11   or the title on that deed, did you, or the name on the deed?
12   A    I never checked that.  That wasn't my duty.
13   Q    Okay.  And as far as the explosives, these fuses or
14   cannon wire, I believe you stated.
15   A    Cannon fuse.
16   Q    Cannon fuse.  And you stated that it could be used for a
17   variety of sources?
18   A    Right.  It's commonly referred to as hobby fuse also.
19   Q    You didn't find any pipe bombs?
20   A    No, sir.
21   Q    And you didn't find any bombs that you'd have ready to
22   explode; in other words, just light that fuse and it could go
23   off?
24   A    No, sir, I didn't.
25   Q    And, sir, when you appeared on the search, were you
```

97

1   present when Bob Joos was arrested?

2   A     I was not at the house when he was arrested.  I was at

3   the top of the lane.

4   Q     When you say the house, you referring to that building?

5   A     That building right there, yes, sir.

6   Q     So you never had any communication with Bob prior or saw

7   him?

8   A     I've never spoke with Mr. Joos in my entire life.

9   Q     Okay.

10          MR. JOHNSON:  No further questions, Judge.

11          THE COURT:  All right.  Any redirect?

12          MR. KELLEHER:  Just briefly.

13                    REDIRECT EXAMINATION

14  BY MR. KELLEHER:

15  Q     You indicated that there were approximately a hundred law

16  enforcement officials who took part in this search, correct?

17  A     Yes.

18  Q     Or the execution of the search warrant.

19          Could you explain to the ladies and gentlemen of the

20  jury why it was necessary to involve this many people?

21  A     Just given the simple terrain, the residence, set so far

22  back off the road.  The SRT teams or the SWAT teams couldn't

23  just drive up to it and serve the search warrant.  They would

24  be compromised.  For ATF agents and highway patrol safety, as

25  well as Mr. Joos', the SRT teams had elected to go through the

                              98

1  woods on foot before they did that, which took a lot of time
2  and they had a lot of space to cover.  And I can only offer an
3  opinion being a former SRT person as to why they utilized that
4  many people, if that's okay?

5  Q    Please do.

6  A    It's just there are so many outbuildings and structures
7  and vehicles and we could only, from aerial photographs and
8  stuff, ascertain whether or not there was 1, 10, 15 people.
9  The undercovers had only seen one person on the property;
10 however, they have to approach this as if every structure is
11 occupied.  Therefore, that takes a lot of people and manpower
12 to do it safely.  The ultimate goal of that operation is that
13 nobody gets hurt, whether it's the person you're going to
14 search, other team members, citizens.  With that rugged
15 terrain, there was concern also of just simple things, of guys
16 twisting their ankles, getting bit by snakes, so on and so
17 forth, and I could go on and on.

18 Q    It would be fair to say, however, that Special Agent
19 Moreland shared with the SWAT teams what Mr. Joos had told him
20 in terms of his mindset and things of that nature, correct?

21 A    Yes.

22 Q    Now, Mr. Johnson also talked about the age of the weapons
23 and for instance -- well, this shotgun looks pretty rusty,
24 right?

25 A    Yes, sir.

1   Q    If someone were to put a live round in this shotgun and

2   point it at someone and pull the trigger, would the age of the

3   weapon determine --

4          MR. JOHNSON:  Your Honor, I'm going to object to the

5   form of the question.  It calls for speculation.  There's no

6   foundation as to --

7          THE COURT:  He didn't quite get finished with the

8   question.

9   Q    (By Mr. Kelleher) -- would that have any impact at all

10  on its lethality?

11         MR. JOHNSON:  The objection's the same.  Unless this

12  witness can testify that he did fire the weapons, to see if he

13  was able to fire them, it calls for speculation.

14         THE COURT:  That's overruled.  I think it was a

15  hypothetical question.

16         You can answer it.  Did you answer it?

17         THE WITNESS:  No.

18         THE COURT:  You can answer it.

19  A    I believe the firearms would -- would function as

20  designed.

21  Q    (By Mr. Kelleher) They would be capable of killing

22  someone, correct?

23  A    Yes.

24  Q    Now, they also -- Mr. Johnson also talked about sawed-off

25  weapons.  All of these are of legal length, correct?

                                100

1   A    Correct.

2   Q    I'm showing you Government's Exhibit 7.  Is this the

3   original length of this particular gun?

4   A    Upon examining the tip of the barrel, it appears it's

5   been altered, shortened.

6   Q    Now, based on your training and experience as a ATF

7   agent, does sawing off a shotgun make it a better or worse

8   hunting weapon?

9   A    Makes it a worse hunting weapon because the pattern will

10  spread.  The longer -- typically on a shotgun, the longer the

11  barrel without going into the choke tubes, the tighter the

12  pattern, the shorter the barrel, the wider the pattern.

13  Q    And, Agent Patterson, are you also a hunter?

14  A    Yes, I am.

15  Q    Hunting weapons are dual purpose, if you will, correct?

16  The weapon doesn't know whether it's hunting a deer or a

17  human, correct?

18  A    That's correct.

19  Q    So whether or not they're hunting weapons ultimately is

20  of no moment, is it not?

21  A    Correct.

22  Q    Now, with regard to this structure, during the execution

23  of this search warrant did you go room to room in conducting

24  your search?

25  A    Yes, I did.

1    Q    And you characterized it as a residence.  Why do you

2    characterize that as a residence?

3    A    There was a set of bunk beds in there.  There's a

4    kitchen.  It appeared to have some staples of food.  There was

5    a bathroom.  One of the bedrooms had a set of bunk beds in it.

6    There was what appeared to be men's clothing, men's shoes.

7    Q    Was there any indication that more than one person lived

8    in that residence?

9    A    Not to my knowledge.

10   Q    Was all the clothing that you observed, did it appear to

11   be men's clothing?

12   A    Yes, it appeared to be men's clothing.

13   Q    Did all the clothing you observed tend to be consistent

14   with -- again, just based on your observations, consistent

15   with one size?

16   A    I didn't look at the sizes.  I just -- in a nutshell, the

17   shoes looked similar in size.

18   Q    There was no evidence, there were no documents, there was

19   nothing else relating to a different person, was there, that

20   you located?

21   A    Not that I located.

22   Q    And this was -- this area was thoroughly searched, was it

23   not?

24   A    Yes, sir.

25   Q    Just to be clear, you took paperwork out, you went

                                    102

1   through filing cabinets, things of that nature, correct?

2   A     Yes, sir.

3   Q     Did you find anything that appeared to belong to someone

4   other than Robert Joos?

5   A     No.

6           MR. KELLEHER:  Thank you.

7           THE COURT:  Any more cross?

8           MR. JOHNSON:  Yes, sir.  Very quick, Your Honor.

9                        RECROSS-EXAMINATION

10  BY MR. JOHNSON:

11  Q     Agent Patterson, you said this sawed-off weapon appeared

12  to be altered?

13  A     Yes, sir.

14  Q     Now, as an ATF agent, is that a crime --

15  A     No, it's not.

16  Q     -- to alter a weapon?

17  A     No, sir.

18  Q     But you didn't see where this was altered or anything to

19  be illegal?  You didn't consider this an illegal weapon?

20  A     No, sir, no, I didn't.  The barrel appeared to be

21  shortened.

22  Q     I'm not sure if I asked this, sir, but did you check to

23  find out if any of these weapons were registered to Bob Joos?

24  A     There is no registry unless it's a weapon that requires a

25  tax stamp.

                              103

1   Q    If someone was to go buy a shotgun today say at Bass Pro
2   or Wal-Mart, do you have to put down your name, address and
3   have you ever been convicted of any felonies?
4   A    Right, you have to fill out Form 4473.  Those records are
5   retained when you trace the weapons; however, as a weapon gets
6   older, the span of where those weapons are obtained --
7   Q    And Mr. Kelleher asked you questions about are you a
8   hunter, would a hunter typically hunt with a weapon sawed off
9   like this, and I believe you stated --
10  A    No, I wouldn't.
11  Q    Now, that area -- you went out there in the summertime?
12  A    Yes, sir.
13  Q    June of '09?
14  A    Yes, sir.
15  Q    And would you consider that a snake-infested area?
16  A    Yes, I would.
17  Q    As a matter of fact, there were two snake skins
18  hanging --
19  A    I believe there was three, sir.
20  Q    -- three hanging.  Would you consider that an effective
21  weapon to kill snakes at short range?
22  A    Absolutely.
23          MR. JOHNSON:  I have no further questions, Judge.
24          THE COURT:  May this witness be excuse?
25          MR. KELLEHER:  Judge, I just have to -- if I may

                                104

1    have the Court's permission, just on the issue of registry.

2          THE COURT:  All right.

3                CONTINUED REDIRECT EXAMINATION

4    BY MR. KELLEHER:

5    Q    You talked a little bit about gun registrations and such.

6    You talked about a 4473.  What exactly is that?

7    A    It's a form that is -- you fill out when you purchase a

8    firearm from a licensed dealer.  You're not registering it;

9    it's simply you're putting your information down and the gun

10   dealer is verifying your information and they conduct what's

11   called a NICS check, which means that he calls in your name

12   and date of birth and the FBI checks your criminal history to

13   insure that you're not a prohibited person.  Once they give

14   the go-ahead, then the sale is completed.  If a gun such as

15   law enforcement uses, a short-barreled shotgun or rifle,

16   there's a registry, the National Firearms Transfer Record.

17   That's the only registry there is.  Certain firearms require a

18   tax stamp.  Unless it's for a government entity, law

19   enforcement or military.  So, therefore, there's no -- nobody

20   registers their firearms with ATF.  The only registered

21   firearms are those prohibiting guns.

22   Q    Let me just ask you a simple question.  All these guns

23   here, is there a computer or a database you can type in the

24   serial number and find out who has that gun at any particular

25   time?

                                105

```
 1   A    No.

 2   Q    If I were to sell you —— if I as a private citizen were

 3   to sell you this handgun —— and this is Government's

 4   Exhibit 20 —— would there be any record of it at all?

 5   A    No, only unless you and I completed a bill of sale, but

 6   that would be between us.

 7   Q    Right.  If Robert Joos went into Bass Pro and wanted to

 8   purchase this firearm and filled out a 4473 and gave them his

 9   identifiers, would he be allowed to walk away with any of

10   these guns?

11   A    If the system worked correctly and his criminal history

12   was run correctly, they would come back and say he's denied

13   based upon prohibiting convictions.

14   Q    Now, and sometimes the system doesn't work correctly.  Do

15   you go out and get the guns when the system doesn't work

16   correctly?

17   A    Yes, we're notified.

18   Q    So it would be fair to say based on your experience that

19   none of these guns could have been purchased by Mr. Joos using

20   his real name and identifiers after he had been convicted of

21   these felonies, correct?

22   A    In theory, correct.

23   Q    And, more importantly, any of these guns could have been

24   obtained virtually anywhere without having to go through any

25   checks, correct?
```

106

```
 1   A     Correct.

 2             MR. KELLEHER:  Thank you.

 3             MR. JOHNSON:  One real brief, Judge.

 4             THE COURT:  All right.  This is the last question.

 5             MR. JOHNSON:  Promise.

 6                  CONTINUED RECROSS-EXAMINATION

 7   BY MR. JOHNSON:

 8   Q     Agent Patterson, did you check the origin of any of these

 9   weapons to find out who the original buyer was?

10   A     These guns were traced but they weren't traced -- they

11   were traced by our system.  That wasn't -- that wasn't a duty

12   of mine.

13   Q     So no one went out there, said, "You purchased this.

14   What did you do with this weapon"?

15   A     Correct.

16   Q     No chain of evidence, so to speak, on that?

17   A     No.  From the original purchaser, no.

18             MR. JOHNSON:  That's it, Judge.

19             THE COURT:  All right.  May this witness be excused?

20             MR. KELLEHER:  Yes, Your Honor.

21             MR. JOHNSON:  Yes, sir.

22             THE COURT:  You're excused, sir.  Thank you.

23             Call your next witness.

24             MR. KELLEHER:  Government calls David Whittaker at

25   this time.
```

107

DAVID WHITTAKER, GOVERNMENT WITNESS, SWORN:

<u>DIRECT EXAMINATION</u>

BY MR. KELLEHER:

Q    Would you please introduce yourself to the ladies and gentlemen of the jury?

A    My name is David Whittaker.  I'm a special agent, certified explosives specialist with the Bureau of Alcohol, Tobacco, Firearms and Explosives.  I'm assigned out of St. Louis, Missouri.  I've been an ATF agent for almost 20 years now.

Q    Now, back on June 25th of 2009, did you take part in a -- the execution of a search warrant on a large piece of property that we've I think now referred to as the Joos compound?

A    Yes, sir, I did.

Q    What was your duty with regard to that search?

A    I was to assist with the search of the -- physical search of the property.

Q    Were you specifically tasked to search any particular area?

A    Yes, sir.

Q    And where was that?

A    I was assigned initially to search the vehicles on the property and then also later the bunkhouse.

Q    Okay.  I'm going to show you what's been marked as Government's Exhibit 48.  And if you would, could you please

108

1  identify that photograph for me?

2  A    Yes, sir.

3  Q    What is that?

4  A    This is a photograph of the front of the shed or

5  outbuilding that we referred to as the bunkhouse.

6           MR. KELLEHER:  Your Honor, I move to admit

7  Government's Exhibit 48.

8           THE COURT:  Any objection?

9           MR. JOHNSON:  No objection, Your Honor.

10          THE COURT:  Exhibit 48 is admitted.

11  Q    (By Mr. Kelleher) And could you describe to the ladies

12  and gentlemen of the jury how you went about searching this

13  particular structure?

14  A    It was -- myself and numerous other agents were searching

15  this outbuilding.  This outbuilding, there's another area of

16  it that's hidden behind the trees on the right-hand side.  The

17  foliage is kind of in the way.  This building continues down

18  to the right a little bit.  There's an entrance in here,

19  there's storage area here, then there's like a bunkhouse or

20  rooms, living rooms in the rear of it.  But all the stuff on

21  the right is basically a storage area.  It was just filled

22  from floor to ceiling with various storage items, books and

23  utility equipment and all kinds of stuff.

24  Q    Were you able to locate any items of evidentiary value

25  from this structure?

                              109

1   A    Yes, sir.

2   Q    Could you explain to the ladies and gentlemen of the jury

3   what you found?

4   A    While searching the far right storage area which is

5   slightly behind the shrubbery here, in the far back I had

6   located a quantity of safety fuse, orange safety fuse, also a

7   small box of nonelectric blasting caps.

8   Q    Show you what's been marked as Government's Exhibit 49.

9   If you would, could you please identify that photograph for

10  me?

11  A    Yes, sir.  This is a photograph of the shelf or table

12  where I located the items I just described, the safety fuse

13  and the blasting caps.

14        MR. KELLEHER:  I'd move to admit Government's

15  Exhibit 49.

16        MR. JOHNSON:  No objection, Your Honor.

17        THE COURT:  Exhibit 49 is admitted.

18  Q    (By Mr. Kelleher) Now, probably should have got a

19  pointer for you, but the blasting -- the safety fuse, first

20  of all, that's depicted in this picture, is that in fact

21  Government's Exhibit 30?

22  A    Yes, sir.

23  Q    And that would be the item depicted in the almost dead

24  center of the photo, correct?

25  A    That's correct.

110

```
 1   Q    Now, you also indicated that you recovered some blasting

 2   caps, and could you tell us where those were located in that

 3   photograph?

 4   A    In the fore picture there's a white bucket.  Inside that

 5   white bucket you'll see a small red cardboard box inside that

 6   white bucket.

 7   Q    I'll show you Government's Exhibit 50.  Could you

 8   identify that photograph for me?

 9   A    Yes, sir.  This is a photograph of the blasting cap

10   packaging box with the blasting caps inside of it.

11        MR. KELLEHER:  Again, Your Honor, I'd move to admit

12   Government's Exhibit 50.

13        MR. JOHNSON:  No objection, Your Honor.

14        THE COURT:  Exhibit 50 is admitted.

15   Q    (By Mr. Kelleher) Now, when you came across those, what

16   did you do with them?

17   A    When I came across that box, knowing that there was a

18   chance of it being older explosives inside, I wasn't sure it

19   was -- obviously it said blasting caps on the box, but based

20   on my training I know that sometimes older blasting caps can

21   become unstable, so I very carefully opened it up and observed

22   that it did in fact have copper blasting caps in it, which are

23   extremely dangerous when deteriorated in the condition that

24   these are in.

25   Q    When you say extremely dangerous, what could happen with
```

```
 1   these particular types of blasting caps?

 2   A    When copper blasting caps -- it's almost like a penny.

 3   When a penny corrodes, it gathers corrosion.  Inside of these

 4   blasting caps is another explosive material that when combined

 5   with that copper it makes a very highly sensitive explosive

 6   material, so much that it can go off with static or excessive

 7   shock.  Sometimes if they're corroded enough, just the mere

 8   effect of opening a box or picking up the box could cause it

 9   to detonate.

10   Q    What kind of explosion would have resulted had this box

11   of blasting caps detonated?

12   A    If that were to go off in my hand, it would probably

13   remove my hand and fragmentation from the metal from the

14   copper blasting caps would be into my body.  It could have

15   caused serious injury or death.

16   Q    Now, when you come across such things in the field as you

17   did at the Joos compound, what do you do with them?

18   A    That has to be destroyed immediately.

19   Q    And did you, in fact, destroy those blasting caps on

20   scene?

21   A    Yes, sir, I did.

22   Q    Could you describe to the ladies and gentlemen of the

23   jury the process by which those are destroyed?

24   A    It's typical that if we come across copper blasting caps,

25   the most safe, effective way to dispose of them is to blow up
```

1  in place, counter-charge them with another explosive; however,
2  because these were in a building, we wanted to save the
3  integrity of the building, so I assumed the risk of moving
4  that box to a location outside of the building. I took these
5  a distance away from the building and put them into a hole
6  that I had dug and placed a counter-charge on top of that box
7  and detonated the counter-charge.
8  Q   I'll show you Government's Exhibit No. 51. Could you
9  please identify that photograph?
10 A   Yes, sir. This is the hole that I had dug and the box of
11 blasting caps in the hole.
12          MR. KELLEHER: And, Your Honor, I'd move to admit
13 Government's Exhibit 51.
14          MR. JOHNSON: No objection, Your Honor.
15          THE COURT: Fifty-one is admitted.
16 Q   (By Mr. Kelleher) From there the blasting caps were
17 destroyed, correct?
18 A   Yes, sir.
19          MR. KELLEHER: I think that covers it. Thank you.
20          THE COURT: Cross-exam?
21          MR. JOHNSON: Yes, sir. Thank you, Judge.
22                    CROSS-EXAMINATION
23 BY MR. JOHNSON:
24 Q   Agent Whittaker, those blasting caps, were you able to
25 determine how old they were, what age?

                              113

```
 1   A    I know that they have not made copper blasting caps
 2   probably since the mid '80s, so I knew they were probably at
 3   least almost 20 years old.
 4   Q    Okay.  And was there any age or -- not age, strike
 5   that -- any dates or anything on the box that they were in?
 6   A    There was a code on the inside front cover as you could
 7   see in the one previous photograph, but it was stained and --
 8   but you could still make it out.
 9   Q    And, sir, when you -- you were briefed before you went
10   out there on the search, correct?
11   A    Yes, sir.
12   Q    And when you were briefed, what were you told about what
13   explosives you might be finding or coming across?
14   A    We were told to look for just about anything, including
15   items that might have been used in a device, pipe bombs or any
16   other type of explosives or things to be used in an improvised
17   explosive device.
18   Q    Your stated that your main duty assignment was to search
19   the vehicles that were out there?
20   A    It started out with the vehicles and then I moved up the
21   hill to the bunkhouse and the vehicles up there.
22   Q    And how long were you out there, sir, how many days?
23   A    I believe I was out there a day and a half.
24   Q    And I don't know if you counted all the vehicles out
25   there, but wouldn't it be fair to say it's close to a hundred?
```

1   A    There were probably at least a hundred vehicles there.

2   Q    You searched them all?

3   A    Myself and a large number of other agents.

4   Q    And these weren't empty vehicles, were they?

5   A    Some of them were not empty.

6   Q    They were packed -- some of them packed to the -- some

7   buses packed to the top, correct?

8   A    Yes, sir.

9   Q    And out of all of those -- we'll just use a hundred for

10  right now, all of those vehicles and buses that you and other

11  agents searched, you all didn't find any bombs or any

12  explosive devices in those vehicles?

13  A    I did not find any and I'm not aware of any other agents

14  that found anything in the cars.

15  Q    Now, as far as the blasting caps that were found, to

16  educate the jury, one wouldn't just use a blasting cap by

17  itself to blow something up, correct?

18  A    The blasting -- in commercial explosives, as this is

19  designed for, a blasting cap is used to initiate a larger

20  charge.  This is a primary explosive.  It would lead into a

21  secondary charge in a commercial blasting industry.

22  Q    And there were no bombs, pipe bombs or anything like that

23  that were found?

24  A    I did not find any, sir.

25          MR. JOHNSON:  Okay.  Thank you.

                              115

```
 1                No further questions, Judge.

 2                     REDIRECT EXAMINATION

 3   BY MR. KELLEHER:

 4   Q     You indicated that these caps alone, however, had enough

 5   explosive charge to blow your hand off, though, correct?

 6   A     That's correct.

 7             MR. KELLEHER:  Nothing further.

 8             MR. JOHNSON:  No, sir.

 9             THE COURT:  May this witness be excused?

10             MR. KELLEHER:  Yes, sir.

11             MR. JOHNSON:  Yes, Your Honor.

12             THE COURT:  You're excused.

13             MR. KELLEHER:  Government calls Fred Bradford.

14   FRED BRADFORD, GOVERNMENT WITNESS, SWORN:

15                      DIRECT EXAMINATION

16   BY MR. KELLEHER:

17   Q     Sir, would you please introduce yourself to the ladies

18   and gentlemen of the jury?

19   A     My name is Fred Bradford.  I'm an explosive enforcement

20   officer with the Bureau of Alcohol, Tobacco, Firearms and

21   Explosives.

22   Q     And what do your duties entail?

23   A     I'm a bomb tech.  We're basically set up in the ATF much

24   like bomb squads would be for the police department or

25   sheriff's department.  What we do that is a little different
```

116

1  is we do a lot of training and stuff overseas for the State

2  Department above and beyond normal bomb duties of the -- for

3  the bureau.

4  Q    Now, in that regard do you have any specialized training?

5  A    I do.  I spent ten years in the Marine Corps as a

6  explosive ordinance disposal technician, came out and was a

7  bomb tech on bomb squad for six years, then hired in with ATF

8  in 1999.

9  Q    And you've been dealing with explosives ever since, I

10 presume?

11 A    Yes, sir.

12 Q    I want to direct your attention specifically to June 25th

13 of 2009.  Were you tasked to assist in the execution of a

14 search warrant of what is now known as the Joos compound?

15 A    Yes, sir, I was.

16 Q    What were your duties on that day?

17 A    To assist if any explosive items or explosives were

18 recovered and help identify them.

19 Q    And did you in fact assist in the recovery of a quantity

20 of Atlas blasting caps?

21 A    I did, yes, sir.

22 Q    I direct your attention to the screen which now shows a

23 photograph of Government's Exhibit 50.  Are those in fact the

24 blasting caps that you helped recover?

25 A    Yes, sir.

117

1   Q    Now, are you familiar with the definition of an explosive
2   under federal law?
3   A    Yes, sir.
4   Q    Do blasting caps constitute an explosive under federal
5   law?
6   A    Yes, sir, they do.
7   Q    Can you explain why that is?
8   A    Actually they fall under two different categories.
9   Blasting caps or detonators are actually mentioned but also in
10  that the explosives that are in the end of the cap are also
11  mentioned, which is RDX usually.
12  Q    So under federal law these blasting caps depicted in
13  Government's Exhibit 50 would constitute an explosive,
14  correct?
15  A    Yes, sir.
16  Q    Consequently, a convicted felon would not be allowed to
17  possess them, correct?
18  A    Yes, sir.
19        MR. KELLEHER:  I have no further questions, Your
20  Honor.
21        THE COURT:  Cross-exam?
22               CROSS-EXAMINATION
23  BY MR. JOHNSON:
24  Q    Agent Bradford, I'll lead off with what Mr. Kelleher
25  asked you.  Would someone not convicted of a felony be allowed

                              118

```
1   to possess those?

2   A    Yes, sir.

3   Q    Sir?

4   A    Yes, sir.

5   Q    And as far as you stated that it would be an explosive

6   device, you would consider that?

7   A    No, sir, I said an explosive.

8   Q    I'm sorry.  What about a destructive device?

9   A    The caps in and of themselves, no, sir.

10            MR. JOHNSON:  I have no further questions, Judge.

11            THE COURT:  All right.  Any redirect?

12            MR. KELLEHER:  No, Your Honor.

13            THE COURT:  May this witness be excused?

14            MR. KELLEHER:  Yes, Your Honor.

15            MR. JOHNSON:  Yes, sir.

16            THE COURT:  You're excused, sir.  Thank you.

17            MR. KELLEHER:  Government calls Anthony Pupura.

18            THE COURT:  Okay.

19   ANTHON PUPURA, GOVERNMENT WITNESS, SWORN:

20                      DIRECT EXAMINATION

21   BY MR. KELLEHER:

22   Q    Sir, would you please introduce yourself to the ladies

23   and gentlemen of the jury?

24   A    Name's Anthony Pupura.  I work at the Bureau of Alcohol,

25   Tobacco, Firearms and Explosives, United States Bomb Data
```

119

1    Center.

2    Q    What exactly does the United States Bomb Data Center do?

3    A    We collect information on explosive manufacturers,

4    bombing and arson information across the country, collect it

5    and put it into different databases.

6    Q    Have you received any specialized training in that

7    regard?

8    A    To collect information?

9    Q    Yes.

10   A    Yes.  We -- over the past eight years we've had different

11   conferences that we go to, we talk to the explosive

12   manufacturers, we have liaisons that we talk to in the

13   explosives industry and the military and civilian law

14   enforcement.

15   Q    Now, with regard to this particular case, United States

16   v. Robert Joos, were you asked to conduct a specific task?

17   A    Yes, I was.  I was asked to trace and make the nexus,

18   interstate nexus determination on the blasting caps.

19   Q    I'll show you what's been marked as Government's

20   Exhibit 50 on the screen, and are those the blasting caps that

21   you were asked to conduct a nexus of?

22   A    Yes, they are.

23   Q    Just to be clear, what exactly does nexus mean at least

24   in regard to this type of case?

25   A    The nexus is when a product is not made in the state that

                                    120

the product was recovered in; for example, this particular

product was made in Pennsylvania and it was recovered here.

Q    So obviously if it was made in Pennsylvania, it had to

cross the state line, correct?

A    Correct.

Q    That's essentially all you were asked to do; is that

correct?

A    That's correct.

Q    Just based on your expert experience, the blasting caps

depicted in Government's Exhibit 50 traveled across the state

line, correct?

A    That's correct.

        MR. KELLEHER:  I don't believe I have any further

questions.

        THE COURT:  Cross-exam?

        MR. JOHNSON:  No, sir, Your Honor.

        THE COURT:  May this witness be excused?

        MR. KELLEHER:  Yes, Your Honor.

        MR. JOHNSON:  Yes, sir.

        THE COURT:  You're excused.  Thank you.

        MR. KELLEHER:  Judge, may we approach?

        THE COURT:  Yeah.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

PROCEEDINGS WERE HAD:)

        MR. KELLEHER:  We're going to do the interstate

```
 1   nexus of the guns and ammo.  I need about five minutes to
 2   reconfigure my evidence.
 3            THE COURT:  Take a short recess?
 4            MR. KELLEHER:  Yes, sir.
 5            MR. JOHNSON:  Go with the flow.
 6   (PROCEEDINGS RETURNED TO OPEN COURT:)
 7            THE COURT:  Okay.  All right.  Ladies and gentlemen,
 8   we're moving right along here but we need to take a little
 9   break just to get a couple more witnesses lined up.  Rather
10   than have you sit here, let's take a short break until 4:30.
11            (Court reads recess instruction to the jury.)
12            THE COURT:  We'll be in recess until 4:30.
13            (Jury exits courtroom at 4:18 p.m.)
14            (Court stands in recess.)
15            THE COURT:  Are we ready for the jury?
16            MR. KELLEHER:  Yes, Your Honor.
17            THE COURT:  You all ready?
18            MR. JOHNSON:  Yes, sir.
19            THE COURT:  Okay.
20            (Jury enters courtroom at 4:33 p.m.)
21            THE COURT:  Please be seated, and call your next
22   witness.
23            MR. KELLEHER:  Government at this time calls Dan
24   Fridley.
25   DAN FRIDLEY, GOVERNMENT WITNESS, SWORN:
```

DIRECT EXAMINATION

2    BY MR. KELLEHER:

3    Q    Special Agent Fridley, would you please introduce

4    yourself to the ladies and gentlemen of the jury?

5    A    My name is Dan Fridley.  I'm a special agent with the

6    Bureau of Alcohol, Tobacco, Firearms and Explosives.

7    Q    Now, with regard to this particular case, at least, do

8    you have an area of expertise?

9    A    Yes.

10   Q    And could you explain to the ladies and gentlemen of the

11   jury what you were called to do in this particular case?

12   A    Yes.  I am -- in the office I'm referred to as the

13   interstate nexus expert.  One of the things that that entails

14   is doing the research on firearms and ammunition as it's

15   recovered by the other agents and determining its manufacturer

16   and its origin in order that I can testify ultimately that it

17   traveled in interstate commerce.

18   Q    Now, for the most part you testify to firearms and

19   ammunition that were recovered in the state of Missouri.  Does

20   that make your job somewhat easier?

21   A    That's correct, yes, it does.

22   Q    Why is that?

23   A    Because there are few -- very, very few manufacturers of

24   ammunition and firearms in the state of Missouri.

25   Q    Now, with regard to making these interstate nexus

                                123

1    determinations, determining where firearms and ammunition were

2    made, have you received any special training in that regard?

3    A    I have.  In addition to the 16 weeks of basic ATF

4    training, I received specialized training at our headquarters

5    in Washington D.C. in the early 1990s and in the early 2000s I

6    received additional advance training in interstate nexus and

7    actually visited and toured most of the major manufacturers of

8    firearms in the United States.

9    Q    Have you on any number of occasions -- actually, quite a

10   few occasions -- testified in federal district court as an

11   expert in making these interstate nexus determinations?

12   A    I have, yes.

13   Q    In this particular case, United States v. Robert Joos,

14   were you called to examine some weapons and ammunition that

15   were recovered from those weapons?

16   A    I was, yes.

17   Q    And before the jury came back into the court just now,

18   did you have occasion to take a look at the firearms that are

19   arrayed before them?

20   A    I did, yes.

21   Q    And these firearms and ammunition, for record purposes,

22   are characterized as Government's Exhibits 1, 2, 3, 4, 5, 6,

23   7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22,

24   23, 24, 25, 26, 27.  There is a variety of firearms and those

25   exhibits also encompass the ammunition that was recovered from

124

1   them.  With regard to the firearms, out of 15 of the firearms

2   that were recovered from Mr. Joos' compound, did you examine

3   each one individually?

4   A    I did, yes.

5   Q    Were you able to determine that each and every one of

6   them was manufactured outside the state of Missouri?

7   A    That's correct, they were all manufactured outside the

8   state of Missouri.

9   Q    And in many cases, for instance, on Government's

10  Exhibit 20, a Ruger .22 caliber rifle, is in fact it stamped

11  with, among other things, Southport, Connecticut, USA?

12  A    The place of manufacture, yes, is stamped right on the

13  gun.

14  Q    Does that make your job somewhat easier?

15  A    Yes, it does.

16  Q    With regard to the ammunition recovered from those guns,

17  did you specifically go through and evaluate all of the

18  ammunition recovered from these specific firearms?

19  A    I did.

20  Q    And, again, did you make a determination that they were

21  manufactured outside the state of Missouri?

22  A    All of the ammunition was manufactured outside the state

23  of Missouri.

24  Q    And, again, necessarily that would indicate that the guns

25  and ammunition had to travel across the state line before

125

```
 1   being recovered from the Joos compound, correct?

 2   A    That's correct.

 3   Q    Finally, Special Agent Fridley, did you test fire each

 4   and every one of these firearms?

 5   A    I did, yes.

 6   Q    Does each and every one of these firearms work?

 7   A    They all function as designed, yes.

 8   Q    By that, they'll shoot?

 9   A    They will, yes.

10   Q    Thank you.

11         MR. KELLEHER:  I have no further questions.

12         THE COURT:  All right.  Any cross-exam?

13         MR. JOHNSON:  Yes, sir.  Thank you, Your Honor.

14                     CROSS-EXAMINATION

15   BY MR. JOHNSON:

16   Q    Agent Fridley, when you stated that your job as an

17   expert, you trace it back to the -- I believe the origin, are

18   you talking about the origin of manufacture?

19   A    The origin of where the gun was manufactured.

20   Q    Not the origin of ownership?

21   A    That's correct.

22   Q    You don't do that at all?

23   A    Not -- not particularly in these kind of cases, no.

24   Q    Why so?

25   A    Well, unless I'm asked to.  But in this particular case I
```

126

```
 1   was asked just to provide the -- where the gun was
 2   manufactured.
 3   Q    Okay.  Thank you.
 4           MR. JOHNSON:  No further questions, Judge.
 5           THE COURT:  All right.
 6           Do you have a question?
 7           MR. KELLEHER:  Just a quick one.
 8                   REDIRECT EXAMINATION
 9   BY MR. KELLEHER:
10   Q    Who originally owned these guns is completely irrelevant,
11   is it not?
12   A    Well, it is to me, counsel.
13           THE COURT:  All right.  May this witness be excused?
14           MR. KELLEHER:  Yes, Your Honor.
15           MR. JOHNSON:  Yes, sir.
16           THE COURT:  You're excused.  Thank you.
17           MR. KELLEHER:  Your Honor, at this time the
18   government calls Lonnie Nance to the stand.
19   LONNIE NANCE, GOVERNMENT WITNESS, SWORN:
20                   DIRECT EXAMINATION
21   BY MR. KELLEHER:
22   Q    Would you please introduce yourself to the ladies and
23   gentlemen of the jury?
24   A    Name is Lonnie Nance.  I'm a Deputy U.S. Marshal with the
25   U.S. Marshal Service here in Springfield, Missouri.
```
127

1    Q    Is your duty station actually here in the federal

2    courthouse?

3    A    It is.

4    Q    Among the duties that you have, is one of them

5    fingerprinting individuals who are arrested for federal

6    crimes?

7    A    Yes, it is.

8    Q    In connection with your duties, did you have occasion to

9    fingerprint Robert Joos?

10   A    Yes.

11   Q    And do you see Mr. Joos in court today?

12   A    He's at the table sitting beside Mr. Johnson in the

13   orange jumpsuit.

14        MR. KELLEHER:  Let the record reflect identification

15   of the defendant, please.

16   Q    (By Mr. Kelleher) And, again, when you fingerprint an

17   individual, could you tell the ladies and gentlemen of the

18   jury just briefly how it's done?

19   A    We start -- we have a full process, asking information

20   and stuff.  When I fingerprinted Mr. Joos, it was because

21   fingerprints needed to be retaken.  I retook them last week on

22   him.  But we have a laserjet printer -- I mean an infrared

23   scan printer and you roll each print over that infrared line

24   and it picks up your fingerprint and scans it into the

25   computer.

1   Q    I'll show you Government's Exhibit 36.  Could you
2   identify this sheet of paper for me?
3   A    Yes.  It is the prints I took last week.
4   Q    Prints of who?
5   A    Mr. Joos.
6   Q    And does it indicate -- in fact, does it bear his name
7   and your name to corroborate those facts?
8   A    Yes.  It prints my name as being the person who printed
9   the card and also I signed my name.
10  Q    Okay.
11            MR. KELLEHER:  Your Honor, move to admit
12  Government's Exhibit 36.
13            MR. JOHNSON:  No objection, Your Honor.
14            THE COURT:  All right.  Government's Exhibit 36 is
15  admitted.
16            MR. KELLEHER:  And I have no further questions of
17  this witness, Your Honor.
18            THE COURT:  Do you have any questions?
19            MR. JOHNSON:  No, sir, Your Honor.
20            THE COURT:  All right.  You can step down.  Thank
21  you.
22            That it?
23            MR. KELLEHER:  We're out of witnesses for today,
24  Your Honor.
25            THE COURT:  All right.  So, ladies and gentlemen, as

                                129

1  I said, sometimes we finish early, sometimes a little later,

2  today is early.  So we're going to recess for the evening.  I

3  would like for you to be back -- as I said, coffee -- the room

4  will be open and coffee be available as early as 8:00 or

5  shortly thereafter.  I'd like for you to be sure and be here

6  no later than 8:45 so you can come into the courtroom at 9:00.

7  And with that again I'll say to you -- were you going to say

8  something?

9            MR. KELLEHER:  Oh, no, sir.

10            THE COURT:  Fooled me.

11            MR. KELLEHER:  Jumping the gun yet again.

12            THE COURT:  During this recess or any other recess,

13  don't discuss this case with anyone, including each other,

14  members of your family, people involved in the trial or anyone

15  else.  If anyone tries to talk to you about the case, let me

16  know about that immediately.  Don't read, watch, or listen to

17  any news reports of the trial.  I know you've heard that there

18  may be some, but please don't watch that.  You can see where

19  somebody else's description of what they saw here and if they

20  just saw bits and pieces wouldn't have any bearing in the

21  context of the whole thing, so you need to be for sure.  Just

22  hang on another day here and keep your concentration on what

23  you've seen and heard here in the courtroom.

24            So don't read, watch or listen to any news reports

25  of the trial and remember to keep an open mind until all the

1    evidence has been received and you've heard the views of your
2    fellow jurors.
3              With that, we'll, as far as you're concerned, recess
4    for the evening, and we'll see you in the morning.
5              (Jury exits the courtroom at 4:42 p.m.)
6              THE COURT:  All right.  Please be seated.
7              Now, you've got two more witnesses.  They don't look
8    like they'll be real long.  What do you anticipate in the
9    morning?
10             MR. KELLEHER:  9:30, 10:00, if we start at 9:00.
11             THE COURT:  All right.
12             Mr. Johnson, are you prepared to start in the
13   morning at that time?
14             MR. JOHNSON:  Yes, sir, I am, Your Honor.
15             THE COURT:  And can you give me an idea of how much
16   time you think that your case --
17             MR. JOHNSON:  Judge, I can't tell you right now but
18   it shouldn't -- if you finish by about 10:00, is that what
19   you're saying?
20             THE COURT:  Let's say ten.
21             MR. JOHNSON:  We should be finished by noon.
22             THE COURT:  Then we need to talk about instructions.
23   Are you prepared to talk about instructions tonight?
24             MR. JOHNSON:  Well, no, sir, because I need to talk
25   to Mr. Joos about them.  He indicated he has some he'd like

                              131

1  to -- what I plan to do as soon as we wrap up here is go
2  downstairs and talk to him.
3          THE COURT:  Mr. Joos, do your instructions deal
4  primarily with the elements of the crimes, what we call the
5  verdict director instruction?
6          THE DEFENDANT:  Yes, sir.
7          THE COURT:  Okay.  Are you prepared to talk with
8  your counsel tonight, then?
9          THE DEFENDANT:  Yes, sir.  I have my list right
10 here.
11         THE COURT:  All right.  Well, let's do this, talk
12 with Mr. Joos and get his ideas and then we won't make a
13 record on it in the morning but I would like to talk to the
14 attorneys about 8:30 in the morning just to get a feel for the
15 draft instructions and where we need to go if there are any
16 changes.
17         MR. JOHNSON:  Yes, sir.
18         THE COURT:  Then we can -- we can go from there, but
19 let's try to be prepared to discuss that in the morning.
20         If you'll have somebody here from the government
21 that can make changes if we need to while we're in court, can
22 you do that?
23         MR. KELLEHER:  I can.  It might be wise since the
24 jury instructions that I have submitted at least are the
25 official ones, if you will, the ones directly from the Eighth

                              132

1    Circuit, and if we get those squared away, I think it would be
2    easier if we're just talking about the addition of perhaps
3    maybe extra instructions.
4            THE COURT:  Well, I don't know if we're talking
5    about additional instructions or maybe a disagreement with the
6    government's instruction.  We'll find out at 8:30 in the
7    morning.
8            MR. KELLEHER:  Okay.
9            THE COURT:  Now, the other thing is whether or not
10   Mr. Joos is going to testify and I need to talk with him about
11   that beforehand.  Is that something we can do at a break after
12   the government's case in the morning?
13           MR. JOHNSON:  Yes, sir.
14           THE COURT:  Talk to Mr. Joos about that so we're
15   ready to deal with that, because if you're done at noon, then
16   I do believe we'll try to submit this tomorrow afternoon to
17   the jury.
18           MR. KELLEHER:  Judge, if I may.  I didn't receive a
19   witness list.  Was there a witness list filed by the defense?
20           MR. JOHNSON:  (Shakes head.)
21           MR. KELLEHER:  Okay.  So I assume that --
22           MR. JOHNSON:  Just don't assume anything, Jim.
23           THE COURT:  Well, I know what you're saying because
24   there was no witness list but we'll just deal with it as it
25   comes up.

1          MR. KELLEHER:  I just --

2          MR. JOHNSON:  Your Honor, I have one other thing.

3  Mr. Joos stated that he would like to wear civilian clothes

4  tomorrow and Mr. Nance has already stated that he could get

5  that squared away with St. Clair County.

6          THE COURT:  Okay.  We'll do that.  They may not have

7  the fringe on it like you're talking about.  You okay with

8  that?

9          THE DEFENDANT:  No, sir, we're talking my clothes.

10         THE MARSHAL:  I set it up for his clothes to come

11 from St. Clair County.

12         THE COURT:  So they were the acceptable clothes?

13         THE DEFENDANT:  The deputies told me they weren't

14 told to bring them.

15         THE COURT:  Okay.  Anything else?

16         MR. KELLEHER:  No, sir.

17         MR. JOHNSON:  No, sir.

18         THE COURT:  All right.  Thank you.

19         (Court stands in recess at 4:46 p.m.)

20                   END OF VOLUME 1

21               *   *   *   *   *   *

22

23

24

25