IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,    )
                             )
              Plaintiff,     )
                             )
          vs.                )    No. 09-CR-5022-RED
                             )
ROBERT JOOS,                 )
                             )    January 12, 2010
              Defendant.     )    Springfield, Missouri



CRIMINAL JURY TRIAL
BEFORE THE HONORABLE RICHARD E. DORR
UNITED STATES DISTRICT JUDGE


VOLUME 2



APPEARANCES:

FOR THE PLAINTIFF:            MR. JAMES J. KELLEHER
                             ASSISTANT U.S. ATTORNEY
                             901 E. St. Louis, Ste. 500
                             Springfield, MO  65806


FOR THE DEFENDANT:            MR. DARRYL B. JOHNSON, JR.
                             JOHNSON & JOHNSON, LLC
                             2731 S. Meadowbrook Avenue
                             Springfield, MO  65807


COURT REPORTER:              MS. JEANNINE RANKIN,CSR,CCR,RPR
                             U.S. COURT REPORTER
                             222 N. Hammons Parkway
                             Springfield, MO  65806


Proceedings reported by stenography; transcript produced by
computer.

I N D E X

Page No.

JANUARY 11, 2010 - DAY 1 - VOLUME 1

RECORD  . . . . . . . . . . . . . . .   6

INSTRUCTION NOS. 1-7 READ . . . . . . . .   30

OPENING STATEMENTS BY MR. KELLEHER . . . . . .   30

GOVERNMENT'S EVIDENCE

WITNESSES:

TRISTAN MORELAND
Direct Examination by Mr. Kelleher  . .   36
Cross-Examination by Mr. Johnson . . .   54
Redirect Examination by Mr. Kelleher . .   63
Recross-Examination by Mr. Johnson  . .   69

JAMES PATTERSON
Direct Examination by Mr. Kelleher  . .   72
Cross-Examination by Mr. Johnson . . .   93
Redirect Examination by Mr. Kelleher . .   98
Recross-Examination by Mr. Johnson  . .   103
Ctd. Redirect Examination by Mr. Kelleher   105
Ctd. Recross-Examination by Mr. Johnson .   107

DAVID WHITTAKER
Direct Examination by Mr. Kelleher  . .   108
Cross-Examination by Mr. Johnson . . .   113
Redirect Examination by Mr. Kelleher . .   116

FRED BRADFORD
Direct Examination by Mr. Kelleher  . .   116
Cross-Examination by Mr. Johnson . . .   118

ANTHONY PUPURA
Direct Examination by Mr. Kelleher  . .   119

DAN FRIDLEY
Direct Examination by Mr. Kelleher  . .   123
Cross-Examination by Mr. Johnson . . .   126
Redirect Examination by Mr. Kelleher . .   127

2

INDEX (Continued)                              Page No.

        LONNIE NANCE
        Direct Examination by Mr. Kelleher   .  .  127

JANUARY 12, 2010 — DAY 2 — VOLUME 2

WITNESSES:

        DONALD HAMPTON
        Direct Examination by Mr. Kelleher   .  .  135
        Cross-Examination by Mr. Johnson  .  .  .  140

        NANCY MANIRE
        Direct Examination by Mr. Kelleher   .  .  140
        Cross-Examination by Mr. Johnson  .  .  .  144
        Redirect Examination by Mr. Kelleher .  .  146

GOVERNMENT RESTS    .  .  .  .  .  .  .  .  .  .  147

DEFENSE MOTION   .  .  .  .  .  .  .  .  .  .  .  147

                DEFENDANT'S EVIDENCE

WITNESSES:

        ROBERT JOOS
        Direct Examination by Mr. Johnson   .  .  152
        Cross-Examination by Mr. Kelleher .  .  .  198

DEFENSE RESTS   .  .  .  .  .  .  .  .  .  .  .  214

DEFENSE MOTION   .  .  .  .  .  .  .  .  .  .  .  217

INSTRUCTION RECORD  .  .  .  .  .  .  .  .  .  .  220

INSTRUCTION NOS. 8—18 READ   .  .  .  .  .  .  .  231

CLOSING ARGUMENT BY MR. KELLEHER   .  .  .  .  .  233

CLOSING ARGUMENT BY MR. JOHNSON   .  .  .  .  .  241

CLOSING ARGUMENT BY MR. KELLEHER   .  .  .  .  .  245

RECORD  .  .  .  .  .  .  .  .  .  .  .  .  .  251

VERDICTS   .  .  .  .  .  .  .  .  .  .  .  .  254

INSTRUCTION NO. 19 READ   .  .  .  .  .  .  .  .  256

3

INDEX (Continued)                              Page No.

DEFENSE MOTION  . . . . . . . . . . . . . . 258

FORFEITURE VERDICT . . . . . . . . . . . . 259

REPORTER'S CERTIFICATE   . . . . . . . . . 264

*  *  *  *  *  *

INDEX OF EXHIBITS

| GOVERNMENT'S EXHIBT | | OFFERED | ADMITTED |
|---|---|---|---|
| No. 1-30 | Firearms/Ammunition/Explosive | 83 | 84 |
| No. 31 | Bag with Documents | 85 | 85 |
| No. 32 | DOC Documents | 84 | 84 |
| No. 33 | Documents/CR294-494FX | 90 | 90 |
| No. 34 | Documents/04MC-CR01375 | 91 | 91 |
| No. 35 | DOC Documents | 91 | 91 |
| No. 36 | Fingerprint card | 129 | 129 |
| No. 37 | Photograph | 41 | 41 |
| No. 38 | Photograph | 48 | 49 |
| No. 40 | Photograph | 86 | 86 |
| No. 41 | Photograph | 87 | 87 |
| No. 42 | Photograph | 87 | 87 |
| No. 43 | Photograph | 88 | 88 |
| No. 44 | Photograph | 88 | 88 |
| No. 45 | Photograph | 88 | 88 |
| No. 46 | Photograph | 89 | 89 |
| No. 47 | Photograph | 89 | 89 |
| No. 48 | Photograph | 109 | 109 |

4

INDEX OF EXHIBITS (Continued)

No. 49     Photograph                              110      110

No. 50     Photograph                              111      111

No. 51     Photograph                              113      113

No. 52     Cart/19,0000 rounds of ammunition  84       84

No. 53     Robert Joos letter                      213      214

DEFENDANT'S EXHIBIT:

No. 1      Motion                                  147      --

No. 2      Resume                                  167      --

No. 3      Letter                                          (voir dire)

No. 4      Yearbook                                157      157

No. 5      Motion                                  217      217

*   *   *   *   *   *

USA v. ROBERT JOOS

CASE NO. 09-5022-CR-RED

CRIMINAL JURY TRIAL

JANUARY 12, 2010

\* \* \* \* \* \*

THE COURT:  Good morning.  Please be seated.

Okay.  We ready for the jury?

MR. KELLEHER:  Yes, sir.

THE COURT:  Defense counsel, we ready for the jury?

MR. JOHNSON:  Yes, sir.

(Jury enters courtroom at 9:29 a.m.)

(Call to Order of the Court.)

THE COURT:  Morning, ladies and gentlemen.

Are we ready to proceed?

MR. KELLEHER:  Yes, Your Honor.  Government calls Don Hampton to the stand.

DONALD HAMPTON, GOVERNMENT WITNESS, SWORN:

<u>DIRECT EXAMINATION</u>

BY MR. KELLEHER:

Q    Will you please state your name for the record?

A    My name is Donald R. Hampton.

Q    Where are you presently employed?

A    I'm employed by the City of Springfield forensic services section as a latent print examiner.

Q    You work for the Springfield Police Department?

135

A     I'm employed with them, yes, sir.

Q     And could you explain a little bit about your duties over there?

A     Basically my job duties include but they're not limited to the processing of evidence submitted to the crime laboratory and comparison of any developed or submitted latent prints with inked impressions of known subjects.  My duties also include the photographing of evidence, the writing of reports which give the results of my examinations, and upon request to testify in courts of law.

Q     Can you tell the ladies and gentlemen of the jury a little bit about your background with regard to fingerprints?

A     Yes, sir.  I have been employed in the field of identification for approximately 30 years.  During this time period I have received a bachelor of science degree from East Tennessee State University majoring in criminal justice and additional credit hours through the University of Virginia.  I was employed by the Federal Bureau of Investigation located in Washington, D.C., as a fingerprint identification technician for two years and during this time period I received extensive training in the science of fingerprints.  I later accepted employment with the Tennessee Bureau of Investigation located in Nashville, Tennessee, as a crime technician.  I held that position for one year and three months, at which point I was promoted to the position of a Latent Print Examiner I.  This

136

was considered to be an apprenticeship program of two years and upon completion I was promoted to the position of a special agent, Latent Print Examiner II, and I held that position for two and one-half years, at which point I accepted employment with the City of Springfield, Missouri, as a latent print examiner and have been employed as such for 22 years. I have received extensive training in the field of latent prints, photography and testimony at the FBI training facilities in Quantico, Virginia. I'm a member in good standing with the Missouri chapter of the International Association for Identification as well as the parent body. I am certified by this organization as a senior crime scene analyst and as a latent print examiner. I have attended numerous other schools, seminars, in various parts of the country regarding the various disciplines in the field of forensics.

Q     And would it be fair to say that you have testified as an expert in the comparison and identification of fingerprints on numerous occasions both in state and federal courts?

A     Yes, sir.

Q     Could you explain to the ladies and gentlemen of the jury what an inked fingerprint is?

A     An inked fingerprint is the reproduction of the bridges or raised portion of the finger by applying a thin layer of black printer's ink onto these ridges and transferring that

137

onto a contrasting background, for example, an inked -- or, I'm sorry, for example, a fingerprint card, and the resulting impression is known as an inked fingerprint.

Q    And in relation to these inked fingerprints, how are fingerprints compared and identifications made?

A    Comparison is made by noting ridge characteristics of similar size and shape present on the fingerprint itself.  An identification is effected by the number and frequency of these ridge characteristics and the uniqueness and clarity of these characteristics and their unit relationship that these ridges have to one another that will make them individualistic, if you will.

Q    Now, with regard to this case were you asked to make a fingerprint comparison last week by Special Agent Farnsworth of the Bureau of Alcohol, Tobacco and Firearms?

A    Yes, sir, I was.

Q    And in connection with that request were you provided two sets of inked fingerprints?

A    Yes, sir.

Q    And I'll show you what's been marked as Government's Exhibit 36 and a package of information -- package of documents previously identified and admitted as Government's Exhibit 35 which contains a set of fingerprints on it.  Could you identify those documents?

A    Yes, sir.  On the Plaintiff's Exhibit No. 35, this is a

photostatic copy of the fingerprint card.  I recognize it by my complaint number and my initials.  Plaintiff's Exhibit No. 36 is a fingerprint card and I recognize it by my complaint number and initials.

Q    And did you effect a -- did you examine both sets of fingerprints and make any conclusions with regard to whether or not they matched one another?

A    Yes, sir, I did.

Q    And could you explain to the jury your findings in that regard?

A    Yes, sir.  I compared Plaintiff's Exhibit No. 36, which is a fingerprint card.  It's a U.S. Marshal Services, Springfield, Missouri, inked fingerprint card.  It bears a date of 06/25, 2009, bearing the name Robert Joos, J-O-O-S, with a date of birth 12/25, 1952.  And I also compared the photostatic copy of Plaintiff's Exhibit No. 35, it is a Western Reception & Diagnostic Center out of St. Joseph, Missouri, bearing the name Robert M. Joos with a date of birth 12/25 of 1952, and I effected an identification; by that I mean that the inked prints present on this photostatic copies of Plaintiff's Exhibit 35 and the U.S. Marshal Services, Springfield, Missouri, inked fingerprint card, the inked prints present on both of them were made by one in the same person, belong to one in the same person.

         MR. KELLEHER:  I don't have any further questions.

THE COURT:  Cross-exam?

                    MR. JOHNSON:  Real briefly.

                              CROSS-EXAMINATION

BY MR. JOHNSON:

Q     Sir, so basically what you're saying is both Plaintiff's

Exhibits 35 and 36, the fingerprint cards, were made by the

same person?

A     They belong to one in the same person, yes, sir.

                    MR. JOHNSON:  I have no further questions, Judge.

                    THE COURT:  May this witness be excused?

                    MR. KELLEHER:  Yes, Your Honor.

                    MR. JOHNSON:  Yes, sir.

                    THE COURT:  All right.  You're excused.  Thank you.

                    THE WITNESS:  Thank you.

                    THE COURT:  Call your next witness.

                    MR. KELLEHER:  Government calls Nancy Manire.

NANCY MANIRE, GOVERNMENT WITNESS, SWORN:

                              DIRECT EXAMINATION

BY MR. KELLEHER:

Q     Ma'am, would you please introduce yourself to the ladies

and gentlemen of the jury?

A     My name is Nancy Manire.

Q     Where are you employed?

A     I am employed with the State of Missouri as a probation

and parole officer.

                                   140

Q    And could you give us a brief explanation of what your
duties entail?

A    We supervise people who are put on probation by the court
or on parole by the parole board.

Q    Okay.  Would it be fair to say that when a person is
released from prison, they are then placed on parole?

A    Yes.

Q    And they're -- again, without getting into too much
detail -- they have to report to you, you essentially make
sure that they stay on the straight and narrow; would that be
fair to say?

A    Correct.

Q    Now, in connection with your duties as a parole officer,
did you have occasion to supervise one Robert Neil Joos?

A    Yes, I did.

Q    Do you see Mr. Joos in the courtroom today?

A    I do.

Q    Could you point him out and describe what he's wearing?

A    He's sitting at this table over here, he's got a white
T-shirt and looks like an Army green vest.

        MR. KELLEHER:  Let the record reflect identification
of the defendant, please.

Q    (By Mr. Kelleher) How did you come to supervise
Mr. Joos?

A    He was placed on parole and I was his officer.

Q    And approximately when did that take place?

A    In October of 2007.

Q    Now, you say he was placed on parole.  Does that indicate that he was -- prior to being placed on parole, does that indicate that he was in the Missouri Department of Corrections?

A    Yes.

Q    And why was he spending time in the Missouri Department of Corrections?

A    He was sentenced on a driving without a valid license.

Q    And you were aware that he spent a period of time in prison for that offense, correct?

A    Yes.

Q    How long was Mr. Joos on parole?

A    He was on parole from October 2007 and his parole expired January 22 of 2009.

Q    So in early January 2009 he was still on parole, correct?

A    Correct.

Q    Now, when a person is on parole, are there certain terms and conditions of that parole?

A    They have ten conditions.

Q    Okay.  I want to direct your attention to one of those conditions.

A    Okay.

Q    Do those conditions include the prohibition against

142

possession of firearms or ammunition?

A    That's condition No. 7, weapons.

Q    Was he aware of that condition?

A    Yes, he was.

Q    Now, in terms of your supervision of Mr. Joos, did you ever have occasion to go out to his residence?

A    I went to his residence prior to him ever being released from the penitentiary.

Q    So it would be fair to say it was before he got there?

A    Correct.

Q    When we speak of his residence, we're talking about a rather expansive section of property in McDonald County, correct?

A    Correct.

Q    I assume this is what is called a home visit or home inspection, correct?

A    Correct, it was for a parole plan.

Q    Now, during the course of his parole did you ever go back to meet him at his residence?

A    No, I did not.

Q    Could you explain to the ladies and gentlemen of the jury why you didn't do that?

A    Because it was such a big piece of property, I would never know who was out there.

Q    Okay.  There wouldn't have been much of a purpose to go

143

out there?

A    No.

Q    Now, again in connection with your duties as his parole
officer, were you familiar with Mr. Joos's criminal history?

A    Yes.

Q    I'm going to show you two marked documents from the
McDonald County Circuit Court marked Government's Exhibits 33
and 34.

A    Okay.

Q    Have you seen that set of documents before?

A    Yes.

Q    And, again, based on your knowledge of Mr. Joos's prior
criminal history, do both of those documents pertain to
Mr. Joos now before the court?

A    Yes, it does.

        MR. KELLEHER:  I don't believe I have any further
questions, Your Honor.

        THE COURT:  All right.  Cross-examine?

        MR. JOHNSON:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. JOHNSON:

Q    Ms. Manire, when you supervised Bob on probation like you
stated that you went out to --

A    It was parole.

Q    Parole.  I'm sorry.  When he was released from prison

144

early, correct?

A    Uh-huh.

Q    When you went out there and saw the property prior to the release because that was the parole plan?

A    Yes.

Q    And while he was on parole he had ten conditions. Were there any special conditions?

A    No, he did not have special conditions on parole.

Q    And the contacts that you had -- since you testified you never went out to make a home visit, I assume they were all office visits?

A    Yes.

Q    And when one is on parole or probation and they violate any of these conditions, usually you write a report of violation, correct?

A    Correct.

Q    Prosecutor would then file a motion to revoke one's parole or probation?

A    The prosecutor would do a probation case. It would be up to the parole board to -- they don't file anything to revoke his parole but they have the power to revoke his parole if he's in violation.

Q    Well, let me just cut to the chase. While Bob Joos was on parole, you didn't file any violation reports, correct?

A    No, I did not.

145

Q    He did everything that he was supposed to according to the ten conditions?

A    At the time I thought so, yes.

Q    Well, you closed his case out, correct?

A    It expired.

Q    Okay. And what contact schedule were you with him, once a month, twice a month?

A    He came in once a month and was eventually put on minimum where he just had to call in.

Q    And when one is put on minimum, they're doing -- that's the best they can be put on other than being off parole; is that correct?

A    Yes, they scored the minimum.

Q    Don't you start off usually maximum, medium?

A    It depends on the individual so --

Q    All right. Thank you, ma'am. I have no further questions.

        THE COURT: Any redirect?

        MR. KELLEHER: Yes, Your Honor.

<u>REDIRECT EXAMINATION</u>

BY MR. KELLEHER:

Q    Had you known that Mr. Joos had 19,000 rounds of ammunition and 15 firearms in his home, I presume that would have been a violation of his parole, correct?

A    It would have been.

146

THE COURT:  All right.

MR. JOHNSON:  No, sir.

THE COURT:  All right.  May this witness be excused?

MR. KELLEHER:  Yes, Your Honor.

MR. JOHNSON:  Yes, sir.

THE COURT:  You're excused, ma'am.  Thank you.

THE WITNESS:  Thank you.

MR. KELLEHER:  Government rests, Your Honor.

THE COURT:  Okay.

Well, ladies and gentlemen, we're switching from government case to the defense case so we're going to take a short recess.  Again, be about 15 minutes, probably.  So just be ready to come back in here at five after ten; ten, five after ten.  We'll be flexible there.

(Court reads recess instruction to the jury.)

THE COURT:  With that, we'll be in a short recess.

(Jury exits courtroom at 9:49 a.m.)

THE COURT:  Please be seated.

All right.  Does the defendant have a motion you want to make?

MR. JOHNSON:  Yes, sir.  At this time I'd like to offer Defendant's Exhibit 1.  It's a motion for judgment of acquittal at the close of government's case.  No argument necessary, Your Honor.

THE COURT:  Okay.  Does the government wish to be

147

heard on this?

MR. KELLEHER: No, Your Honor.

THE COURT: All right. Well, with the evidence that's been presented, I think that the government has made a submissible case to allow this to go to the jury, so the motion for judgment of acquittal is denied.

MR. JOHNSON: Yes, sir.

THE COURT: Now, has the defendant made a decision about whether to testify or not?

THE DEFENDANT: Yes, sir. Due to the fact that every time prosecution witness lied, at least half the jury looked over at me like, Did you really do that; there's so many lies on the record now that I'm going to have to refute them. I went through and made a detailed list of all of them so they can be asked the questions of me by my attorney here while I'm on the stand. I'm going to testify, yes, sir.

THE COURT: Now, I need to advise you of your right to testify here just as I do for every defendant.

You understand, Mr. Joos, that you have the right to testify or to not testify; do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And if you were to choose to not testify, they would not be able to make any negative inference; in other words, somebody couldn't argue that you must be guilty because you didn't testify or something like

148

that; do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Now, if you elect to testify, you're going to be subject to cross-examination by the government's attorney; do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: And that may include further questions about your prior convictions; do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Now, have you talked with your attorney about this decision to testify?

THE DEFENDANT: Yes, sir.

THE COURT: And do you feel like you've had a full discussion and all the time you need to make that decision to testify?

THE DEFENDANT: Yes, sir.

THE COURT: So in consideration of your discussions, your considerations and all, then, I understand that it's your decision that you want to testify?

THE DEFENDANT: Yes, sir, but I'm mainly considering your decision, because you just stated that you think they made their case and I agree with you, I think they made their case, but they made their case by lying, so the only thing I can do is refute it.

THE COURT: Okay. I understand. And understand

149

it's kind of a one-sided case at this point here with what they've presented.

THE DEFENDANT:  Yes, sir, which is why I got indicted to start with because it was a one-sided case in front of the grand jury.  They don't get to hear my side of the story, how they going to do anything except indict you?

THE COURT:  So do you have any other witness beside Mr. Joos?

MR. JOHNSON:  No, sir.  And, Your Honor, for the record, I want to state that it's my advice that Mr. Joos not testify.

THE COURT:  Okay.  Well, I understand.  There's pros and cons, Mr. Joos.  I'm sure you understand that.

THE DEFENDANT:  I understand that.

THE COURT:  But I think what we'll do is have the marshals go ahead and seat you up here so you don't have to walk up here; you've got the leg chains on.  You'll be seated before the jury comes back in.  And then when you're done, we'll take another break and you'll just stay seated here until after they go out.

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Okay.  The government have anything you want to say at this point?

MR. KELLEHER:  No, Your Honor, I don't.

THE COURT:  Okay.  Well, we've got about five

150

minutes or so, so we'll be in a short break here and then when we come back in, we'll be ready.

(Court stands in recess at break 9:54 a.m.)

(Jury enters courtroom at 10:11 a.m.)

THE COURT:  Please be seated.

Is the defense ready to proceed?

MR. JOHNSON:  Yes, Your Honor.

THE COURT:  Okay.

MR. JOHNSON:  Your Honor, at this time I would like to call Mr. Robert Joos to the stand, which is already seated.

THE COURT:  We'll need to swear him in.

COURTROOM DEPUTY:  Please stand and raise your right hand.

Do you solemnly swear that the testimony you're about --

THE DEFENDANT:  Sorry.  Matthew 5:34, Christ said swear not at all.

THE COURT:  Okay.  Affirm.  Can you affirm?

THE DEFENDANT:  Yes, sir.

COURTROOM DEPUTY:  You do solemnly affirm that the testimony you shall give in the case now on trial will be the truth, the whole truth and nothing but the truth under the pain and penalty of perjury?

THE DEFENDANT:  I do, so help me God.

COURTROOM DEPUTY:  Thank you.

151

ROBERT JOOS, DEFENDANT, AFFIRMED:

<u>DIRECT EXAMINATION</u>

BY MR. JOHNSON:

Q    Bob, could you please state your name?

A    It's Robert Neil Joos, Jr.

Q    And I've been calling you Bob since as long as I've defended you?

A    Yes.

Q    Bob, how old are you?

A    I'm 57.

Q    And where were you born?

A    I was born in St. Louis, Missouri.

Q    And did you grow up in St. Louis and graduate from high school?

A    I grew up in St. Louis, graduated high school there before I went in the service.

Q    And your mother and father, what did your father do for a living?

A    He was a chiropractor.

Q    How many siblings do you have?

A    I had -- I have had four brothers and a sister.

Q    So there's five in the family?

A    Yes, sir.

Q    You the oldest?

A    Yes, sir.

152

Q     And what high school did you graduate from?

A     McDonald County -- that's where I'm living.
Midwood-Richmond Heights High School.  It was a combined
school district.

Q     And your achievements in high school are what?

A     Well, in high school I was -- I received several straight
A student awards which they give for academic achievement.  I
did get a B one semester of gym and one semester of typing.
On graduation I graduated third in my class.  I had a GPA
somewhere close to four.  I received outstanding math, science
and German students awards.  I was offered a full scholarship
to the University of Missouri-Columbia, which I declined in
favor of going to the U.S. Air Force Academy.

Q     What about were you ever in the Boy Scouts or Cub Scouts?

A     Yes, sir.  I went through the entire Cub Scout program,
achieved all ranks there.  I became an Eagle Scout.  I also
received it's called Pro Deo Et Patria, which is the God and
Country award for service to your church which is for Lutheran
scouts.  That's where I was confirmed, in the Lutheran church.
Brotherhood member of the Order of the Arrow which is for
outstanding campers, basically, guys that know what they're
doing in the woods.  I received numerous patches for hiking
20 miles at a time, which is pretty good for a 12- and
13-year-old hiking 20 miles in one day.  When I was in the
scouts I initiated and ran a glass recycling program in the

153

community for my explorer post which is guys in high school. I also went on three Philmont Expeditions which is -- Philmont is a big scout ranch in New Mexico in the mountains where all three times we hiked 50 miles through the mountains and I got 50-mile hike awards on those. I got one 50-mile canoe award for canoeing 50 miles through the Boundary Waters in Canada, up north into Minnesota. I -- let's see.

Q    Let me ask you --

A    Oh, and as far as scouting goes, I was also -- after I became an adult, I was an assistant scout master, associate advisor for the troop and post for 20 years.

Q    You stated that you got accepted to University of Missouri. Did you also get accepted to the Naval Academy?

A    No. I was offered a full -- I was offered a primary appointment to the Naval Academy or a primary appointment to West Point. I declined both of those and took an alternate instead to the U.S. Air Force Academy, which means I had to compete with 15,000 other guys nationwide to get one of the 800 slots available to the alternates.

Q    Why did you choose the Air Force Academy?

A    Well, when I was at Missouri Boys State just prior to entering my senior year in high school, there were representatives, cadets from each of the three academies that came and gave a presentation. At the time I didn't even realize there was an Air Force Academy. I knew about West

154

Point and Annapolis.  My uncle graduated from Annapolis.  And they put on presentations and then came the Air Force Academy. There just -- excuse me.  There just wasn't any comparison between what the Air Force Academy offered and the standards they had compared to Annapolis and West Point, so I said, "That's where I'm going."  And I didn't know how to apply at that time or anything but they gave us information.  I started out on it and I got Representative James Symington, U.S. Congressman, to sponsor me and I went through all the preliminary testing and everything and that's when he offered me the appointments to the other two academies and I wouldn't take them so he gave me an alternate.  Then I had to go through another whole series of testing and competition to get one of the appointments.

        THE COURT:  Let me just say something.  If you can slow down just a little bit.

        THE DEFENDANT:  Oh, yes, sir, I'm sorry.  I tend to get going too fast.

        THE COURT:  The reporter will very much appreciate it.

        THE REPORTER:  Thank you.

Q     (By Mr. Johnson) Bob, what year did you enroll in the United States Air Force Academy?

A     I went into the Air Force Academy on 5th of July, 1971.

Q     Okay.  And did you complete the Air Force Academy?

A    No, I did not.  I failed aeronautical engineering and was released from service, given an honorable discharge.

Q    How many years did you complete, sir?

A    I was there two and a half years.

        MR. JOHNSON:  Your Honor, may I approach the witness?

        THE COURT:  Yeah.

        MR. JOHNSON:  Let the record reflect I'm showing the witness what's been previously marked as Defendant's Exhibit 4 for identification.

Q    (By Mr. Johnson) Bob, I'm showing you a 1973 yearbook, United States Air Force.  And apparently you had a celebrity in your class, correct -- or the academy?

A    He was there.  He was two years ahead of me.  Actually, he was part of the class that was the primary trainers for my class.  And that was Cadet Captain Sullenburger.  He's the pilot that landed the aircraft in the Hudson and everybody survived.

Q    And then -- so we got him marked here and then also have your picture.  And, for the record, that's going to be page 336.  And that's you?

A    Yes, sir, that's me.

Q    Now, what was your GPA there prior to flunking aeronautical engineering?

A    It wasn't that good.  It was about a 2.7 or close to 3.

156

I was -- the Vietnam war was going on. I was focusing on combat training because most of our POWs over in Vietnam, downed air crews and pilots.

MR. JOHNSON: Your Honor, before I forget, I would like to offer Defendant's Exhibit 4 into evidence.

THE COURT: All right. Any objection?

MR. KELLEHER: No, Your Honor.

THE COURT: Exhibit 4 is admitted.

Q    (By Mr. Johnson) So you went approximately two and a half years at the United States Air Force Academy and you flunked out of aeronautical engineering?

A    Yes, sir.

Q    Upon being discharged from the Air Force Academy, did you attend another university?

A    Oh, yes. When I came out of the Air Force Academy, I went on to Washington University in St. Louis. That's where I got my bachelor of science degree in engineering.

Q    Is that a private university?

A    Yes, sir, it is. At the time it was one of the top ten engineering schools in the country, as was the U.S. Air Force Academy at that time.

Q    How long did it take you to get your degree at Wash U?

A    Just one year. I came out of the Air Force Academy with 121 1/2 credit hours because of the way they push you academically in there. You're taking on average 23 credit

157

hours a semester and then summer school also. So I came into the Washington University -- but they require -- in order to get a degree from Washington University, they require you do at least a minimum of 40 credit hours at the university. So I actually graduated with over 160 credit hours with my degree.

Q    Bob, about how old were you when you graduated from Wash U?

A    Let's see. I should have been 21, 22. I think I just turned 22.

Q    Now, your -- you may have already testified to this, but your father, he had a chiropractic firm, business in St. Louis?

A    Yes, sir, he was a chiropractor in St. Louis and nutritionist.

Q    And upon your graduation from Wash U, where did you go? Did you stay in the St. Louis area? Did you move elsewhere?

A    No, I moved back to Colorado Springs. In fact, I got back there in time to watch my class graduate.

Q    And why did you move back to Colorado Springs?

A    I just really loved the area out there.

Q    The mountains?

A    Mountains and beautiful country. And I had a place at that time up in the mountains, on top of the mountain looking at the back side of Pike's Peak from 50 miles away.

Q    And what was your employment there?

158

A    While I was there in Colorado I --

Q    Talking about when you graduated from Wash U, you were 21, now back there, where did you work?

A    Right.  I started out -- let's see.  I'm trying to remember what the first job was.  Basically, I have so many handyman skills, electrical, plumbing, carpentry, anything dealing with buildings except for I don't do a whole lot of heat and air.  Anything else I can do from septics all the way up to roofs.  So I knew a lot of people from having been in the Air Force Academy out there and a member of the German Club and I got to know a bunch of the Germans.  I used to go polka with them whenever I could get off base.  So they put me to work.  I lived with one of the families there and they put me to work on different places, people I knew, I need my garage refixed or I need this painted, my house painted, things like that.  Started out doing that.

Q    Let me ask you --

A    Then I got a job as a bindery technician.

Q    I'm sorry.  I didn't mean to cut you off.

A    And then also I got into real estate investments, started buying and selling houses out there in Colorado Springs.  Then -- in fact, I bought my first house with a loan I got on the title of my truck for five hundred bucks.  That was my down payment.

Q    Bob, what was your engineering degree in?

159

A    I have a bachelor of science in engineering in technology and human affairs, which is the application of engineering to solving the world's problems of hunger, food, shelter, energy. Specialization was underground housing and alternate energy sources, solar powers.

Q    What about recycling?

A    Yes, there was recycling involved in that also, which I had always been interested in recycling.  I paid for most of my Boy Scout programs growing up by digging around in trash cans and hauling stuff to recycle.  Pay to get things done. Dad had five kids, my mother didn't work until I was older, so if I wanted camping equipment, I pretty much had to buy my own.

Q    So it's fair to say you were always big in the outdoors, camping, hiking, canoeing?

A    Oh, yeah.  I've always loved it outdoors.  That's why I didn't become a chiropractor.  My dad tried to encourage me to become a chiropractor and go into practice with him but -- and I was -- he gave me nine years' training as a technician, so I know what I'm doing but I just didn't want the formal education because I didn't want to be cooped up in an office all the time.

Q    Bob, how long did you stay out in Colorado Springs before you returned back to Missouri?

A    I returned like -- returned to Missouri around 1980.  I

160

was still traveling around the countryside looking for other places because we didn't have a place established in Missouri yet. Basically 1980 was when I first came back.

Q    When you returned back to Missouri in 1980, where did you move to, what city or county?

A    I moved into McDonald County. My father had a chiropractor friend in the county and through him I met another chiropractor who needed work on his house, so I moved in with him and his family and started fixing up his house for him.

Q    At that time period where did you live? What was your physical address?

A    At that time I think it was Fifth and Miller, Pineville, Missouri.

Q    Okay. And did your father or you ever own any land in McDonald County?

A    I didn't own any but I started putting some real estate deals together for my parents.

Q    At the time your parents were still residing in St. Louis?

A    Yes, they were.

Q    Okay. Now, you've heard testimony all day yesterday and I don't think I've heard the term today, but yesterday, the Joos compound. Now, the land, the exhibits we saw with 200-plus acres, who is the owner?

161

A    The registered owners at the county courthouse are my
mother, my father and my brother, youngest brother.

Q    And you have no ownership rights of the land?

A    No.

Q    And when did your father and mother purchase that land?

A    I believe it was 1983.  I'm pretty sure it was '83.

Q    How many acres is it total?

A    It's 200 acres total.

Q    And we heard testimony 10 to 12 caves on it.  Is that
accurate?

A    Depends on your definition of a cave.  There's a dozen or
so rock shelters and probably a dozen actual caves, kind you
get back into and run around in.

Q    Okay.  Now, you're in different dress attire today than
you were yesterday.  Could you explain why?

A    Well, yesterday they wouldn't give me my clothes to bring
with me to the courthouse.  So -- and I --

Q    Do you require special clothing?

A    Yes.  Under the laws of God if you're an Israelite,
you're required to wear fringe on your clothes, which I have
the fringe down the sides and then on the border, the fringe
at the bottom there has to be a violet ribbon.  If I had
sleeves on the shirts, they have to have fringe down -- fringe
around the cuff with the violet ribbon on the cuff.  That's in
the clothing laws of the Israelites in Deuteronomy.

162

Q    Like a buckskin outfit like Daniel Boone, he'd be good to go, then?

A    Right, if you put the violet ribbon on it.

Q    And that comes out of the old testament?

A    Right, the old testament law.  That's what I live by. That's what's --

Q    What is -- what religion do you practice, Bob?

A    I'm a Christian Israelite.  I'm an Israelite by birth, which there's nothing I can do about that.  That's my bloodline.  I'm a Christian by choice.

Q    Okay.  And what religion did you grow up in?

A    I grew up and was confirmed in the Lutheran church, which is you're required to go through the Bible, read every word of the Bible with the minister.  For two years you're going through this twice a week.  And you get through the whole Bible so he can answer any questions you have for you, and then when you graduate from that class you're considered a confirmed member of the church.

Q    Okay.  Now, when you're back in McDonald County did you continue working odd jobs, handyman jobs and such as you just testified to?

A    Yes, I did, but I also established a branch of the church there in the county.

Q    And --

A    Which we need to go back a little bit on -- I should have

163

actually read some of this stuff because I didn't --

Q    We'll talk about that in a little bit.

A    It's hard to remember everything you've done in the past.

Q    Where did you establish a branch of the church at?

A    On that 200 acres that the church bought a lease from my parents, leased that 200 acres from my parents.  The legal documentation for the church establishes as a branch of the Christian Israelite church which there's some 5 million of us in this country and millions more overseas.  But my -- the branch that I supervise, all of our legal documentation is recorded at the county courthouse along with our lease.

Q    So basically your father, mother, and brother own the 200 acres?

A    Yes, sir.

Q    And the church leases the 200 acres?

A    Correct.  They lease it from my parents.

Q    Okay.  And also while we're talking about your religion and your dress attire, what about your beard and long hair?

A    In 1983 I took the vow of Nazarite.  Numbers Chapter 6 in the Bible, if you are going to dedicate your life to God and be in his service and you're a son of Israel, you're required to take the vow.  And under the vow I'm bound by six more laws than anybody else.  I can't have any alcohol, I can't have any contact with a dead body, I'm not allowed to cut my hair on my head, which includes the beard.  Christian Israelite --

164

Israelite men aren't allowed to shave anyway, but I'm not even allowed to trim it, cut it; just have to let it grow. I haven't cut this since 1983. It used to be a lot longer but I'm getting older and it's falling out faster than it's growing back so --

Q    And was getting in my way when I was whispering to you, tickling my nose and getting in my mouth.

        Bob, are you an ordained minister?

A    Yes. I was ordained in 1981 from a branch of the church that was in Colorado Springs at the time. That branch since -- did move up to Noxon, Montana, and we got into a theological or a legal conflict over the idea that they were going to get a 501(c)(3) tax number, tax exemption number from the government, which makes you a government-regulated, not-for-profit enterprise regardless of what you call yourself. But under Section 508(c)(1)(a), the IRS cannot require that the church have a tax number. So because of our ideological differences, we split from that branch of the church. We're still a branch of the parent church, the Christian Israelite church, but we no longer associate with that branch because they wanted to get into the system to get perks of the tax number, I guess.

Q    Bob, I want to show you what's been previously marked as Defendant's Exhibit 2 for identification, and can you identify this document?

A    Yes, sir.  This document was a background check done by an attorney because there's so much adverse publicity about me in the news media, I wanted to file a liable and slander suit against the media and -- because they've just absolutely destroyed my reputation.  And so she did a background check. She contacted three attorneys that I knew personally in St. Louis.  One was my scout master, one was a guy I went to school with who could confirm all these things, plus, she went through documentation to document everything on this sheet here and -- but I could never come up with enough money to go through with the suit.  But it was all documented.

Q    If you would turn to the back.  Did you write this information on this?

A    Yes.  Now, this information I put together myself.  This is where you find all of the 613 laws of God which are in the bible, almost all of which are in the first five books known as the Torah, or the books of the law.  It gives you chapter and verse.  It's alphabetized as to the subject matter all the way from agriculture to the name of God, which is Yahweh, and in between you've got things like cloving laws, food laws, idolatry laws, taxes, everything is in here.  It's right out of the book.  A person can go through and look up for themselves.  And normally I would have this folded up and bound to my hand and bound to my head, but when they arrested me they wouldn't let me have that so -- I was lucky to get the

166

clothes I had on.  Well, I actually didn't have them on but I was lucky to get clothes to take with me.

Q    So basically it's -- lack of a better word, it kind of looks like a resume of your accomplishments through life on the first page?

A    Yes, sir.  The first page is basically -- and some things were forgotten or overlooked.  I forgot that I learned to play the drums when I was in sixth grade and learned to read music.  That's not on here.  But most of the other stuff is.

          MR. JOHNSON:  Your Honor, at this time I'd like to offer Defendant's Exhibit 2 into evidence.

          THE COURT:  Any objection?

          MR. KELLEHER:  Yes, Your Honor, the government would object.

          THE COURT:  All right.  Well, I understand there's a lot on there but I'll allow it, so it's admitted.

Q    (By Mr. Johnson) You can keep it right there, Bob.

A    Okay.

Q    Now, Bob --

A    Excuse me.  There's a few more things that probably need to be explained on this list because I use military abbreviations and I don't know if all the jury is going to be familiar with the abbreviation on here.  They may not know what they are.

Q    We'll get to that.

A     Okay.

Q     You talking about the different awards in the military?

A     Yes, all the different military awards.

Q     The clearances?

A     Like the PFT for maxing the physical fitness test, which only two guys in my entire class of 1500, four achieved that, PFT.  Of course there's -- I guess most people know what IQ is.  I was airborne.  I went through the airborne training with 82nd Airborne, Fort Benning, Georgia.

Q     Let's get to IQ.  IQ of 156?

A     Yes, that's what they told me I tested out in 1971.

Q     What's the highest back then?

A     Oh, at the academy?

Q     IQ from the scale.  If you tested at 156, what is the highest?

A     I've heard as high as it goes is like 230 or something.  Einstein was 160 so -- but they say as you get older you get dumber.  You lose about a point a year.

Q     Like your hair, huh?

A     I don't know what it is now.  Yeah, like your lose your hair, you lose your IQ, too.

Q     Let's -- and this list, I mean, it's exhaustive but I think it's pretty self-explanatory.

A     They may not understand what a state certified religious character is.

Q    All right.  What is that?

A    I was sent to the nut house because I wouldn't take a
public defender in the county court.  They kept me there for
33 months without trial.  I kept refusing a public defender so
they figured I was nuts and sent me to the nut house, and they
determined that --

Q    That's a good point.  Let's digress on that point.
Yesterday --

        THE COURT:  Let me say, and I know you've got a lot
to say, but try to --

        THE DEFENDANT:  Keep it short?

        THE COURT:  -- slow down for her.

        THE DEFENDANT:  Oh, I'm sorry.

        THE COURT:  Remember, she's got to stay with you
there.

        MR. JOHNSON:  She's beating those keys and you're --

        THE DEFENDANT:  I'm sorry.

Q    (By Mr. Johnson) Okay.  That's a good point.
Thirty-three months, that's the first felony conviction that
was testified to yesterday regarding unauthorized use of a
weapon, correct?

A    Correct.  I kept refusing to take a public defender, and
they didn't want to take me to trial without an attorney
because they didn't want me to have evidence and witnesses for
my defense and I kept demanding them, and after going through

169

five judges, they finally dropped most of the charges on me and kept just two, which resisting and -- it wasn't concealed carry. They charged me with --

Q    Unauthorized use of weapon.

A    -- unauthorized use of a weapon.

Q    Could you explain to the Court where the weapon was found and what you were doing with the weapon?

        MR. KELLEHER:  Judge, I'm going to object to all this.  This isn't relevant to anything.

        MR. JOHNSON:  Your Honor, I believe there's relevance to the conviction.

        THE COURT:  Yeah, I understand.  As I said, there's a lot on there.  I've given you a lot of leeway here because what we're all about here is the case before us.  But I'm going to let you go ahead.  The objection is overruled.  But let's try to stay within the spirit.  This is pretty far beyond.

Q    (By Mr. Johnson) We're just referring to the '94 conviction from the unauthorized use of a weapon.

A    They claim they found a handgun in the van I was driving. That's basically what it boiled down to.

Q    Then you stayed in the county jail for 33 months?

A    Thirty-three months without trial.

Q    And a jury found you guilty and you got credit for time served?

170

A    Right, that's -- see, that's one of the lies they said
yesterday, I spent 33 months in DOC.  No, I spent 33 months
without trial in McDonald County.  They gave me time served.

Q    So for the jury, DOC is Department of Corrections, which
is prison, correct?

A    Department of Corrections.

Q    So you didn't go to prison on the first conviction, it
was 33 months in the county jail?

A    No.  Right.

Q    Now, then there was another conviction that was testified
to yesterday I believe occurred in 2004, driving with no
driver's license.  Bob, when did you lose your driver's
license?

A    I didn't lose it.  I rescinded it in '83.

        MR. KELLEHER:  Judge, I'm going to object.  When he
did and when he did not have a driver's license is not
relevant.

        THE COURT:  I understand.  I'm going to let you have
a brief explanation of it.  Go ahead.

A    Brief explanation.  The law says you have the right to
travel on public a right-of-way.  You do not have the right to
use it as your place of business.  I do not use the public
right-of-way as my place of business.  I was not in a motor
vehicle as defined by Missouri code of state regulations
12 CSR 10-225.  Motor vehicle is defined in the code as a

171

commercial use vehicle.

Q     (By Mr. Johnson) Bob, the question is, when did you rescind your license?  You never lost your privileges, correct?

A     Correct.  It says I was driving while suspended.  That wasn't it.  It was operating a motor vehicle without a valid license.

Q     Did you lose your license?  Did you not --

A     I rescinded it due to my religious beliefs.  God's law says making no covenant to a heathen.  People don't understand, you know, that --

Q     Did you go up to the Department of Revenue and say, "Here's my driver's license back"?

A     Well, I sent it back with a recision notice, which is also filed with the McDonald County courthouse.  It was sent to the state department of motor vehicles of Texas.  That's where I had my last license out of.

Q     So it was a voluntary act on your part to rescind your privileges -- or license?

A     To get in compliance with the laws of God, correct.

Q     And after a number of convictions of driving with no driver's license, it was bumped up to a felony and you went to a jury trial on that; is that correct?

A     Correct.  And again I was not allowed to present evidence or witnesses in my defense.

172

Q    Well, just the outcome of that, you were convicted of driving with no driver's license?

A    Yeah, I was falsely convicted by the state.  That's the issue that was -- I was prepared to take up to the federal court on appeal when I was arrested on this.  I exhausted my state remedies.  The only remedies left are in a federal court.

          MR. KELLEHER:  Judge, I'm going to object to this --

A    If you're going to assert a right, you can only assert the right by getting convicted and then taking it up on appeal.

          MR. KELLEHER:  Judge, I object.

          THE COURT:  I understand.

Q    (By Mr. Johnson) Bob, you got to listen to the question.  You're still going a little too fast.

A    Sorry.

Q    You got to answer the question, because you might be going too fast for the jury, too.

          Now, Bob, this conviction which occurred I believe in 2004 you actually were sentenced to the Department of Corrections, correct?

A    Let's see.  First -- correct order.  First I was sentenced on felony resisting arrest.  On that I got reversed on appeal because the Court found there was no evidence on which to convict me.  This was a two-count charge; one,

173

resisting arrest, one, driving without the license.  I did almost two years on that felony resisting before I got it overturned.  So it was consecutive sentence.  The judge sent me back for two more years for driving without a license and DOC held me a hundred days past the end of my sentence, at which time I filed federal habeas corpus which went to the federal Judge Whipple in Kansas City and when he eventually ruled on it, not in state custody.

Q    Bob, you were paroled at one point because we just heard from your parole officer, correct?

A    That's correct.  While I was on parole I was pursuing the habeas corpus action which finally ruled in my favor by Judge Whipple.  He dismissed it on the ground I was not in custody.

Q    Okay.

A    Custody is -- if you're on parole, you're in custody. U.S. Supreme Court says so.  So if I'm not in custody any longer, then I can't be on parole.  So, actually, I won the case.

Q    Okay.  But --

A    Which means I hadn't been on parole from day one.

Q    Let's --

A    It goes back to the time you filed your habeas.

Q    Bob, let's take it from here, though.  Right now testimony yesterday, you had two felony convictions.  The convictions were offered into evidence and certified so -- and

174

that's what you're charged with today is a felon in possession of weapons as well as explosive devices, correct?

A    Correct, because the courts since I've been jailed for the last six months have consistently refused to hear my petition in violation of my rights under the First Amendment for petition to redress a grievance.

Q    Okay. Bob, now, when you were on parole you heard the testimony of the parole officer that you -- no violations, you did everything you were supposed to, correct?

A    That's correct. And I even did things voluntarily. A guy was circulating a rumor that I was using drugs and he was going to report me. I went immediately to my parole officer and asked for a drug test. They tested me and I tested absolutely clean. I don't use drugs. I've got chronic fatigue. I've got chronic nausea. I've got chronic headache. I've been to the jail doctor. They can't do anything for me because I won't take drugs.

Q    Bob --

A    I'll take medicine, which is the herbs which God has given us, but they don't deal in herbs. They only deal in drugs, and I won't take them.

Q    In June of '09 when the feds conducted their search, where were you living? What was your address?

A    June of '09? Oh, my address, official address is Robert Joos, in care of the church, Powell, Missouri.

175

Q    And where is that physically located?

A    The church is physically located -- the church sanctuary
is that 200 acres and so I live on that 200 acres.

Q    So you eat, sleep every night on that 200 acres?

A    Right, someplace on it.  Depends on which job I'm working
on.  There's a lot of job sites out there.  Being a
construction engineer for underground housing, I've convinced
a few people to build some places out there underground.  So
I'll go and I'll work on digging their places out and trying
to prep something for them.

Q    Okay.  Now, we saw pictures yesterday or diagrams of the
200 acres and I believe it was Government's Exhibit 30 which
showed a structure that the agents testified to is a church
office.  Are you familiar with that structure?

A    Yes, I am.

Q    And it is Plaintiff's Exhibit 38 I'm showing the witness.
This structure here --

A    Correct.

Q    -- what is that?

A    You're looking at the front of the church office
building.  The jurors can't see that.  You got something to
put on the screen so they can see it?

Q    I'm sorry.

A    This is the front of the church office.  I was
building -- at the time I was arrested, I was in the process

176

of building the bell tower.  We had people donate a bell to us
and so I figured, Well, build a bell tower on the end of the
office building.  Plus, there's a section over here I was
building an additional structure on the side to put on a
separate summer kitchen because we heat the building with wood
and I have an outside wood stove for cooking outside in the
summertime.  It's too hot inside for people to use the stove
in there.  And so a summer kitchen plus I was going to put an
apartment over the top of that and put a line out to the big
walnut tree there and build a treehouse in the walnut tree out
there.  On the other side of that is a stream that runs by.
Then we'd have another place for people to stay when they come
out there.

Q    So this was the church office?

A    This was the church office.

Q    Did you live in this structure?

A    No, I didn't actually live at the structure.  I worked on
it.  I used the office occasionally because that's where most
of the church law library is.  Basically, what I've got inside
the building is my legal papers that I was working on in order
to get them filed in the federal court to get those two false
convictions in state court overturned.

Q    Bob, what structure did you live in, because the
government testified there were several structures on this
property?  Which one did you live in?

A    At the time I was paroled -- I had lived in various structures around the --

Q    We're talking about the time of June --

A    At the time of June?

Q    Correct.

A    I was living in the -- let's see, which was it?  There's a big motor home out there sits along the road.  We just got one and I had been doing some work on it so I just usually slept in it.  I'd sleep in the area where I was working, like I said, one of the caves in those areas.  But I was having real trouble at the time.  Because of this chronic fatigue I was sleeping -- by the time I was arrested, I was down to 12 hours.  I was able to stay awake 12 hours a day.  But I had been so sick back after the feds had been out there snooping around that I was sleeping at one point 20 hours a day.  I could hardly stay awake.  I'm used to only sleeping four to six hours a night and here I am sleeping 20.  I couldn't figure out what was -- I thought I was having trouble with my hypoglycemia.  Well, it turned out, as it turns out, I started noticing all these -- my body was starting to be covered with all these spots.  Well, they're liver spots.  I've got liver damage.  So when things started turning green, I started eating all the greens that were coming up, especially plantain, which will help detox you if you've got a problem where you've got a --

178

Q    Bob --

A    -- toxin of some kind is damaging to your liver.

Q    Bob, you're going too fast again.

A    Oh, sorry.

Q    We don't want to educate the jury on medical issues at
this point.

        Let's cut to the chase, Bob.  Started out with
testimony from Agent Moreland yesterday and talking about the
Mahon brothers.  Do you know the Mahon brothers?

A    Yes, I do.

Q    And what are their names?

A    Dennis and Daniel.

Q    And how did you become acquainted with them?

A    There was an attorney I knew in Tulsa, Oklahoma, who -- I
forget, I think I met him through some correspondence with
different people and he heard about the church and the
sanctuary, was interested in building him a place out there
possibly.  He came out and used to camp out there.  He told me
about these guys he knew in Tulsa, Mahon brothers, they might
be interested.  So they came out there and I met them, I
showed them places around the property and the different caves
that were available for lease or rent or whatever.  That's how
I originally got to know them.

Q    How often did they come to your property, or to your
parents' or the church's property?

179

A    Once or twice a year usually.  For several years I didn't

see them at all, didn't even hear from them, then one day they

started calling again, wanted to come back and take a look

around again, so I showed them around the property again.

Q    You know they've been indicted in that bombing in

Scottsdale, Arizona?

A    I heard about that, yes.

Q    Did they call and tell you they were involved with that?

A    No.  In fact, since that time they had been back out

there and I had seen them and they never mentioned anything

about it, said anything about it, alluded to it, nothing.

Q    And as far as any -- you heard the testimony in voir

dire, a couple of the panel had heard you on the news about

being anti-government, white supremacist.  Would you classify

yourself as a white supremacist?

A    No, absolutely not.  That's just not true.  It's, again,

a false reputation created by people trying to destroy the

church, run us out of there, and take over the property.

Q    Do you belong to any organizations like the Klu Klux

Klan?

A    No, never have belonged to anything like that.

Q    Skinheads?  Aryan Nation?

A    No, I have not.

Q    Now, you heard about Agent Moreland testified he came out

to the property on at least two occasions, I believe in

January and February of '09 and met with you?

A    Correct.

Q    Okay.  And he identified himself as Jimmy?

A    Right, that's all.  I didn't know anything other than the name.  He said he was Jimmy.

Q    Well, how did he -- how was he able -- strike that.

     How did you invite him and meet him?  You invited him to your land?  How did that take place?

A    Well, there was this lady known as Becka Stevens.  Becka was a friend, apparently, of the Mahons, especially Dennis.  Dennis had the hots for her.  He was living up in northern Illinois where it was too cold for her.  She's from like Arizona.  So he told her about his place -- you know, he's got a little piece of ground leased down on the church property and he told her about that place.  He says really good, nice place, might be able to set up something there to survive because, you know, we're apocalyptic Christians.  We believe this entire system is going to collapse and we just want a place to hide when it does.  So he sent her down there and I showed her around.  She picked up a -- said she picked up the owl feather while I was showing her around out in the woods and she brought it into the office when we went in there and laid it on the --

Q    When she first --

A    -- mantle of the fireplace.

181

Q    I'm sorry, Bob.  When she first came down there, did she come with one of the Mahon brothers, Becka Stevens?

A    No.  When she came down, she came down on her own.  She didn't come down with anybody else.

Q    And then did she contact --

A    In fact, she never -- she's never been down there at the same time with the Mahons.

Q    Well, how did you meet Jimmy?

A    She brought him down there.  She said she had friends that she could catch a ride with because they were going to go up and see the Mahons in Illinois so she said when they came through, she said her friends might be interested in having a place out there.  I'm always looking to recruit people for the church.  It's hard to do when you got a reputation like mine, you know, because they just punch me in on the Internet and, Oh, my God, this guy's a maniac, I don't want to get involved with this.  So any time anybody wants to come down and join the church or go through the program -- part of the program is studying the laws because you don't get confirmed in the church unless you agree that this is the laws of God.

Q    Real quick about that church.  The exhibit we were just talking about, because I'm sure the jury is interested, you don't hold church services in that building, do you?

A    No.  Occasionally we have bible studies in there but like Christ said, where two or more are gathered in my name, there

182

he is.  And our church is small.  Largest number of people
we've ever had on the property at one time is like 40 people.

Q    Do you ever hold services outside of the property?

A    Oh, yes.  If people -- I'm kind of like the old time
traveling doctor.  I'm a traveling minister.  If people want
to sit down and talk about this, about the laws, things that I
believe they need to be doing in order to avoid the wrath of
God, this is what they need to know.

Q    When Becka Stevens brought Jimmy to the property, which
now we know is Agent Moreland, did Jimmy introduce himself as
being interested in the religion or he said the movement?

A    He was more interested in talking about -- well, I asked
him about, well, yeah, it would be nice to have a survival
place here.  He said something to those -- when I asked him
about that.

Q    Bob, you need to slow down again.  She's --

A    Okay.  That's what he was wanting was to look at -- he
claimed to look at all these caves, he might want to lease a
cave, prepare a place in case the system collapses.  But then
all he wanted to talk about was something he called the
movement and racist issues.  This was all stuff he was
bringing up.  I never brought up any of this stuff.

Q    While he was out there did he ever talk about guns or
weapons?

A    Yeah.  He not only talked about them, he brought out a

183

big 50 caliber snipper rifle, machine gun and a pistol that they -- I told him there was an old car out there we were going to junk.  They wanted to shoot something up so I said you can shoot up that car over there.

Q    Speaking of old cars, there was a lot of old cars out there?

A    Yes.  People -- we're a poor church.  We'll take any kind of donation people will donate to us including garbage.  I hauled garbage for years to use for compost out there because the soil is -- we live in rock orchard country like some of you probably do; you got a new crop of rocks every spring pop up out of the ground.

Q    Did you have any conversations with Agent Moreland about possessing any weapons, you possess them or possessing any explosive devices?

A    No.  He asked me about how to build.  He told me he did demolition work, you know, demolishing buildings.  So he was a handyman, sometimes you got to tear things down.  He said he had a building he wanted to demolish, wanted to know what I knew about demolishing buildings using explosives.  I never done that myself but I said I know some things, I can give you some information on how to do it.

Q    He also testified that a number of weapons were located in the church building.  The first visit he could only see the butts or the stocks of the weapons.  Who owns those weapons?

184

A     That's a good question.  There's a lot of people that
use —— I shouldn't say a lot.  A lot for us.  Maybe a half
dozen people that have keys to that building.  And it's a
storage building, it's not just an office.  Office is really a
misnomer.  The kitchen and the dining room are —— the whole
dining room is just lined with file cabinets.  The dining room
table's got file cabinets on it.  There's a computer in there
which I never used because I hate the things.  And what else
was in there?  A copy machine, the small copy machine.  The
big copy machine was in the back room.  And then the kitchen,
one wall is lined with law books and then there's files on the
kitchen counter and files on the —— next to the sink.  So
that —— mainly that's the office part of the building, really,
you know, where people do their legal research and where I do
my legal research.  The rest of the building is basically
storage.

Q     Well ——

A     People store their stuff there.  I don't pay any
attention to it.  It's not my stuff.  I have no business
snooping around in their stuff.

Q     —— did you own any of the weapons?

A     No, did not own anything.

Q     Any of these shotguns or pistols?

A     Some of that stuff I've never seen before.  That one
thing is the same thing that Jimmy pointed out, that Mossberg.

185

Q    Shotgun?

A    Yeah.  Well, he brought food out there to eat and we were
having lunch in the kitchen, he sees this thing sitting over
behind the door and he goes, "Oh, is that a Mossberg sitting
over there?"  That's the first time I'd seen it.  I didn't
know anybody had left anything sitting there.  I hadn't been
in the building in a few days and somebody -- so I'm like,
"Yeah."  I didn't want him going over there messing with it.
It could have been a BB gun for all I know.  I didn't go over
and check it out.  And that's one of his lies; he said he went
over and picked it up, checked it.  No, he never even touched
the thing.  And he was never out of my sight while we were in
there so I know he didn't do that.

Q    Did he fire any of the weapons while he was out there,
the ones that you said --

A    No, I've never fired any of them.

Q    No, no, no.

A    -- and he never fired any of them.

Q    Okay.

A    He never even touched any of them.  Like I said, he was
never out of my sight so --

Q    Did he ask you about any automatic weapons, M-16s,
AK-47s?  And I think he was testifying about a Russian sniper
weapon yesterday.

A    Oh, the Russian -- and I think they said there was a

Mosin-Nagant over there. You need to take a look at that thing. It's an antique World War II bolt-action rifle. Okay? I had a guy tell me that he could get a deal on like a dozen of them from some buddy of his so I was taking names of people who might be interested in them and then when he had the arrangements made, I'd give him the names, they could go talk to the guy, and if enough people got together to buy enough of them, the guy would give them a break on a dozen at a time instead of buying them one at a time. They're more expensive when you buy them one at a time. So I just try to help people put together -- it's just like with the newspaper ads. People are interested in guns. I'm always looking, okay, I'll cut the ad out. Just like Jimmy said yesterday -- or Moreland, whatever -- I gave him some ads that I cut out of the paper for him because he said he's looking for guns, so I gave him the ads. I don't personally go out and get guns for people, no.

Q   Now, what you were testifying to about your religion, you think the system is going to collapse, correct?

A   Absolutely. It's not just because of my religion. I'm watching TV and they're saying it. 250,000 water main breaks every year in this country. The roads are collapsing. People are dying when bridges are collapsing. They're not repairing anything. The sewer systems are backing up. The rivers are full of pollution. The air is full of pollution.

Q    Well, what was the reason in collecting all those trashed, junked vehicles on the land?

A    I run the church's poverty program.  We have people that are so poor even if they weren't so terrified to come to court to testify on my behalf they don't have the gas to come from southwest Missouri up here to court.  We're talking people living on like a 350-, $400-a-month Social Security check.  So we provide anything we get.  We provide building materials, car parts, anything we can put together.  Plus, I don't believe in throwing things away.  I grew up poor, made my living digging in the trash in addition to having a full-time job in the summers working as a printer's devil.  I believe in recycling.  And God's law says he's going to destroy those who destroy the earth.  These people are just throwing everything away are throwing away our planet.

Q    Had you seen all the weapons before other than yesterday?

A    No, other than, like I said, if -- if that thing that he said was a shotgun he saw at the --

Q    I'm talking about rifles, shotguns.

A    No, all the other stuff, huh-uh, just that one thing he said was a Mossberg.  Now, I don't know that that's the thing that he saw sitting there because I never inspected it or messed with it.

Q    Were you aware that they were in the church office?

A    No.  I didn't -- I didn't keep track what people were

188

storing there. Like I said, when I went to the church office it was either to show somebody a movie or to do some legal research.

Q   Let's talk about that movie. Jimmy said -- Agent Moreland, street name Jimmy, we'll call him, he testified that you had him watch a Vietnam war movie; is that correct?

A   Right. It was called -- if you're not familiar with it, it's We Were Soldiers.

Q   And --

A   It's a reenactment of the very first battle between our combat troops and the North Vietnamese. It was 200 of our guys against 4,000 of theirs. It was superior fire power against superior numbers.

Q   And why did you want him to watch that movie with you?

A   My point in showing him the movie was to point out the fact that there's no point in fighting the system with arms, we don't have the fire power, we don't have the numbers, so the solution is Revelation 18:4, "Come out of her, my people, that you will not partake in her sins, or receive of her plagues." We've got over 4,000 dead already in this country from swine flu. They weren't living out in the system, they never would have got it to start with. If you were living like God intended you to, out on the Earth, taking care of the Earth, you wouldn't be having those problems.

Q   Did you inform him that everyone in your congregation had

189

a .30-'06 because that was the weapon of choice?

A    No.

Q    And they had armor-piercing bullets?

A    Now, he may just be confused on that point and not just deliberately lying. I said I used to know people when I was a consulting engineer for an underground housing project out in Colorado in Cripple Creek, that group of people were also -- they weren't really apocalyptic Christians but they were more like survivalists. They also believed the collapse was coming. I'm helping them build underground places out there and those people all had .30-'06s and .45s and I think 12-gauge shotguns. That was their standard -- you know, what they wanted everybody in the community to have.

Q    Bob, you may have already testified to this but I don't remember. At what age did you switch religions from Lutheran to the religion that you practice now?

A    I started studying for that ministry in '77, '78. It was a part-time thing because I couldn't go to seminary or work on it full-time. So it took about five years, four or five years before I got my ordination on that. That's when I started studying it.

Q    Somewhere in your late twenties?

A    Right.

Q    Now, there was another building that was testified to called the bunkhouse, referred to the bunkhouse?

190

A     Correct.

Q     And one of the agents testified that's where the gun powder was found, the fuses, the cannon wire he testified to and the blasting caps.  Were you aware that these items were in the bunkhouse?

A     No, absolutely not.  And --

Q     Do you know who put them there?

A     It's called a bunkhouse but it's basically a big storage building.  There's one corner of it that has rooms with bunks in them and it's got a little wood burning stove in there for heat and that's why we call it the bunkhouse, but mostly the whole thing is packed up with storage.  I think one of their guys yesterday even testified that it was piled floor to ceiling almost with storage items, which is pretty much the way the thing looks.

Q     Well, who all has access to the property, to the church building, to the bunkhouse?  Are there locks on the doors?

A     There's locks on everything now.  When they were out there I think everything was locked up.  But there's any number of times I found the back door to the office, somebody's left it open or the back door to the bunkhouse has been left open.  In fact, the day that what's her name, Becka was out there the first time, she was --

Q     Besides --

A     When we got to the place she had to pee real bad.  I

191

said, "Well, pull up here -- "

Q    Bob, listen --

A    "-- go out and use the outhouse out there."  Instead she went around behind the bunkhouse an peed.

Q    Bob --

A    Then I found after that the back door was open.

Q    You're losing us.  Who all had access to keys to either the church building or the bunkhouse?

A    The people besides myself would have been Jeff Conway, Earl Rushing used to have a set of keys, I believe Billy Herd had keys.  And, again, if you got keys, you have authorization to loan them or supervise other people with the use of the keys and so other people can be coming in and out of those buildings.  And this has been going on for years.  We've been there 25 years.  So the amount of stuff, like they testified yesterday, it's all over the place.

Q    Jeff Conway, he lives on the land, correct?

A    Correct, he lives there.

Q    He lives there with his wife?

A    Correct.

Q    What's her name?

A    Mary Lisa Conway.

Q    And they live in the trailer right when you enter into the property?

A    Correct.

Q    And how long have they lived on the land in the trailer?

A    They've been there since '98, I think, since '98.  And they're not the only ones.  His kids used to live in the trailer next to it, the ones that weren't still living at home.  The adult kids were living next door and various other people.  In fact, when they came out there, a lady named Janet who didn't have a place to live, she was living in the trailer next to Jeff's place.  Which, of course, you know, her and several other people who were associated with the church headed for the hills.

Q    Bob, I'm going to ask you, so you didn't own any of these weapons that are in court today --

A    No, I never owned any of those.

Q    -- and this 19,000-plus ammunition?

A    None of that stuff.

Q    Whereas they said it was located, it was in the church building, in the bunkhouse and you don't know how it got there?

A    No, I don't.

Q    And you've been --

A    I have -- of course, I have my suspicions because a lot of the guys who come out there, they only come out there once a year to hunt, so they don't want to carry their guns back and forth, I imagine it would make sense to store them out there on the property.  Like I say, it's not my stuff.  I

193

don't mess with it.  I don't go snooping in people's stuff.
Now, there's church storage areas which are for donations.
Now, those are the areas that I mainly deal with because I'm
always taking stuff in and taking stuff out.  When somebody
else is using the areas, I don't mess with their stuff.

Q    Now, when Becka contacted you, did she ever contact you
through the mail?

A    Yes, on numerous occasions.  She'd write letters and I'd
write her back.

Q    Did she ever ask you about how to build a bomb or what's
required?

A    She told me Jimmy had a demolition job, which something
he'd referred to earlier when he'd been there, and she wanted
a diagram of something that could be used to demolish a
building.  So I sent her all the information along with all
the safety information, the government requirements for, you
know, your bonding and licensing and permits and all that
other stuff that's required.  Some places you have to have it,
some places you don't.  I found out when a guy blew up a
mobile home on one of our properties in McDonald County that
McDonald County doesn't require it. As long as it's your
property, you can blow it up, burn it down, whatever you want
to do with it.

Q    Did you ever instruct her on how to build a bomb?

A    No, I never gave her personal instruction on how to do

194

anything like that.

Q    We heard testimony yesterday about a recipe.  Are you familiar with Agent Moreland's testifying about that?  Did he ever ask you about how to build a bomb or what components?

A    When he called, I think, about that demolition charge I told him how to build for demolishing the building.  One of the reasons I did that was because -- well, because of my reputation there may be people coming to me thinking that I'm going to help them get involved in something that I don't believe in to start with.  And this guy was making a pretty good case for himself that he was up to no good.  Now, for years I haven't been able to refute what people have been saying about me, so I figure if this's guy dumb enough to use it for something illegal, he's got a specific design that I gave him and he'd been calling me on the phone telling me that, well, he's going to be there, he's going to be there.  One of the reasons I fell asleep in the office that night because if I go underground with the phone, I can't get reception.  He said he's going to call because he was going to be coming back my way after he took care of some business in Arizona.  So I'm figuring if this is monkey business, as soon as he calls me and he says he's on the way, I'm going to contact the sheriff, find out if anything's been blown up that ain't supposed to be blown up anywhere in the country, because I don't know where he's going to be calling from -- he's on a

195

phone they can trace on a cell, because all your cell phones can be triangulated through the towers that you use -- if he's in the area where something got blown up and then maybe they got a design of the bomb used, I'd have the sheriff waiting for him when he gets there.

Q    Bob, when they -- the feds and local authorities came out for the -- to execute the dynamic search warrant in June of '95, where were you located when they arrested you?

A    That's when I was waiting for the phone call.  Plus, I had a -- wanted to get an early start on building that bell tower the next morning.  I was asleep in the recliner right next to the front door in the office.

Q    So you were in that structure that --

A    I was in that structure right there.

Q    In the church building?

A    Correct.

Q    And when they came in to execute the arrest, did you cooperate?

A    Didn't have much choice.  I mean, I heard this explosion and when I jerked awake, the lock off the front door was bouncing off the fireplace next to me and zinging out into the room.  Of course, it's dark and I see this figure in the doorway all dressed in black with a machine gun yelling and screaming.  I couldn't really tell what he was telling but I wasn't going to move until I got some clear instruction.  I

196

heard all kinds of people yelling and screaming outside.  In
the background I started hearing a helicopter.  They jerked me
up out of the chair and hauled me outside in my underwear and
start shooting all these questions at me and I have no idea
what's going on.

Q     Okay.

          MR. JOHNSON:  Your Honor, at this time I have no
further questions.

          THE COURT:  All right.

          THE DEFENDANT:  There's one thing that we didn't
cover which was that state certified religious character
thing.  It says on there like when they had me in the nut
house they use character now instead of fanatic because
terrorists have given fanatics a bad name.  And basically
that's what I am, I'm a religious fanatic, which means
somebody who's extremely devout, and that's exactly what I am.
I live by these laws that are set forth right here that are in
the bible.

          MR. JOHNSON:  Thank you, Bob.

          THE COURT:  All right.  Let me ask the government,
is this going to take a little while?

          MR. KELLEHER:  No, I don't think so, Your Honor.

          THE COURT:  Okay.  I was going to take a short
break.

          MR. KELLEHER:  I can't imagine this going more than

10, 15 minutes.

        THE COURT:  Jury okay with that, another 10, 15, 20 minutes?  Okay.

CROSS-EXAMINATION

BY MR. KELLEHER:

Q    Good morning, sir.  Now, on the date that this search warrant was executed, you indicated that -- that the officers came in and arrested you.  You indicated that you were asleep in the office, Government's Exhibit 38, correct?

A    Right.  I was sitting there in my recliner, right.

Q    Very same building where all these weapons were recovered, correct?

A    So you say.  I don't have any idea where those weapons were recovered from.  I didn't know where they were, didn't even know they were in there.

Q    And you indicated that you were asleep, sleeping in recliner next to the front door?

A    Correct.

Q    I assume that's the front door you enter into and leave every time you enter and leave the office?

A    Or the back door.  There's a back door to the building too.

Q    Okay.  And I'll show you Government's Exhibit 40.  Is that a picture of the front door?

A    That looks like the edge of it, yes.

198

Q    Okay.  Government's Exhibit 41, that would be the back door, correct?

A    The edge of the back door, yeah.

Q    Okay.  So you would have had to have walked past those guns to enter or leave that office every single time you came in and left?

A    You're making an assumption that they're guns.  How would I know they're guns, first of all, unless I either examined them closely and actually take them out and test fire them?  Unless you fire something like that -- I've seen all kinds of BB guns made to look like, you know, real guns.  But, again, if it's somebody else's stuff, I'm not going to mess with it.

Q    According to your resume here you have all sorts of firearms training, huh?

A    Sure.  NRA safe hunter award, I was a qualified expert in the military with a pistol.

Q    Safe hunter award, let me talk about that.  Now, safe hunter, I would imagine that they teach you that it's probably not a good idea to have loaded guns laying around the house not knowing what they are, right?  I mean, you know how to clear this weapon, right?

A    If that's what it is.  Nobody ever -- I never examined it and I never fired it.

Q    But you attested to the fact that this Mosin-Nagant gun was a single-shot, bolt-action weapon, correct?

199

A    That's a Mosin-Nagant?

Q    Is it?  I don't know.  Maybe I have the wrong one.

A    Doesn't look like one to me, from here anyway.

Q    In any event, there's one over here.

A    They're like an antique World War II rifle.

Q    Which one is the Mosin-Nagant, do you know?  Single-shot,
bolt-action, you're familiar with firearms, obviously, if you
knew that this was an antique gun?

A    That could be what it is but I don't know because I've
never examined it or fired it.  If it doesn't have a receiver
in it, it's not operational.  It's not a firearm.

Q    Okay.

A    I was charged and held for two years one time on a
quarter million dollar bond charged with a machine gun.

Q    Mr. Joos --

A    They had to dismiss it because it turned out it wasn't a
machine gun.  It was a fake.  And they had to drop the case
because they would never bring it and show it to the Court.

Q    Where was a fake machine gun located?

A    They said they found that out at the church.

Q    You didn't know about a machine gun either, huh?

A    There was no machine gun.  Like I said, it turned out to
be a replica, a fake.  I found out from the attorney in
St. Louis.  His friend, Dr. Fleishman, had stored it down
there.

200

Q     Now, it is true that you have the key to that office, right?

A     I have keys to most of the buildings out there but not all of them.  Some are private storage buildings.

Q     This is a padlock that you use to lock that up, right?

A     Yes, there was a padlock on the front door.

Q     And it's your testimony that I think I heard two, three names of people who have keys to that padlock?

A     Yeah, that's just the ones I know of.

Q     Who's Billy Herd?

A     That's the guy I met a few times out of northern Arkansas.

Q     Okay.  And Jeff Conway lives there on the --

A     Right, lives there on the property.

Q     And he lives outside the gated area, right?  There's a gate to your property, right?

A     There's a gate to separate the lower part of the property from the upper part of the property.

Q     And he lives outside the gated area, right?

A     Right.

Q     You're the only one who lives inside the gated area regularly, correct?

A     Regularly, yeah, but there's people, like I said, that have leases out there.  People come out there and hunt, they come out there and stay on the property, they come and they

go.  That's not the only road in.  There's two other roads into the property from other sides.

Q    You're the only one who stays out there regularly?

A    Regularly, yeah.

Q    You're the only one who stays in this office regularly?  Is that where you cook and clean and do your legal work?

A    No, that's generally just where I have to do legal research because that's where –– most of the church law library is located in there.

Q    You say the church law library.  Is there anybody else who uses the church law library?

A    Sure.

Q    Who?

A    Let me get my list out here.  I don't want to forget anybody.  I got to thinking about that, who else have I actually seen in the building.  Here we go.  Yeah.  This is Defendant's Exhibit 3 that's already been entered, I understand.  These are people I've actually seen in the building.  Here we go –– besides the cops.  Becka Stevens, who was working for the cops and the –– whoever this April gal is and this guy Jimmy.  This would be Dr. Williams, Dr. Moyers, Ms. Barnes, Tom –– that's the only name I knew him by –– Mr. Willoughby and his wife, Ms. Webber, Ms. Lyons, Mr. McCulla, Mr. Teal, Mr. Rushing, Mr. Enoch, Mr. Walters –– Ms. Walters, of course Mr. Conway, Mr. Joos and three of his

202

friends, Mary Charles and her cameraman, the Mahon brothers,
Dr. Joos and his wife, Mr. Stover and his wife, Mr. Miller and
his wife, Diana Lynn and her cameraman, Elisha, the Hellman
brothers, Attorney Hough and his wife, Mr. Henneman,
Mr. Barker and two children.

Q    And --

A    Attorney Barker and two of his children, Deputy West,
Mr. Danard, Mr. Frederick and his wife -- Mr. Danard and his
wife, guy named White Boy and two of his friends.

Q    Let me interrupt you there, Mr. Joos.  These are the guys
who used your church law library?

A    These are people that I have seen in the -- oh, I'm
sorry.  You just wanted the ones using the law library?

Q    Correct.

A    Because when they use the law library, usually they want
me to help them.  I'll go in there and help find stuff on
research.

        Using the law library, Dr. Moyers --

Q    There are a number of people who use the law --

A    Number of people.  And this is --

Q    And why do they use --

A    -- it's in the exhibit.  There's a whole bunch of people
that have been in it that I've seen.  This is just the ones
I've seen, not the ones that other people have brought in
there.

Q    Why do they use your law library?

A    Well, because there really isn't any other available in the area.  The closest one is, I believe, in Fayetteville, Arkansas.  And generally the stuff they're looking for I've already done the research on.

Q    Let me cut to the chase here.  You attested to the fact that the two photographs depicting the firearms are in that structure, the office as you call it?

A    You're calling firearms.  I don't know if they're firearms.

Q    Did you hear the testimony yesterday of Special Agent Fridley who said that he test fired them all and they all were operational?

A    Well, he may know that but I don't know that.

Q    Of course not.

        Now, as we sit here today a jury much like this jury found you guilty of two different crimes, correct?

A    They --

Q    They found you guilty of driving --

A    Only because I wasn't allowed to present any evidence or witnesses.

Q    And I understand --

A    Like today --

Q    Mr. Joos --

A    -- I wasn't allowed to subpoena evidence or witnesses for

204

this trial today.

Q     Mr. Joos, please just answer my questions.  Two juries found you guilty of two separate felony offenses, correct?

A     Well, considering I wasn't allowed to --

Q     Mr. Joos, it's very --

A     -- put on a defense, yeah.

Q     Mr. Joos, you're a very smart man.  I know you can understand my questions.

       Did two juries in McDonald County, Missouri, find you guilty of two different felony offenses?

A     That's not the whole truth.  They found me guilty based on the fact I wasn't able to present any defense, like today.  I've got no witnesses here.  There's nobody but me to testify for myself.  The people who could have testified to all this stuff right here I just found out yesterday my Explorer Post advisor, who had been my best witness --

Q     Mr. Joos --

A     -- was murdered in August.

Q     Mr. Joos, I hate to keep interrupting you.  I thought these were some very simple questions.  Did a jury in McDonald County convict you on two separate occasions of two separate felony offenses?

A     After I was denied the right to present evidence and witnesses, yes.

Q     Just like you are now, I know.

A    Just like now.

Q    But, yes, and as we --

A    The jury is never going to get to hear the whole truth.
If I'd been allowed to speak to the grand jury, you people
wouldn't be here today.  I've been to three grand juries on
nine different felony counts, never once been indicted by a
grand jury until now because they wouldn't let me talk to the
grand jury.  Why doesn't a grand jury ever indict me when they
talk to me?  Because they can hear the whole story.  They get
the whole truth --

Q    Mr. Joos --

A    They don't get the part that's just the truth that they
want to give you.  They get the whole truth.

        THE COURT:  Okay, Mr. Joos.  Let's go back and
answer the question.

        THE DEFENDANT:  I'm sorry.

Q    (By Mr. Kelleher) As we stand here today and as on --
in -- well, ever since these happened, you've been
unsuccessful in having them reversed?  The two convictions
I'm talking about, just the driving without a valid license
and unlawful use of a weapon, those convictions are still in
effect, correct?

A    I had just finished exhausting my state remedies and --

Q    Okay.  Again --

A    -- I was preparing -- I've been in jail for the last

eight months.  I can't get a federal court now to review these things on judicial review which the law requires they do.  The First Amendment says I have the right to petition for redress of a grievance.  And when I do, the Court says, "We're not going to listen to you."

Q    Should I take that as a yes?

A    My own attorney said if I could -- if I had the money to hire an outside attorney to file these cases for me, this would all be gone because I've got the case law to prove that I was falsely convicted as a matter of law and from the record on appeal you can see that I was falsely convicted as a matter of fact.  What is a person to do when you've got the federal government who's spending trillions of dollars to do all kinds of silly stuff --

Q    Mr. Joos --

A    -- and has got unlimited --

Q    Mr. Joos --

A    -- power against me --

        THE COURT:  Just a minute.

A    -- and I can't get a witness --

        THE COURT:  Okay.

A    -- or evidence for my defense?

        THE COURT:  Mr. Joos, I know that you and I have had this discussion, too.  I indicated to you that this trial was limited to certain remedies and certain issues and that there

207

may be other courts at other times that could deal with some

of your other issues.  Remember that?  We did talk about that.

        THE DEFENDANT:  This Court could deal with the

issue.

        THE COURT:  Okay.

        THE DEFENDANT:  I petitioned this Court --

        THE COURT:  I know.

        THE DEFENDANT:  -- to deal with the issue and they

refused.

        THE COURT:  I know.  Now --

        THE DEFENDANT:  A false conviction under the law is

not a conviction.

        THE COURT:  Well --

        THE DEFENDANT:  It's just like a false arrest.  It's

not an arrest.  A false conviction is a crime that's been

committed against me and they've been persecuting me ever

since I started even studying --

        THE COURT:  Now --

        THE DEFENDANT:  -- for the ministry.  The

government's been coming after me.

        THE COURT:  Okay.  Mr. Joos, we talked about that.

        Let's move on with other questions.

        MR. KELLEHER:  Yes, sir.

Q    (By Mr. Kelleher) Now, you indicated that you sent a

design for explosives to Becka, correct?

A    Yes.  I have a copy of it right in here.  It was in your discovery, one of the very few things that I was allowed to see.  I was never allowed -- most -- 90 percent of this stuff I never got to see on discovery.  And the things that I wanted, I wanted their other witness, the person who was there, this Becka Stevens woman, I wanted her subpoenaed in here to testify.  Like I said, you people aren't going to get to hear the whole truth.  I've got exactly -- you just asked about it.  I've got it right here somewhere.  Let me get it.

Q    Mr. Joos, it was a simple question.  You sent her a design for an explosive, correct?

A    Correct, but that's not the whole truth.  I not only sent the design for the explosive, right here is the letter that gives you all the things that you have to know --

Q    Let me ask you this --

A    -- in order to use those legally.

Q    Mr. Joos, when Special Agent Moreland called as Jimmy, he indicated that "he had a problem with the Cainites," correct?  Do you remember having that conversation?

A    He had a problem with Cainites?

Q    Yes.

A    Those are direct bloodline descendants of Cain.  He's said a lot of things about a lot of things.  He's usually ranting and raving about the Jews but --

Q    So the Cainites are Jews, is that your understanding?

209

A     No.

Q     What?

A     My understanding is that a Cainite is somebody who's a
direct bloodline decendant of Cain.

Q     Who was --

A     He was -- he's the one ranting and raving about the Jews.

Q     Who would Cainites include?

A     Well, anybody who is a direct bloodline decendant of
Cain.

Q     Well, is that a specific religion?

A     Without a DNA test, how am I going to know?

Q     Is that a specific or ethnic group?

A     Let's see.  Originally, Cain went to the Land of Nod,
built huge cities, took a bunch of wives, so you'd have to go
back archeologically and check where he came from.  But in the
bible the Cainites followed the Israelites out of Israel.

Q     Let me ask you this.

A     Out of Egypt.  I'm sorry.

Q     Maybe this will be more simple.

A     So they're still around, you know.

Q     When Special Agent Moreland referred to the Cainites, was
it your understanding that he was referring to Jewish people?

A     No.

Q     Who did you think he was referring to?

A     Well, I wasn't quite sure.  He never made it clear.

Q    He didn't?

A    He might have been referring to some Jewish people. There's probably some Jewish people that are Cainites. But just because they're decendents of Cain doesn't make them necessarily, you know, evil.

Q    Okay. And he indicated that he had a problem with the Cainites and he had a problem -- and he wanted to send a message to them that could be fixed with the bucket and he needed a sketch of how that bucket was made, and he indicated that he needed penetration to make a point?

A    Yeah. Like I said, I thought he was up to no good. And here's the information I sent him and that's the call I was talking about that I was waiting on.

Q    So you said --

A    He said he was coming back, he was sending the girls ahead or something but he was going to come back and give me a call when he was done with his business out there and head our way, and that's when I was going to contact the sheriff, find out if anything was blown up that wasn't supposed to be blown up and nail this guy.

Q    So --

A    Prove once and for all that I'm not a terrorist and I'm not engaged in any of these criminal activities and I don't condone these criminal activities that the government and the news media are constantly accusing me of.

211

Q    Mr. Joos --

A    It's been 30 years and I'm tired of this crap.

Q    Mr. Joos, you have an IQ of 156, huh?

A    I had in 1971 when I was tested.  Like I said, they say
as you get older, you lose IQ points.  But I don't think I've
lost all that many that I can't understand what these bastards
have been doing to me for the last 30 years.

        THE COURT:  All right.  Let's --

Q    (By Mr. Kelleher) Yeah.

        THE COURT:  Mr. Joos --

        THE DEFENDANT:  I'm sorry, sir.  I get --

Q    (By Mr. Kelleher) Mr. Joos, I'm doing my best to treat
you as respectfully as I can.  So having a very high IQ,
being a very intelligent man, when a person says he's having
problems with Cainites and asks for an explosive design, you
sent it to him hoping that he would actually use it to clear
your name?

A    No, I wasn't hoping at all.

Q    But you didn't --

A    He told me that he had a demolition job he needed to do.
He was in the home repair/remodeling work.  And since you
brought it up, I want to enter as evidence so these people get
to see the letter he's talking about.  Okay?  You brought it
up.

        MR. KELLEHER:  I have no further questions, Your

Honor.

THE DEFENDANT:  I want this entered as evidence right here because you -- like I said, you can't -- you want the whole truth?  Read the letter.

THE COURT:  All right.

THE DEFENDANT:  Read exactly what I sent him and told him that needed to be done if he's going to legally use this design.

THE COURT:  Mr. Joos, let your counsel come back with redirect.

Do you have some redirect?

MR. JOHNSON:  No, sir, I don't, Your Honor.

THE DEFENDANT:  You going to move to put this into evidence?

MR. JOHNSON:  No, I'm not.

THE DEFENDANT:  So the jury is not going to get to see --

THE COURT:  Well, let me see the letter.

Well, the letter has been talked about.  I'm going to let the letter into evidence, so mark it.

MR. KELLEHER:  Judge, I already have it marked. It's marked as Government's Exhibit 52.

THE COURT:  All right.

MR. KELLEHER:  I'll offer that as Government's Exhibit 52.

THE COURT:  Government's Exhibit 52 is admitted.
All right.

MR. JOHNSON:  No objection.

THE COURT:  Redirect?

MR. JOHNSON:  No, sir.

THE COURT:  All right.  Do you have any further
evidence?

MR. JOHNSON:  No, sir, I don't, Your Honor.

THE COURT:  So you're going to rest at this time?

MR. JOHNSON:  Yes, sir.

THE COURT:  Is there any rebuttal by the government?

MR. KELLEHER:  No, Your Honor.

THE DEFENDANT:  I just want to enter one objection
of my own on the record.  I wasn't allowed to --

THE COURT:  Here's what we'll do.

THE DEFENDANT:  -- even testify to the whole truth
to the jury.  I mean, my attorney did the best job he could
but there's still a lot of information that the jury should
have at their disposal that I wasn't allowed even to testify
to let alone present the hard evidence of, like the records on
appeal from the cases and the -- Judge Whipple's decision on
the habeas corpus case, which I can testify to what it was but
I'm not being allowed to so --

THE COURT:  I understand.  But we'll talk about that
in just a minute.  I'm going to let the jury go here because I

214

had made some rulings on that, Mr. Joos, and we'll -- you can make a record of it if you want to but we're going to let the jury go.

Ladies and gentlemen, we're going to need a little preparation time, so I'm going to let you go, and be back here at -- let's say at 12:45, if you can.  It may be one before we get started back again but be back in the jury room at 12:45 ready to proceed this afternoon.  And remember what I've told you before.

(Court reads recess instruction to the jury.)

THE COURT:  So with that, we'll be in recess.

(Jury exits courtroom at 11:27 a.m.)

THE COURT:  Mr. Joos, you can go back to your counsel table.

THE DEFENDANT:  All right.

MR. KELLEHER:  Your Honor, just so the record is clear, the letter should be Government's Exhibit 53 rather than 52.

THE COURT:  We already have a 52, don't we?

MR. KELLEHER:  We do.

THE COURT:  The record will reflect that 52 that we just admitted should be 53.

All right.  Now, everybody can be seated, please.

Mr. Joos, I'm giving you a lot of leeway here to make a record because I know you've talked about appeal being

215

very important for you, but what my rulings are, just so you understand and can deal with this, is that I know you've talked about decisions made by Judge Whipple and you want to have your prior convictions and the facts, as I understand it, that went into those cases reviewed.

THE DEFENDANT: Yes, sir.

THE COURT: And I have said that this case is not the forum or the court and the case that those are properly heard in because this case is all about do you have on the record, the official records of the courts, is there a final conviction? And that's been provided by those documents that are here. Now, if that gets changed later, I can't control that. If it does, it does. But right now and at the time that you are claimed to have possession of these guns, were there final convictions by courts of record, and there were.

THE DEFENDANT: In the state courts, yes, sir, but those have no standing in the federal court --

THE COURT: Yeah, they do.

THE DEFENDANT: -- until they're ruled on by the federal court --

THE COURT: Well --

THE DEFENDANT: -- if they're challenged in the federal court, which I've done.

THE COURT: Mr. Joos, here's what I'm saying, because I have to make rulings. And you certainly have the

216

right to appeal my rulings and that would be -- those items
would be something -- I'm trying to help you out by telling
you what my rulings are, and that is that those convictions I
felt were appropriate and I admitted them into evidence.  So
now the jury's decision will be are you the person who is the
subject of those convictions and did you possess these
firearms.  There will be some instructions that gets into
knowledge, notice, intent, things like that, but that's the
way it's going to be here.  So those other issues, many of
those will have to be taken up on appeal from this case.  You
understand what I'm saying?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  Okay.  Now, is there anything else that
needs to be put on the record before we discuss instructions?

        MR. KELLEHER:  Not as far as the government is
concerned, Your Honor.

        THE COURT:  Mr. Johnson?

        MR. JOHNSON:  I would like to offer Defendant's
Exhibit 5, motion for judgment of acquittal at the close of
evidence.

        THE COURT:  All right.  Do you want to be heard on
this?

        MR. JOHNSON:  No, sir.

        THE COURT:  Is it different in any way from the
prior?

MR. JOHNSON:  No, sir.

THE COURT:  Does the government want to be heard on it?

MR. KELLEHER:  No, Your Honor.

THE COURT:  All right.  Well, I've already ruled that I felt like there was a submissible case and nothing has changed that.  I know that, Mr. Joos, you've denied some of that but that's something for the jury to decide, not for me to decide on this.  So this motion for acquittal is denied and the case will be submitted to the jury.

Anything else?

MR. JOHNSON:  Nothing from the defense, Your Honor.

MR. KELLEHER:  Nothing from the government.

THE COURT:  Okay.  I need to go over the instructions with the attorneys.  I think we should do that right now.  We'll make a record before we start with the jury at -- we'll try to shoot for that 12:45 I mentioned.

Now, is 30 minutes sufficient time for closing?

MR. KELLEHER:  That should be more than sufficient, Your Honor.

MR. JOHNSON:  Yes, sir, from defense.

THE COURT:  All right.  Does the government want to break that down 20 and 10?

MR. KELLEHER:  I guess.  I was thinking --

THE COURT:  I'm not -- you make it --

218

MR. KELLEHER:  -- more 25 minutes, 15 and 10, I think.  Again, there's not very much to cover.

THE COURT:  Run that by me again.  You got 30 minutes.

MR. KELLEHER:  I know.  Twenty and 10 will be fine.

THE COURT:  The math didn't work there.

MR. KELLEHER:  I understand.  I was thinking 25 minutes would be more than sufficient, but if it's 30 minutes, 20 and 10 should be fine.

THE COURT:  What kind of warning do you want on those?

MR. KELLEHER:  Two minutes.

THE COURT:  On both?

MR. KELLEHER:  Yes, sir.

THE COURT:  If you go over on the 20, it takes away from your 10; if you come up short on the 20, it does not add to your 10.

MR. KELLEHER:  Yes, sir.

THE COURT:  Defense, what kind of warning do you want?

MR. JOHNSON:  Two-minute warning, Judge.

THE COURT:  Okay.  All right.  So we'll -- I'd like the lawyers to come back and we'll talk about instructions and get them prepared and then we'll be ready to submit this case when we come back in to the jury.

219

MR. JOHNSON: Yes, sir.

(Court stands in recess at 11:33 a.m.)

THE COURT: Let's make our record on instructions.

The instructions that I intend to give -- I've already given seven instructions and so we'll start with No. 8. And my references are to the model jury instruction number that is related to what we have here it was based on. So No. 8 will be the 3.01; No. 9, 3.02; 10, 3.03; 11, 3.04; 12, 3.06; 13, 6.18.92; 14, 3.09; 15, 3.11; 16, 8.02; 17, 7.05; 18, 3.12. There's a verdict for Count 1 and a verdict for Count 2. I have inserted into the verdict for Count 1 a reference to Instruction No. 13, and in regard to the verdict for Count 2 a reference to Instruction No. 14. And then if there is a finding of guilt on the possession of the firearm charge, there is a forfeiture instruction. Now, I don't know about the forfeiture instruction. Mr. Joos has denied possession of the guns.

MR. JOHNSON: Yes, sir.

THE COURT: Mr. Joos, what that is is if you're convicted, then the jury would decide whether those guns should be for forfeited. Now, you can talk with your counsel about that. I know you've denied possession, so I don't know if you claim the guns or not but --

MR. JOHNSON: No, sir, we don't have a problem with that instruction.

220

THE COURT:  With giving it or not giving it?

MR. JOHNSON:  Giving it.

THE COURT:  So we're going to do the forfeiture,
then, if it comes in that way.

THE DEFENDANT:  What about the people the guns
belong to?

THE COURT:  Pardon?

THE DEFENDANT:  They got to make a separate claim?

THE COURT:  They would have to do that in
forfeiture.

THE DEFENDANT:  That is a separate procedure?

THE COURT:  You've answered my question.  We'll do
the forfeiture.  You could have waived that if you didn't care
where the guns went, but if you're thinking there are other
people that they belong to --

THE DEFENDANT:  The people they belong to I'm sure
are going to want them back.

THE COURT:  Yeah, we'll do the forfeiture.  So my
question is to the government, then, do you have any
objections to Instructions 8 through 19 or the two verdict
forms?

MR. KELLEHER:  No, Your Honor.

THE COURT:  Do you have any additional instructions
that you want me to offer?

MR. KELLEHER:  No, Your Honor.

221

THE COURT:  Or to give.

Okay.  I'll ask defense counsel, do you have any objections to the Instructions 8 through 19?

MR. JOHNSON:  No, sir, Your Honor.

THE COURT:  Do you have any objections to the two verdict forms 1 and 2?

MR. JOHNSON:  No, sir, Your Honor.

THE COURT:  I do want to respond, Mr. Joos, to you because we have this Exhibit 3 and you had some instructions you requested in there.  The first one was if find no substantial effect on interstate commerce, then must find not guilty.  The jury has to find that this was involved in interstate commerce, so that's already in an instruction that we have.  The next one was if you find the defendant falsely convicted of state felonies, then not guilty.  And I've told you, that's a matter that will have to be taken up separately because this -- as long as there were convictions of record that are put in here, the issue for the jury will not be to go behind that but to see if -- their issue will be are you the person that's involved in those records of conviction.

THE DEFENDANT:  Yes, sir.  Can I put my objection at this time as to why I don't think that's correct?

THE COURT:  Go ahead.

THE DEFENDANT:  In *Cheek v. United States*, 498 U.S. 192 in 1991, U.S. Supreme Court overturned that case because

222

the defendant was not allowed to present the defense that what he did -- what he had done was not against the law.  He didn't believe what he had done was against the law.  And his theory of his -- his theory of the law -- you know, it's not what the judge would instruct the law but what the defendant was relying upon as a defense was not allowed.  In other words, the U.S. Supreme Court said no, you can't tell the defendant he can't do that.  This was a defense the guy had already presented on a couple of times before and lost on.  The Court said it doesn't matter how many times he's used the defense or what his theory of law is but he is allowed to tell the jury why he feels that he's not guilty of what he is being charged with.  You see, this is a case where I'm being punished once again for something they claim I did but that I'm claiming I didn't do to start with.

THE COURT:  I understand.

THE DEFENDANT:  And so it's almost like a double jeopardy thing.  I'm punished again for something even though I'm not being charged for the exact same crime.

THE COURT:  Right.

THE DEFENDANT:  My point is that *Cheek* says I can present that argument to the jury and I wasn't allowed to do so.

THE COURT:  I'm just telling you I see it a little differently.  It'll be there for appeal.  If I'm wrong, then

223

it won't be the first time, to be quite honest with you, so it does happen.

All right. The next one it says if they find defendant had no knowledge of the guns, ammo caps, then not guilty. Knowledge is -- it has to be knowingly. The jury has to find that you knowingly possessed the weapons or the explosives. So that's already in an instruction that we have.

The next one you had if find the defendant had no knowledge of the law prohibiting, I guess you're saying prohibiting you from having firearms. I'm sure you've heard the old adage ignorance of the law is not an excuse.

THE DEFENDANT: Yes, but I have a half dozen cases which say just the opposite of that, U.S. Supreme Court decisions and Eighth Circuit Court decisions which state that there has to be notice. You have to prove that the defendant knew that what he was doing was against the law. And if I may, I'll give these to you. *U.S. v. Freed* which is 401 U.S. 601 at 609, also at 610, which says possession in the United States is innocent conduct, and that in American society firearms possession is not per se blameworthy. Then there's *Staples v. United States*, 511 U.S. 600, 618 and 19, 1994. The Court said that they must prove that I knew they were firearms.

THE COURT: Now, remember knowingly, I told you that's already in there.

224

THE DEFENDANT: It's not just that I knew they were there but I actually knew they were firearms and not replicas or something else, BB guns that looked like firearms or what have you. There's actually two different issues. But –– and then there's *Ratzlaf v. U.S.* which is 510 U.S. 135, 1994, which says fair notice is required when it's not the kind of law that a lay person would intuit existed because the conduct is prohibited and it's contrary to the moral code of society. Obviously it's not. It's not illegal to have any of this stuff. And under Revised Statutes of Missouri 571.070, my firearms rights were automatically restored when my sentence was served. Now, I was never notified that that law was changed in August of '08. Nobody ever put me on notice of that. And on that issue, I've got two cases. One is *United States v. Dupaquier*, D–U–P–A–Q–U–I–E–R. That's 74 F.3d 615, 617 through 19. That's the Fifth Circuit in 1996.

THE COURT: Are you saying that before 2008 you knew that as a felon you could not possess firearms?

THE DEFENDANT: No. Prior to August of –– see, I wasn't noticed that in August of 2008 the statute was changed from dangerous felons in possession of firearms to just felons in possession of firearms. They dropped the dangerous category out of that. See, prior to that when you look at the statutes, it says only dangerous. And then Revised Statutes of Missouri 556.061 says what all the dangerous felonies are.

225

THE COURT: Okay.

THE DEFENDANT: And concealed carry or unlawful use of a weapon and driving without a license are not listed in the category of dangerous felonies.

THE COURT: Okay.

THE DEFENDANT: Therefore that was an automatic firearms restoration case for which it -- if it's automatically restored, they don't have any jurisdiction over that. And it was a federal firearms -- you know, a felon in possession case.

What was that? Oh, *Dupaquier*. That was Fifth Circuit 1996. Automatic rights restoration negates the crime of felon in possession under federal law.

THE COURT: Let me just say this to you. You don't have to repeat all your cases here because you've made the issue for appeal so you can put all you want in your brief on appeal.

THE DEFENDANT: Okay.

THE COURT: Okay?

THE DEFENDANT: Now, there's another issue which is brought up by the Seventh Circuit. That's the *Dahler v. U.S.*, 143 F.3d 1084, which says state discharge papers must specifically restrict gun rights. Again, that has to do with notice. Where it says when I'm discharged from parole or even discharged from the penitentiary it says you, under federal

226

law, can never again possess a firearm.  Again, we go to notice.  Okay?  You're saying I don't have -- I didn't have to be notified, ignorance of the law is not an excuse, but I've got all these court cases says they are.

THE COURT:  Mr. Joos, here's what I'm saying.  I know you've got a lot of cases there but what you really want to preserve is the issue and then your cases are what you're going to use for appeal, because I have already ruled I'm not --

THE DEFENDANT:  So I've preserved the issue, then, by --

THE COURT:  I think you've preserved the issue sufficiently in regard to your knowledge of the law.

Now, the next one is you ask if the feds conducted a warrantless search.  Now, the search, that wasn't an issue in this court, so I'm not going to instruct on that, whether the search was valid or not or warrantless because that hasn't been raised as an issue that this Court is deciding here.  Once we get to the jury -- that would be something for a judge to decide before you got to trial.  So that's not an issue for the jury.  I'm not -- we're talking about instructions right now.

THE DEFENDANT:  Okay.

THE COURT:  I'm not going to instruct on that.

If find the charge is unconstitutional.  Well, that

227

would be something for the Court to decide, not the jury, so I'm not instructing on whether or not this is constitutional to the jury.

THE DEFENDANT: Okay. That goes back to *Cheek v. U.S.* again. That was one of my --

THE COURT: If it's unconstitutional, you raise that on appeal. That would be the place to do it.

THE DEFENDANT: Yeah. Well, the issue is I wasn't allowed to raise it before the jury.

THE COURT: The jury is not going to decide what's constitutional or not.

THE DEFENDANT: I'm being charged with violation of law and I'm coming back and saying, no, I'm not in violation of law because the United States Supreme Court says this is what the law is, not what the -- what the statute says.

THE COURT: Okay. So that issue --

THE DEFENDANT: That gets overturned all the time because it's unconstitutional.

THE COURT: You'll have that issue for appeal.

THE DEFENDANT: Okay.

THE COURT: Then it's if you had no knowledge that the firearms were functional, that you could have thought they were fake or air guns or that you did not know that firearms were firearms. Well, again, knowledge, you'll see in that instruction that you have to knowingly possess the firearms.

THE DEFENDANT:  Knowing that they are firearms.
It's two different issues.

THE COURT:  I think that would be part of it.
Knowing possession would require that.

THE DEFENDANT:  Okay.

THE COURT:  And then your last one was the firearms
could be counterfeits.  I'm not sure what that was.

THE DEFENDANT:  Okay.  The issue is their agent
testified that there are manufacturers of guns and ammunition
in the state of Missouri, which even if it weren't, anybody
with a small machine shop could counterfeit anything sitting
there.  And years ago, from my understanding, that was fairly
common for people in their backyard machine shops or guys that
had machine shops for other purposes could also make a firearm
counterfeit, make it look like another firearm and then sell
it; you know, he's making his own.  It was almost like a home
hobby deal.

THE COURT:  I understand your issue and you've
raised that.  It's in the record.  She's got a record of all
this.  But I'm not going to instruct that to the jury because
there was no evidence that they're counterfeits.  The evidence
was that they were manufactured guns.

THE DEFENDANT:  That's my challenge to the evidence.

THE COURT:  Well --

THE DEFENDANT:  There wasn't any evidence dealing

with their manufacturer.

        THE COURT:  I appreciate that.

        THE DEFENDANT:  They never traced it back to the manufacturer.  The guy he's claiming made them never came forward and said, "Yeah, we made that in our factory."  The serial numbers weren't traced back.  Nobody who was the manufacturer ever came forward said, "Yeah, that's something we made."

        THE COURT:  Okay.  I'm just making a record.  I have to do the best I can here.  So that's in the record.  It's preserved.  I think that covers everything you gave me here. So this exhibit will be also made as part of the record, Exhibit 3.

        THE DEFENDANT:  Yes, sir.

        THE COURT:  Okay.  Now, anything else by the government before we bring the jury in?

        MR. KELLEHER:  No, Your Honor.  Do we have copies of the final instructions?

        THE COURT:  All of them?

        MR. KELLEHER:  I really just need the final instructions, if that's okay.

        THE COURT:  Make two sets.

        MR. KELLEHER:  I want to make sure that I'm not showing the jury something that is a little bit different than what the Court --

THE COURT:  I assume out of the 10 or 12 instructions you're not talking about more than three or four that you're going to use?

MR. KELLEHER:  Right.

THE COURT:  I've got a set for defense, too.

Mr. Popa is our alternate.  He'll be excused before they go to deliberate.

Okay.  Are we ready for the jury?

MR. KELLEHER:  Yes, sir.

MR. JOHNSON:  Defense is ready, Your Honor.

(Jury enters the courtroom at 1:25 p.m.)

THE COURT:  Please be seated.

Well, didn't quite make it by 12:45 but we were getting our instructions ready and everything.  So I will give you the closing instructions, ladies and gentlemen, and then you'll hear the closing arguments from counsel and then it'll be time for you to deliberate on your decision.

So I've given you seven instructions.  Remember, I'm going to give you possession of all of these instructions when you go back to deliberate, but I start with No. 8.

(Court reads Instruction Nos. 8-14 to the jury.)

THE COURT:  Is that last word explosive or explosion?

MR. KELLEHER:  Should be explosion.

THE COURT:  That's what I thought.

231

No. 14, the last word in the second to the last paragraph, print the first page and change the word explosive to explosion.

My law clerk needed a little work here anyway. It'll be corrected in what you have.

All right. No. 15.

(Court reads Instruction Nos. 15-18 to the jury.)

THE COURT: Now, there are two verdict forms. One refers to Count 1, the other to Count 2, and it just -- it has the caption of the case, the name of the case above it, and then it says Verdict. Then the first one says, "We, the jury, find the defendant, Robert Joos," then there's a line and below the line are the words guilty/not guilty, your choice whichever way it was, "of the crime of being a felon in possession of firearms and ammunition as charged in Count 1 of the indictment and as submitted under Instruction No. 13." So it refers back to 13 for the elements. And then signed by the foreperson and dated today's date.

The next one, same form as the verdict form, "We, the jury, find the defendant, Robert Joos," either guilty or not guilty, "of the crime of being a felon in possession of explosives as charged in Count 2 of the indictment and as submitted under Instruction No. 14," because that's the Count 2. So those will be the verdict forms.

"You will take these forms to the jury room and when

232

each of you has agreed on the verdicts, your foreperson will fill in the form, sign and date it, advise the courtroom deputy that you're ready to return to the courtroom." It says also, "If more than one form was furnished, you'll bring the unused forms with you." I'm going to give you one form for each count there.

All right. Government ready to proceed?

MR. KELLEHER: Yes, Your Honor.

THE COURT: All right.

MR. KELLEHER: Good afternoon, ladies and gentlemen. I will have two occasions to speak to you this afternoon. I will make an opening statement, then Mr. Johnson will speak to you, and then I'll have a chance to come back and speak with you again. Hopefully, this won't take too long.

You have now heard two days' worth of evidence and you heard about the movement, white supremacists, Cainites -- a word you probably never heard before in your life -- you've heard about explosives, explosive plans, you've seen numerous exhibits.

Surprisingly, or maybe not surprisingly, this case is actually rather simple. Show you Instruction No. 13 -- and it's probably hard for you to read -- but at the end of the day when you go back to deliberate, you really only need to consider those three things, of course in the context of the rest of the instructions.

233

But you need to determine, one, whether the defendant has been convicted of a crime punishable by one year. He's been convicted of two. We showed that to you in any number of ways, including bringing in the defendant's own parole officer. Now, what the defendant claims in terms of it being a bad conviction and all that is ultimately irrelevant. The Court has instructed you that those convictions are in fact crimes punishable by terms of imprisonment of greater than one year. The defendant, by his own admission, served greater than one year as to each of them. So you know that beyond a reasonable doubt. It's really not even an issue apart from maybe in the defendant's mind.

Two. The defendant knowingly possessed a firearm -- and you see that long list there -- or ammunition. What that means is if you believe from the evidence -- and this is Government's Exhibit 2 and these are shotgun shells taken out of that Mossberg shotgun. If you believe from the evidence that the defendant possessed this and nothing else and that this moved in interstate commerce, he's guilty of that crime. It's that simple. You don't need to go any further. You find that he possessed that Mossberg shotgun, he's guilty. You find that he possessed that Mosin-Nagant gun that was referred to, he's guilty. If you believe he possessed one round of those 19,000 rounds of ammunition over there, he's guilty. That's what I mean when it's simple.

234

Possession.  How do we establish possession?  Well, strangely enough, the defendant didn't come in and say, "I possessed the firearms."  Shouldn't be a surprise to anyone.  That's just not going to happen in real life.  You know, we watch movies and TV shows and such and occasionally a very good prosecutor may be able to break a defendant on the witness stand.  Doesn't happen in real life.

So how do we prove possession?  Well, in this case it's simple.  It's not like these guns were hidden somewhere in a closet or they were discovered somewhere in this junk somewhere and maybe there was a round of ammunition somewhere.  No.  All of these guns, every single one of them, was located in this office, this residence.  By the defendant's own admission, this was the front door.  His response to those two guns sitting there?  Well, how could I know that they were guns?  You know, I don't even know how to respond to that.  But what the defendant admitted should give you a pretty good idea of how he knew that they were guns.  This is what the defendant admitted.  This is his little resume.  NRA Home Firearm Safety Certificate, NRA Hunter Safety Certificate, expert marksman award, armed and unarmed combat training.  He didn't know they were guns?

If that wasn't bad enough, the guns were loaded.  He would have you believe that some unknown strangers wandered into this compound -- and the gate's up here.  I mean, this is

235

all of his. You have to drive down a couple of miles to get to the gate, then you drive through the woods and over the river all the way back here to where that residence is to drop off these guns. That's what he would have you believe.

And despite the fact that he was actually apprehended in that structure where he was asleep, by his own testimony, he has guns at the front door, he has guns at the book door. You heard evidence from Special Agent Patterson that there were guns all over the place. And they're all labeled; you can see where the guns were taken from, recovered from, the front room, so on and so forth.

So, ladies and gentlemen, there is, I mean, absolutely no question that he possessed them. And, again, even if you believe every single ridiculous word that came out of the defendant's mouth, a person who although is not in actual possession has both the power and intention at a given time to exercise dominion and control over a firearm, ammunition or an explosive either directly or through another person or persons is then in constructive possession of the firearm, ammunition or explosives."

What that means, the long and short of it, if you exercise dominion and control, say, if you have control over a house by, I don't know, having the key to the padlock that opens and closes it, you have constructive possession of that firearm because you exercise dominion and control over it.

236

You have complete control over that firearm.  Mr. Joos, by his own admission, controlled who entered and left that particular structure.  He had the key.  He had the key to get into that vast property.  Even if you believe every single word that came out of his mouth, he still had possession of that gun.

He also -- he also clearly had knowledge of what guns he had.  That Mosin-Nagant -- Mr. Joos is a very smart man.  There's no question about it.  He got into the Air Force Academy, which is an amazing accomplishment for anyone.  There's no doubt in my mind that he has a 156 IQ.  The problem is, when you're that smart, sometimes you want to prove that you're smarter than everyone else.  And when you start talking about one of the guns on those carts as being a bolt-action, single-shot rifle, antique, a Mosin-Nagant, that's a bit arcane for someone who doesn't actually know what that gun is.  It's a little bit coincidental that he happened to discuss that particular brand of gun with the undercover officer in terms of buying a case of them and then one shows up at his house.  It's not like this was a Winchester shotgun or a Mossberg.  This was a Mosin-Nagant.  If you remember, Special Agent James Patterson who sees that gun was unsure of how to pronounce the name of the gun.  It's not just a coincidence that they happen to find one there after he discussed it with the undercover officer and on the witness stand was able to describe it to you perfectly.  He out-smarted himself.

237

Mr. Joos also characterizes this is as a church, which is kind of his cover, I guess, that he operates a church and church members come and go despite the fact that we're talking about a remote area of McDonald County, a remote compound in McDonald County that's accessed by a gate that he has the key to and apparently is the only person who had the key to it because Jeff, who doesn't live within the confines of the gate, was unable to open the gate for the undercovers when they showed up at that ranch.

Now, when the undercovers went to what Mr. Joos characterized as the church, you would have expected Mr. Joos at some point, because this is a church, to maybe discuss religion, maybe show them a bible, maybe hold a prayer, over the weekend, Saturday and Sunday, maybe even hold a service. But there was no discussion of that. They discussed guns and explosives. And keep in mind that Special Agent Moreland, who went by Jimmy, his undercover role was a gun dealer and that man invited him there, yet now he has no interest in guns. I'm just a pastor of a church. Really?

Well, let's look at some of the religious items that he has in his collection there. Let's see, Animal House, Army of Darkness, Being John Malkovich, Benny Hill's Review, Benny Hill, Benny Hill, Boogie Nights, Boondock Saints, Con Air, Confessions of a Hit Man, The Ambulance.

Now, that's the front door to the church office.

238

Some of you, I suspect, have probably been inside the office of a pastor or reverend or priest. I find it very difficult to believe that any of those people of God would have that particular video collection and those particular weapons -- which were loaded at the time -- in their office. This was not a church office. The church is a front for Mr. Joos.

Again, the discussions of the guns. Special Agent Moreland told you they had, again, very extensive discussions about guns because, again, by Mr. Joos's own mouth, he believes in basically an apocalyptic world. We live in a place that he believes everything is going to end soon. What he told Special Agent Moreland is that guns are valuable, guns will be the most valuable thing because most of us won't have 19,000 rounds of ammunition at our disposal, so people like Mr. Joos will get to run the place. 19,000 rounds of ammunition.

Mr. Joos's credibility. Again, most of what he said I think everybody will agree was pretty incredible, not knowing that those were guns, not being aware of the fact that there were 19,000 rounds of ammunition strewn around his living room is pretty incredible. Maybe you noticed that he couldn't swear because it's against his religion, yet not more than 15 minutes later he called the federal government a bunch of bastards. Religion is Mr. Joos's way to do what he wants, to use it as a justification. This wasn't a church. This was

239

Mr. Joos's compound.  This was where Mr. Joos got to do whatever he wanted.  This was where Mr. Joos fantasized about duking it out with the evil government.

Well, the evil government doesn't come onto this property for no reason.  The government would have absolutely no idea that this junkyard existed but for his actions. That's the bottom line.  He's not being persecuted; he's here because he's a convicted felon.  He's here because he drew attention to himself because he associated with some horrible people that he invited onto his land, that he talked to.  And he's here because when people began to look at him because of that association -- and there's nothing wrong associating with bad people, but when you draw attention to yourself and people see these things in your living room, they know you're a convicted felon, they're going to come and get them.  And they did.

Mr. Joos was -- it's almost difficult to argue this case because the evidence of possession is just so overwhelming.  I don't know how you can argue that two guns, two loaded firearms at your front door were not possessed by you.  I don't know how you counter that.  It's hard to do because it's so obvious.

I don't know how you counter the claim that you were unaware that 19,000 rounds of ammunition -- 19,000 rounds, we're talking about an amount of ammunition that Bass Pro

might have in their showroom –– that you were unaware of that. I don't know how you counter that because it's so obvious that anyone had to be aware of that.

Count 2, possession of those blasting caps. Again, we're not talking about something that's concealed in the middle of nowhere. Those blasting caps were found in that white bucket on a shelf in a storage area right next to some cannon fuse. Now, it's one thing, I guess, to suggest that people left firearms at your house, although I don't know why anyone would trek however many tens of miles so they could drop this off in Mr. Joos's upstairs bedroom. But why would anybody drop blasting caps off in the structure that had Mr. Joos's release papers from the Department of Corrections in it?

Ladies and gentlemen of the jury, I'll leave you with this. You're asked to exercise your reason and common sense in making a determination in this case, and reason and common sense and the –– overwhelming, I think, doesn't even begin to describe the level of evidence in this case. But the mountain, the pile of evidence against Mr. Joos cries for guilty verdicts as to each count.

Again, I appreciate your time and attention.

THE COURT: All right.

Mr. Johnson?

MR. JOHNSON: Thank you, Your Honor.

Your Honor, may it please the Court, ladies and gentlemen of the jury.

Mr. Kelleher stated he doesn't know how anyone can counter a defense for Bob in this case and we have this mountain of evidence and he doesn't understand how that could be countered. What we have, ladies and gentlemen -- and I don't know about you, but listening to all those experts yesterday and even a couple today about the fingerprints, and we had two people testify about Bob's fingerprints, we had one this morning, this guy's 30 years' experience, FBI, he talked about all the experience he has. We have over 19,000 rounds. According to the prosecutor, that's what Bass Pro has. Why didn't we have one fingerprint on any of those rounds admitted into evidence today? Fifteen weapons, not one fingerprint. Yet we had two people testifying for the government about fingerprints.

You heard Agent Moreland, he started off the testimony yesterday explaining the story that the Mahon brothers bombed a facility in Scottsdale, Arizona, and they checked the records, the phone records and that's how they came up with the name of Robert Joos. You all remember that. Cross-examination when I asked him, wait a second, was that telephone number listed or registered under Robert Joos? No, no, it was a church. There was two phone numbers. Where are the telephone records? We're starting off the case, how the

242

ball got rolling, trying to link Bob with this bombing with the Mahon brothers in Arizona. No telephone records. And that's '04.

We come out with Agent Moreland pretending he's a gun nut, gun freak. Jimmy comes out to Bob's property -- and I say Bob's property. That's what the government wants you to think. Compound. And that's another interesting thing. Wouldn't you want to find out who the actual owner is? We didn't hear any evidence except from defense who was actually the owner of the property. Even Agent Moreland testified when he was out there he saw another individual, not Jeff and his wife that live in the trailer but he saw another individual out there. Wouldn't one want to find out who owns this, who has access to this property, who's all been out there? And Mr. Kelleher stated that Bob's the only one with keys. Well, that's not true. Jeff has keys. Jeff let us out there to look at it. There are several people with keys. But -- so we're missing any evidence of ownership, any fingerprints on any of this evidence. And, incidentally, all these weapons, they're all legal except if one is convicted of a felony and is in possession of them.

Now, here the agents come out, talk about the movement, white supremacist, the gun movement. Agent Moreland's first visit, Bob never showed him any guns. He testified he never saw any. He saw the butts of the weapons

243

with a sheet cover on them. Now, I find that kind of odd if that's why he's out there. Bob never showed him any bombs, any explosive devices, any materials. He makes another trip out there a month later. He testified Bob never handled a weapon, never picked one up. The one that he said he picked up was that shotgun.

And this dynamic entry, over a hundred agents or close thereof to go in for the search, three days, helicopters. One agent testified that his duty was to search all these vehicles. There's over a hundred vehicles out there, cars, trucks, buses, RVs. Search all of them. Not one weapon, not one round of ammunition, no explosive devices, nothing.

I find this very odd that here this investigation has been going on this length of time, we have no automatic weapons, even the explosives the expert testified that we don't use those any more. These are copper caps. They went out in the early '80s. Those are also legal to own if one doesn't have a conviction.

Then you might not like Bob's demeanor, Bob's dress, his long hair. I don't like his long hair. It kept interfering with me with this whole trial. Or Bob's beliefs. He's very devout about his beliefs. He's very strong-willed when it comes to that. But you can't convict a person on their beliefs.

244

The law, possession.  And we had -- there was a lot
more evidence from the defense's side that states all these
unanswered questions, all these gaps to fill.  And the expert
that testified yesterday, I think his name was Agent Fridley,
he was talking about the origin of the weapons.  In other
words, the origin of the manufacturer to state that these
weapons were produced, manufactured outside the state of
Missouri.  I asked him, did you check the origin of ownership?
No, I didn't, I was never asked to.  Why?  Why not trace it to
find out and put it in his hands?

The government has left a lot of questions
unanswered, and when you deliberate it is guilty beyond a
reasonable doubt and I don't think the government has proved
their case, proved the facts in this case.

Thank you.

THE COURT:  Mr. Kelleher?

MR. KELLEHER:  If we had fingerprints we would have
shown them to you.  The fact of the matter is, it's plastic
and wood.  Fingerprints don't get left on wood and plastic.
It's that simple.  That doesn't prove anything.  We know where
the firearms were recovered from, his house.  We need to prove
possession, we don't need to prove that he touched it in some
way.  We don't need to prove that he owned it.

Mr. Johnson talks a little bit about phone records.
I don't know what phone records we could have possibly had

245

that would have established that he possessed those firearms, ammunition and explosives. It's not like there was a wiretap talking about, "Yes, in my house we have 17 firearms and ammunition." The telephone records that Special Agent Moreland talked about was a list of phone numbers, the phone numbers that the Mahon brothers called immediately after they placed the bomb, the first of which was to him, has absolutely nothing to do with this case.

The actual owner of the property. We know who the actual owner of the property is. It's his parents. Okay. That doesn't prove anything. It doesn't mean anything. The only thing that we're here for is who possessed those weapons. Or not even so much that; it's not about who does. There could be 80 people who possess those weapons. We're here to determine whether he possessed those weapons and that blasting cap. Who owns the property is ultimately of no consequence. We heard no testimony that his parents were ever out there. We heard no testimony that his brother came out and put the guns out there. We heard no testimony about his parents other than the fact that they bought it back in 1983 and that he moved out there some 26 years ago.

Now, no automatic weapons. Okay. He's -- if he was charged with a having an automatic weapon, maybe that would have some relevance, but the fact of the matter is even if that were somehow important, we don't really need an automatic

246

weapon when you have 19,000 rounds of ammo.

The copper blasting caps are old. Again, I'm not sure how that's a defense. I think you heard how those copper blasting caps were so lethal that they had to be destroyed in place. They're explosives; it doesn't really matter how old they are. The fact of the matter is, because he's a convicted felon, he can't go into the blasting cap store and buy some because they ask the person who they are, and if he says he's Robert Joos, born on 12/25, 1952, they say, "You can't purchase blasting caps." That's probably the reason why all of his guns are old and his blasting caps are old, because he can't walk into a store and buy new ones.

Finding out the origin of the firearms. Well, we know who made them mostly because it's stamped on the bodies of all of these firearms. And for all we know there could have been 4,000 people who have had those firearms over the course of the years since they've been manufactured. Who cares? The only question is where they ended up, and where they ended up were in his possession. Same with the blasting caps. If there was a way to trace it all the way back into his hands, there would have been a way to preclude him from getting the firearms in the first place. The testimony established that that vehicle does not exist. You can go into a gun show, you can go to your neighbor and you can buy a firearm, and somebody can buy that firearm from you and

247

somebody can buy that firearm from that person and there's
never, ever a record unless you have one that you made
yourself.  There's no central repository of gun owners.  Just
not the way it works.

Now, what evidence do we have?  Well, going to beat
the drum a little bit more for a little bit longer and then
I'll let you go back and deliberate.  What evidence do we
have?  We have 15 guns, 12 of which were fully loaded.  Now,
if you took an NRA safety class, I suspect that they would
probably teach you not to leave loaded firearms around
somebody else's house, or if you had them lying around your
house and you had no idea where they came from, then I suspect
the NRA would probably endorse maybe going in and checking,
making sure they weren't loaded so nobody accidentally gets
shot.  The reason why guns are loaded in someone's house is
for self-defense.  Perfectly legitimate reason for having
guns, unless you're a convicted felon.  I would imagine -- I
don't know.  This is southwest Missouri.  I would imagine most
of us have guns sitting around our house either loaded or with
ammunition nearby.  Perfectly legal unless you're a convicted
felon.

It's also perfectly legal to have each one and every
one of those 15 guns, unless you're a convicted felon.
Perfectly legal to have 19,000 rounds of ammunition in your
house, unless you're a convicted felon.  And, ladies and

gentlemen, when you have 15 guns, 12 of which are loaded, many of which are handguns, and 19,000 rounds of ammunition, to come into this courtroom and say you didn't possess them is absolutely ludicrous.

These guns were located in Robert Joos's house. Robert Joos was a convicted felon. All of this stuff traveled in interstate commerce and, consequently, he is guilty of both counts of the indictment. This, this, 19,000 reasons to vote guilty.

THE COURT: All right.

Now, ladies and gentlemen, it's time to have you recess for your deliberations. I always have a little bit of an unpleasant task before I do that because you'll notice there are 13 of you and 12 of you will deliberate but we had one of you as an alternate because if somebody would have gotten sick or couldn't be here today, we would have still been able to go through the trial with our alternate.

But, Mr. Popa, you're our alternate. You'll be excused now. I know it's always a little disappointing to get this far and then not be able to finish off, but what I would like for you to do until the jury renders a verdict is let Karen have your phone number where you'll be and she'll let you know when we have a verdict. There is a slight chance if somebody gets sick or something and not be able to go through with this, we could call you back in and do that. So if you

would not -- remember my instruction, don't discuss this case with anyone, don't read any news reports of the trial, and just remember to keep an open mind like I've said before. We'll call you as soon as the jury has -- you can stay right there now but I'm just saying when they go back into the room, why, Karen will talk to you and you'll be excused then. But hope you understand that we have the extra just to make sure we don't waste a trial if something happens to somebody. So that's the task on that.

The second thing for the rest of you, you're going to go back to deliberate. We're going to give you a little two-way radio. If you need to communicate with Karen, you'll be able to talk. It's very simple to operate and just let her know.

Now, you're going to have a full set of instructions back there and here's the way it works. If you want to take a break, you can take a break. You don't have to talk to me about can you take a break. If you have any smokers here, they have to go downstairs, and that's fine too. Just remember this one thing: You only deliberate when all 12 of you are present. So if somebody is on break and only part are there, somebody's in the bathroom or somebody's downstairs smoking, stop your deliberations until you get all 12 together again because you want everybody to hear what everybody has to say. So that's the one rule you need to follow. No

250

deliberations unless all 12 are present.

So with that, take your notes back with you, it's time now to share those notes. Karen will take you back to the jury room. And, Mr. Popa, again, thank you for your service here. If you'll give her the number, she'll let you know. Thank you, sir.

(Jury exits courtroom at 2:11 p.m.)

THE COURT: Please be seated.

Now, get your exhibits all together. I know that if they want to see exhibits, we won't send guns and ammunition back there at the same time but we'll work on that, what they want. But be sure that you each have the exhibits that were in evidence available, look them over so we don't have to take a lot of time if we get a request for the exhibits.

Is there any other record that the government wants to make at this time?

MR. KELLEHER: No, Your Honor, nothing from the government.

THE COURT: Defense counsel, any other record that you have?

MR. JOHNSON: Nothing from the defendant.

THE DEFENDANT: Yes, sir.

THE COURT: You have a record?

MR. JOHNSON: Mr. Joos does.

THE DEFENDANT: I need for the record -- I need to.

251

In his closing the prosecutor was making accusations that I am
not -- I wasn't allowed to rebut myself, and my counsel, even
though I gave him a list of things that he said that should
have been rebutted, things that were not in evidence, things
that were personal attacks, things that -- a common person
would not understand the difference between cussing and
swearing. I don't swear. Cussing is not swearing. Look up
the definitions of those words. It's not the same thing
technically.

        THE COURT: Okay.

        THE DEFENDANT: I don't swear. One is permitted by
the law of God, the other one isn't.

        These different -- 1, 2, 3, 4, 5, 6, 7, 8 things
that I wanted him to rebut before the jury, he didn't do, so
I don't know if it's improper closing on his part or of it's
ineffective assistance of counsel on his part. I want it
noted for the record that I object to this and it'll just take
a second to read these into the record, my objections.

        THE COURT: All right.

        THE DEFENDANT: He said my release papers were found
in the office, but that's where I do my research and was doing
my research to overturn the conviction.

        There is no upstairs bedroom. Everything up there
is storage.

        The blasting caps were in the storage building, not

252

typically out where anybody would happen to see them or could go through stuff.

The number of guns and ammo he brought up is easily attributed to the number of people involved who have the stuff stored out there.

The -- okay, the cussing is not swearing.

He said the office is where the guns were. As I think I testified, the kitchen and dining room area are really the only office parts of the building itself. The rest is storage for others.

The -- then he failed to raise the issue my respect for other people's property. If I don't inspect them, if I don't use them, I don't know really what they are. My respect for property is the reason I don't touch them.

And as far as the Mosin-Nagant goes, I saw it in court and I recognized it because I've seen it before, if that's what it is, but it could also be a replica, but he didn't challenge that. And I'm just making a record that I think this is --

THE COURT: I understand.

THE DEFENDANT: -- ineffective assistance of counsel or improper closing by the prosecution.

THE COURT: Okay. Thank you, sir. So does that do it?

MR. JOHNSON: Nothing else from the defense, Your

Honor.

THE COURT:  All right.  We'll be in recess.

(Court stands in recess at 2:14 p.m.)

I'm told the jury has a verdict, so bring them in.

(Jury enters courtroom at 2:48 p.m.)

THE COURT:  All right.  Please be seated.

And I understand you have a verdict?

THE JUROR:  Yes, we do, Your Honor.

THE COURT:  If you'll hand that to Karen.

Seems to be proper in form.  All right.  Here's the verdict.  "We, the jury, find the defendant, Robert Joos, guilty of the crime of being a felon in possession of firearms and ammunition as charged in Count 1 of the indictment and as submitted under Instruction No. 13," signed by the foreperson, dated today's date.

The next form, "We, the jury, find the defendant, Robert Joos, guilty of the crime of being a felon in possession of explosives as charged in Count 2 of the indictment and as submitted under Instruction No. 14," signed by the foreperson and dated today's date.

Does either side desire for the jury to be polled?

MR. KELLEHER:  No, sir.

MR. JOHNSON:  No, sir.

THE DEFENDANT:  Yes, sir.

THE COURT:  Ladies and gentlemen, what that means is

254

I will ask each of you if this is your verdict and then you just answer yes or no if this is your verdict.

So, Ms. Sailsbury, is this your verdict?

THE JUROR: Yes, it is.

THE COURT: Mr. Mitchell, is this your verdict?

THE JUROR: Yes, it is.

THE COURT: Mr. Page, is this your verdict?

THE JUROR: Yes, it is.

THE COURT: Mr. Udell, is this your verdict?

THE JUROR: Yes, sir.

THE COURT: Ms. Draper, is this your verdict?

THE JUROR: Yes, it is.

THE COURT: And, Ms. Smith, is this your verdict?

THE JUROR: Yes, it is.

THE COURT: Ms. Jones, is this your verdict?

THE JUROR: Yes, it is.

THE COURT: Ms. Cochrane, is this your verdict?

THE JUROR: Yes, it is.

THE COURT: Mr. Blakey, is this your verdict?

THE JUROR: Yes, it is.

THE COURT: Ms. Hall, is this your verdict?

THE JUROR: Yes, it is.

THE COURT: And, Ms. Scoville, is this your verdict?

THE JUROR: It is.

THE COURT: And, Mr. Brown, in this your verdict?

255

THE JUROR:  Yes, sir.

THE COURT:  Okay.  Now, because of the possession of the firearms, we have an issue of forfeiture and that's just for you all to decide if the firearms should be forfeited.  So I have to give you one more instruction and ask you to make that decision for us.  And I'm going to give this to you, Instruction No. 19.  It's not like I was keeping a surprise for you here, it's just that depending on what your verdict is, then we either do or don't do Instruction No. 19.  So here is the instruction.

(Court reads Instruction No. 19 to the jury.)

THE COURT:  So I'll have Karen give this to you, ask you to recess back and to reach this one additional finding for us and then you will be done for sure when you've made that decision.  So if you'll retire and let us know when you have it.

(Jury exits courtroom at 2:57 p.m.)

THE COURT:  Please be seated.

Now, we'll wait for that verdict.  And if either of the attorneys want copies, Bryan will make copies for you.

But in regard to the conviction that the jury just came in with, a presentence investigation will be conducted and a report will be prepared and that will be provided to you, Mr. Joos, and your counsel to review and make -- you'll be able to review that presentence investigation and make any

256

objections or corrections that you think are appropriate, and when that process is completed, then you'll appear here again for sentencing on that conviction.

I know you're interested in the appeal part of that, too, and you'll have time to file your appeal when that's completed. Mr. Joos, you understand what I'm saying? I'll give you notice of appeal but it doesn't all become final until I issue a sentence.

THE DEFENDANT: Yes, sir. And then on the forfeiture, I don't understand how do I appeal that? I'm going to have to notify people and see if they can find out who all that stuff belongs to. How do they --

THE COURT: If the jury comes in and requires a forfeiture of that, there's a provision for people to file claims for that property. Now --

THE DEFENDANT: On the forfeiture determination?

THE COURT: Just on the forfeiture. If there are other people that claim ownership of those guns, they need to be filing that I guess with the U.S. Attorney.

MR. KELLEHER: Yes, Your Honor. It's public notice. There's publication somewhere, and I forget exactly where it is, but there will be a public notice of all of these firearms, and then I think today Your Honor will enter a preliminary order of forfeiture, then there will be notice period, and then at that point they can make claims.

257

THE COURT:  But if you have people that are claiming interest, they need to contact the U.S. Attorney's office and let them know they're claiming an interest in that.

THE DEFENDANT:  Yes, sir.

THE COURT:  It's not Mr. Kelleher.  It'll be somebody else over there.

MR. KELLEHER:  That's correct.

THE COURT:  Anything else?

MR. KELLEHER:  No, sir.

THE COURT:  Anything else?

MR. JOHNSON:  No, sir.

THE DEFENDANT:  Yes, sir.  Motion for judgment of acquittal notwithstanding the verdict.

THE COURT:  You want to make that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.

THE DEFENDANT:  I mean, I wasn't really prepared because, again, the marshals took my paperwork.  I told them that I might have to do this.

THE COURT:  Here's the thing.  Let me just be clear with you.  You don't have to do that to appeal anyway.  But to get a ruling on that, you've made your motion and I'm sure you understand I'm not going to change my rulings because I let it be submitted to the jury, so I will deny that motion.  But you've got it for the record that I denied your motion for

acquittal.

THE DEFENDANT:  Okay.  I don't have to go through any case law or even --

THE COURT:  On appeal you do.

THE DEFENDANT:  Okay.  But I don't have to do it here in order to set the record?

THE COURT:  You've made your claim for it.  The recitation of case law isn't going to change that any.

THE DEFENDANT:  Oh, okay.

THE COURT:  All right.

MR. JOHNSON:  Nothing, Your Honor.

THE COURT:  Okay.  We'll give it a minute here and see what happens.

(Court stands in recess at 3:01 p.m.)

THE COURT:  Please be seated.

Okay.  I'm told that we -- do you need your agent here?

MR. KELLEHER:  No.

THE COURT:  The jury has a verdict.

So, Karen, you want to get the jury?

(Jury enters the courtroom at 3:10 p.m.)

THE COURT:  Please be seated.

You have a verdict, so, Karen.

So here is the special verdict form or the special verdict.  "We, the Jury, return the following Special Verdict

259

as to the defendant's interest in each of the properties alleged in the Forfeiture Allegation to be subject to forfeiture of the United States:  No. 1.  Mossberg, model 500A 12 gauge shotgun, bearing serial number L473476.  We, the jury, unanimously find this property is subject to forfeiture, yes.

"Two.  Mauser, model 98, 8 millimeter rifle, bearing serial number 55518.  We, the jury, unanimously find this property is subject to forfeiture, yes.

"No. 3.  Unknown manufacturer, model Westernfield, 12 gauge shotgun, bearing serial number 28501.  We, the jury, unanimously find this property subject to forfeiture."  Yes is checked.

"No. 4.  Harrington and Richardson, model Topper M48, 20 gauge shotgun, bearing serial number H7206.  We, the jury, unanimously find this property is subject to forfeiture. Yes.

"No. 5.  Winchester, model 1300, 12 gauge shotgun, bearing serial number L2856801.  We, the jury, unanimously find this property is subject to forfeiture."  Yes is checked.

"6.  Savage, model 187J, .22 caliber rifle, bearing no serial number.  We, the jury, unanimously find this property is subject to forfeiture.  Yes.

"No. 7.  Remington Arms company, Model 597, .22 caliber rifle, bearing serial number 2951327M.  We, the jury

unanimously find this property is subject to forfeiture." Yes
is checked.

"No. 8. Norinco (North Carolina Industries) model
SKS, 7.62 caliber rifle, bearing serial number 11011275D. We,
the jury, unanimously find this property is subject to
forfeiture. Yes.

"No. 9. Astra, model A-70, 9 millimeter pistol,
bearing serial number W8060. We, the jury, unanimously find
this property is subject to forfeiture. Yes.

"No. 10. Ruger, model Mark II, .22 caliber pistol,
bearing serial number 217-14110. We, the jury, unanimously
find this property is subject to forfeiture. Yes.

"No. 11. Galena Industries, Incorporated, model AMT
back-up II, .380 caliber pistol, bearing serial number R07876.
We, the jury, unanimously find this property is subject to
forfeiture. Yes.

"No. 12. Tanfoglio, F. LLI, S.N.C., model GT308,
.380 caliber pistol, bearing serial number T68012. We, the
jury, unanimously find this property is subject to forfeiture.
Yes.

"No. 13. Stallard Maverick, model JS-9MM, 9
millimeter pistol, bearing serial number 030277. We, the
jury, unanimously find this property is subject to forfeiture.
Yes.

"No. 14. Harrington and Richardson, model Topper

261

model 88, 12 gauge shotgun, bearing serial number AX621282. We, the jury, unanimously find this property is subject to forfeiture. Yes.

"No. 15. Mosin-Nagant 7.62 caliber rifle, bearing serial number 189293F. We, the jury, unanimously find this property is subject to forfeiture. Yes.

"No. 16. Numerous rounds of ammunition of various types. We, the jury, unanimously find this property is subject to forfeiture." Yes is checked. It's dated today's date and signed by the foreperson.

All right. Now, as I said, ladies and gentlemen, that completes your duties today and I want to thank you for that. And I'll say this in front of everybody here, in terms of when you leave here whether or not you talk about the case, it's up to you. There may be -- well, I don't know, there's been some news coverage so I don't know if any of the news media would want to talk to you. Sometimes some of the lawyers or their representatives want to talk about what you thought about the case. All I'm saying to you, it's your call. You don't have to talk about it, but if you want to, you can. I'm not putting any limits on you. But I would say this, if somebody wants you to talk about it or tries to get you to talk about it and you don't feel like talking about it, you just tell them that and that's the end of it. If they push you beyond that, you let me know about that because that

would be entirely improper for that to happen. But it's up to you whether you talk or not. I just want you to know it's your call on what you do with that.

With that, I'll ask you one more favor and that is after every jury trial I come back and talk to the jury just for a few minutes. If you all will wait for a couple of minutes, I'll be back there just real quick after you go back. If you can't wait, that's fine, you don't have to, but if you can, I'll be back and talk to you for a couple minutes. It's like I do with every jury. It's no different here.

With that, you all are excused and thank you again for your service.

(Jury exits courtroom at 3:16 p.m.)

THE COURT: Okay. Please be seated. Now, only question is there any additional record by the government?

MR. KELLEHER: No, Your Honor.

THE COURT: Or by defense?

MR. JOHNSON: No, sir, Your Honor.

THE COURT: Mr. Joos?

THE DEFENDANT: No, sir.

THE COURT: Okay. Thank you. Collect all your exhibits. I think you have them back there, but if you don't, Karen or Jeannine will get them for you if they're up here.

Thank you.

(Court stands in adjournment at 3:17 p.m.)

263

<u>CERTIFICATE</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____      _____
Date      Jeannine M. Rankin, CCR, CSR, RPR