IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
           vs.                 )   No. 09-5022-CR-SW-RED
                               )
ROBERT JOOS,                   )
                               )   May 18, 2010
                Defendant      )   Springfield, Missouri


SENTENCING
BEFORE THE HONORABLE RICHARD E. DORR
UNITED STATES DISTRICT JUDGE


APPEARANCES:
FOR THE PLAINTIFF:           MR. JAMES J. KELLEHER
                             ASSISTANT UNITED STATES ATTORNEY
                             901 E. St. Louis, Ste. 500
                             Springfield, MO 65806


FOR THE DEFENDANT:           PRO SE


STAND-BY COUNSEL:            MR. DARRYL B. JOHNSON, JR.
                             JOHNSON & JOHNSON, LLC
                             2731 S. Meadowbrook Avenue
                             Springfield, MO 65807


COURT REPORTER:              MS. JEANNINE RANKIN,CSR,CCR,RPR
                             U.S. COURT REPORTER
                             222 N. Hammons Parkway
                             Springfield, MO 65806


Proceedings reported by stenography; transcript produced by
Computer.

1             USA v. ROBERT JOOS

2           CASE NO. 09-5022-CR-SW-RED

3                MAY 18, 2010

4                  SENTENCING

5              *   *   *   *   *   *

6          THE COURT:  I thought Mr. Joos had stand-by counsel.

7          MR. JOHNSON:  I didn't know if you wanted me at

8    table.

9          THE COURT:  Why don't you sit at the table.

10         I know that you've indicated you want to represent

11   yourself and I agreed to that, but just in case we have any

12   situation where we need stand-by counsel, I'm going to ask him

13   to sit there.  He's not going to be speaking for you here,

14   you'll get to speak, but that's why I had him sit there.

15         THE DEFENDANT:  Yes, Your Honor.  I'm not going to

16   be able to represent myself because he never turned over a

17   copy of his to file to me.  I've not been allowed adequate

18   time to review what the prosecutor showed me last week on

19   Wednesday and Thursday.  I need copies of 100 pages out of his

20   discovery.  I found in his trial file over 50 pages that

21   weren't in the discovery which he claimed that Mr. Johnson

22   here gave back to him.

23         THE COURT:  All right.

24         THE DEFENDANT:  I have a -- I had a motion for

25   sanctions and sentencing delay that I sent in on -- this is

                           2

May 2nd when I realized that nobody was complying with your
court order of April 14th and, like I said, I don't know
what's in my file because I never got a copy of it from
Johnson.  There's no way I can be prepared for this.  Plus, I
still can't get my exculpatory evidence into the courthouse
without getting by the marshals with it.  They continue to
take my paperwork away from me.  The last time they took my
paperwork the bomb letter disappeared which was exculpatory
evidence which I saw again in the discovery when we did last
week but I can't get a copy of it from the prosecutor.

THE COURT:  Okay.  Here's what we're going -- we are
going to have a sentencing today.  And I realize that there
are a lot of things that you feel aren't right and that you
need to have heard but I've read -- you filed a lot of stuff
between the trial and now and in all fairness, almost all of
that deals with your disagreement with what happened at trial,
and today we're not here to retry the case.  We made our
decisions and you're going to have a chance to appeal and at
the end of today I'll have the clerk file a notice of appeal
for you if that's what you want.  But you're going to have a
chance to appeal and deal with that with the Court of Appeals
but today all we're talking about is your sentencing.

THE DEFENDANT:  Yes, sir.

THE COURT:  We're not talking about whether or not
the search was legal, whether or not there was probable cause.

3

1  I know you have issues with that but that you'll have to deal
2  with on appeal.

3          THE DEFENDANT:  But my objection at sentencing, Your
4  Honor, is that how can I prepare when Johnson wouldn't give me
5  a copy of my file?  How can I prepare when I can't get copies
6  of about 100 pages out of the over 3,000 that I saw briefly
7  last week that the prosecutor showed me but wouldn't give me
8  copies of anything?  Prepare for sentencing, I need to be able
9  to -- and I also didn't know anything about -- I wasn't
10 informed of any of this stuff here, the claims they're going
11 to use today, KKK roster, some kind of DVD, a picture of a
12 machine gun and some other stuff here that I wasn't informed
13 of any of that.

14         THE COURT:  Okay.  Let's take it a step at a time
15 here.  So let me talk to the -- we'll go through our procedure
16 here.  The first question I have is for the prosecutor and
17 then I'll be back to you.

18         Have you received a copy of the presentence
19 investigation report and had a chance to review it?

20         MR. KELLEHER:  Yes, Your Honor.

21         THE COURT:  Do you have any objections to it?

22         MR. KELLEHER:  No, Your Honor.

23         THE COURT:  Okay.  Now, Mr. Joos, this is the
24 presentence investigation report.  You've got a copy of that,
25 right?

4

1    THE DEFENDANT:  Yes, sir, and I filed 16 pages of
 2  objections to it.

 3    THE COURT:  I understand.  And they're attached to
 4  it.  I've read those.  But I take it by that, then, you've had
 5  a chance to review it?  You filed the objections to it so you
 6  must have reviewed it?

 7    THE DEFENDANT:  Yes, I did.

 8    THE COURT:  Okay.  And I see that you have
 9  objections there.  Now, I will say to you, I have -- I have
10  read those objections and most of them deal with matters that
11  you disagree with the trial.  You'd probably agree with me on
12  that, wouldn't you, about the search and seizure, about
13  evidence at trial and different things like --

14    THE DEFENDANT:  Yes, sir, denial of counsel is a big
15  one.

16    THE COURT:  Okay.  I'm just telling you those are
17  matters for appeal, not for sentencing.  So I've read through
18  that and the objections that you have filed, the written
19  objections, I'm denying those.  So mainly I'll say two things:
20  I'm denying those that are objections to what happened at
21  trial.  Some of those you are correcting and adding
22  information that you disagree within the report where you say
23  it should be different words or something.  You know what I'm
24  talking about where you say some of this is misrepresented and
25  should be stated differently?

5

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  And those aren't really objections,

 3    they're just -- I consider that to be additional information

 4    for me to consider, and I will consider that.  I understand

 5    what you've said there on those.  But to the extent that

 6    you've objected to the report, that's denied.

 7              THE DEFENDANT:  Well, there's also hearsay on there

 8    which is not supposed to be considered, and there's a over

 9    ten-year-old conviction which is not supposed to be

10    considered.

11              THE COURT:  Well, in terms of your conviction, I

12    believe it -- I'm not sure if we have more than one that gets

13    it -- the ten-year-old get to have any significance on

14    sentencing?

15              MR. KELLEHER:  It doesn't, Your Honor.  Well, it

16    does in terms of criminal history points but not -- I don't

17    believe any -- well, there were criminal history points

18    assessed because I think he was still on parole at least --

19    yeah.

20              THE COURT:  Which one is it?  One of you tell me,

21    which one is it?

22              THE DEFENDANT:  It's a concealed carry charge that's

23    over ten years old and the U.S. Supreme Court --

24              THE COURT:  Which paragraph --

25              THE DEFENDANT:  The sentencing guidelines say you
```

6

```
 1  cannot use --

 2           THE COURT:  Hang on just --

 3           THE DEFENDANT:  -- for sentencing purposes a

 4  conviction that's over ten years old.

 5           THE COURT:  Hang on just a second.

 6           MR. KELLEHER:  It's Paragraph 55, Your Honor.

 7           THE COURT:  Okay.  So I'll ask probation about that.

 8  I know the ten-year-old comes in on evidence at trial but what

 9  about in terms of the three points that are added here?

10           PROBATION OFFICER:  Your Honor, the sentencing date

11  for the Paragraph 55, the sentencing date was April 4th of

12  1997.  It's actually -- because it's a three-point conviction,

13  it's within the 15-year requirement under 4A1.2(e)(1).

14           THE COURT:  Let me just look at that.  What was that

15  cite again?

16           PROBATION OFFICER:  4A1.2(e)(1) where it talks about

17  applicable time period.

18           THE COURT:  Okay.  Mr. Joos, here's what it says at

19  that cite, "Any prior sentence of imprisonment exceeding one

20  year and one month that was imposed within 15 years of the

21  defendant's commencement of the instant offense is counted."

22           THE DEFENDANT:  Isn't that restricted also to

23  violent offenses?

24           THE COURT:  No.

25           THE DEFENDANT:  Isn't there a clause in there that
```

7

1   says violent offenses only?

2             THE COURT:  This is for terms of computing your

3   criminal history.  So that's the reason for that.  So if you

4   have an objection -- it's okay to object because this is all

5   part of the record for appeal so --

6             THE DEFENDANT:  Yes, sir.

7             THE COURT:  I gather you're still objecting to it

8   and that's denied.

9             THE DEFENDANT:  Yes, sir.  I'm objecting to all the

10  hearsay that's in there also.

11            THE COURT:  All right.

12            THE DEFENDANT:  And I'm also objecting to not being

13  informed that under 12 U.S.C. 851 and 962(2)(b), Court was

14  required to inform me after conviction and before sentencing

15  that any challenge to a prior conviction must be made prior to

16  sentencing with written response of a prosecutor and it said

17  the Court shall hold a hearing prior to sentencing on the

18  issue of findings of fact and conclusions of law and then if

19  it's denied it must be -- the sentencing must be delayed until

20  appeal is heard by the Eighth Circuit.

21            THE COURT:  That's certainly doesn't sound like a

22  United States Code statute to me.  Are you saying --

23            THE DEFENDANT:  I ran across it by accident when I

24  was researching cases, 12 U.S.C. 851 962(2)(b).

25            THE COURT:  It wouldn't be worded like that telling

1    the Court what to do, I don't think.

2          MR. KELLEHER:  No.  I think he might be referring to

3    Title 21, the prior drug convictions, perhaps, but I'm not

4    familiar of any provision of law.  The fact of the matter is,

5    the convictions were already determined to be valid by the

6    Court.

7          THE COURT:  Mr. Joos, what's your cite again?

8          THE DEFENDANT:  It's 12 U.S.C. Section 851 and 962

9    (2)(b).

10         THE COURT:  Got it, Bryan?

11         LAW CLERK:  Yeah.

12         THE COURT:  Can you call it up or just go copy it?

13   Get the book.

14         THE DEFENDANT:  I'm not sure on the (2)(b) because

15   on the computer it's hard to tell if there's another --

16         THE COURT:  All right.  We'll get the book,

17   Mr. Joos.  I got a feeling 12 United States Code doesn't deal

18   with this but we'll see.

19         Any other objections you want to state?

20         THE DEFENDANT:  Well, my objection to not having a

21   copy of my file which this Court ordered Johnson to turn over

22   to me on the 14th of April and an objection did not -- having

23   any response from anybody on my motion for sanctions that

24   was -- I don't know if the Court got it.  I didn't get any

25   notice from the court clerk like I normally do.  It was sent

9

1  in on the 2nd of --

2       THE COURT:  Well, sanctions won't have anything to

3  do with your sentence.

4       THE DEFENDANT:  -- May.  That was my objection to

5  not having a copy of my case file, which I still don't have.

6  I never got a copy of the case file.

7       THE COURT:  What is it in your case file that you

8  think you need to respond to this presentence investigation

9  report?

10      THE DEFENDANT:  Well, I don't know that until I see

11 my case file.

12      THE COURT:  Okay.

13      THE DEFENDANT:  That's the problem.  That's the same

14 problem with discovery.

15      THE COURT:  All right.

16      THE DEFENDANT:  All this stuff on discovery, I've

17 got 50 missing pages that the prosecutor had in his trial file

18 that was not in the discovery file, apparently, which means he

19 didn't turn over all discovery.

20      THE COURT:  Okay.

21      THE DEFENDANT:  So --

22      THE COURT:  That objection will be denied.  So we're

23 going to go forward now with the sentencing.

24      And based on the presentence investigation report,

25 the --

```
 1                THE DEFENDANT:  I'm not finished with objections,
 2    sir.
 3                THE COURT:  Well, what other objection do you have?
 4                THE DEFENDANT:  Okay.
 5                THE COURT:  Don't repeat what you filed with me
 6    because I've already --
 7                THE DEFENDANT:  First objection is being shackled so
 8    I can't handle the paperwork.
 9                THE COURT:  Okay.  That's denied.
10                THE DEFENDANT:  The second being threatened by
11    another inmate downstairs in the holding cell where they've
12    got violent inmates put in with protective custody which they
13    recognize as soon as they see that red armband.
14                THE COURT:  Okay.
15                THE DEFENDANT:  A big guy all padded up that
16    threatened me and a kid in there with violence and --
17                THE COURT:  Okay.  Well, you're okay now, so that's
18    denied.
19                THE DEFENDANT:  My other objection is not being able
20    to bring my exculpatory evidence.  I've got 11 testimonials
21    that I had no way to get into the court because I can't get
22    them past the marshals.
23                THE COURT:  And I understand, but we're not trying
24    your case today.
25                THE DEFENDANT:  That's what I wanted to present
```

11

1   today.  But how could I present it when I haven't been allowed

2   time to prepare to defend myself in this sentencing and

3   present the sentencing issues?

4             THE COURT:  I know -- I may be wrong about this but

5   I'm going to deny that objection.

6             First of all, Title 12, Mr. Joos, deals with banks

7   and banking so it's not going to have anything to do with you

8   and the Court.

9             THE DEFENDANT:  Well --

10            THE COURT:  I know you said you found it by

11   accident but I'm thinking maybe --

12            THE DEFENDANT:  I was running case law and I saw it

13   and I punched it up and that's what it said.

14            THE COURT:  I'm afraid they have a mis-cite there

15   for you.  Okay.  So that was your objection, right?

16            THE DEFENDANT:  Right.  The other objection to not

17   having my case file.  Mr. Johnson --

18            THE COURT:  I just ruled on that a little minute

19   ago.

20            THE DEFENDANT:  Yeah, but you asked me what was in

21   the file and I just recall --

22            THE COURT:  You told me you didn't know.

23            THE DEFENDANT:  My motions were in there, should

24   have had a copy of the jury instructions, which I've never

25   seen, should have had a copy of -- he had a copy, because I

saw it here at trial, of the so-called bomb letter that they
keep using against me as an exhibit but which nobody's ever
looked at.  It's exculpatory evidence.

THE COURT:  All right.

THE DEFENDANT:  It was also in the discovery which I
tried to get a copy of which he did not give to me.

THE COURT:  All right.  Mr. Joos, I know -- I know
that you're emotionally involved here because you're the one
that's got everything at stake and I understand that, but
we're not retrying the case today.  I'm sorry, but we're not
retrying the case.  That's what you have to do on appeal.  And
they're not going to retry it but at least you can claim
your --

THE DEFENDANT:  But the bomb letter has exculpatory
evidence in it.

MR. KELLEHER:  Your Honor, the bomb letter was
admitted at trial.

THE COURT:  I know, it's evidence at trial, it'll be
part of the record.

But, Mr. Joos, we're going to move on because we are
going to have --

THE DEFENDANT:  I'd also bring that up at
sentencing.  Anything which might show the Court that I'm not
guilty of any of this stuff or would show that I should
receive a lesser sentence I should be able to present to the

13

1    Court.

2              THE COURT:  Okay.  We're going to --

3              THE DEFENDANT:  Which I have not been allowed to do.

4              THE COURT:  You're going to have a chance to speak

5    for yourself here about the sentence but we are moving on

6    today.

7              So based on the guidelines that we just talked about

8    and the analysis in the guidelines, the total offense level

9    for calculation of the guidelines is 22, the criminal history

10   category is 4.  So by statute your sentence to custody on

11   Count 1 can be not more than ten years, your sentence to

12   custody on Count 2 can be not more than ten years, supervised

13   release by statute under Count 1 is not more than three years,

14   Count 2 not more than three.  The guideline range is 63 to 78

15   months for custody and two to three years for supervised

16   release.

17             Now, I'll first hear from you, Mr. Joos, as to what

18   you think should be the appropriate sentence and any matters

19   of what they call allocution or anything you want to say for

20   yourself that you think is pertinent to what the sentence

21   should be and then I will hear from the government.

22             Now, Mr. Joos, statutory factors that I am to

23   consider deal with the nature and circumstances of the

24   offense, the history and characteristics of you, the

25   defendant, consideration of the seriousness of the offense,

                                14

consideration to promote respect for the law and provide just

punishment for the offense, consideration of adequate

deterrence to other people and you from this kind of conduct,

consideration of protection for the public and consideration

of whether you need an education or vocational training or

medical care.

Now, those are all considerations I make. You can

comment on any of those you want to because those will be

considerations I'll be making. So let's hear from you as to

what you think is the appropriate sentence.

THE DEFENDANT: Start with medical. I've been for

six months trying to get medical treatment for illnesses and

injuries. I can't get any Court or the sheriff to get me to a

competent physician to have something done about my pinched

nerves in the back and my neck. So that's the first thing,

since you brought that up.

I'm going to have to go slow here because I can't

handle these papers very well with these on.

THE COURT: Okay.

THE DEFENDANT: The second thing is I've got 11

testimonials from attorney, doctor, a widow lady, people who

have associated with the church over the years that I've

helped out who sent me letters, you know, for my benefit, but

since the only piece of exculpatory evidence I had from trial

was the bomb letter, so-called bomb letter -- that's what I

15

1    wanted to show the Court what they were using --

2            THE COURT:  I'm familiar with the bomb letter.

3            THE DEFENDANT:  Sir?

4            THE COURT:  I remember the bomb letter from trial.

5    Are you saying you've got 11 testimonials there right now?

6            THE DEFENDANT:  I couldn't bring the stuff with me.

7    Like I said, I wasn't prepared for this today because I

8    thought this was a motion hearing because of the motions I

9    filed in which I explained to the Court --

10           THE COURT:  Okay.  I understand that part.  Are you

11   telling me --

12           THE DEFENDANT:  You ordered the Court -- you ordered

13   the prosecutor to show me what he had.  Well, all he showed me

14   was almost 3,000 pages of discovery, over 90 percent of which

15   had nothing to do with me.

16           THE COURT:  Okay.

17           THE DEFENDANT:  Which I had to go through, spend --

18           THE COURT:  You and I need to have a little give and

19   take.  I get to talk a little bit and you talk a little bit.

20   Okay?

21           THE DEFENDANT:  Yes, sir.

22           THE COURT:  Let's talk about testimonials.  You say

23   you had them but chose not to bring them because you thought

24   this wasn't your sentencing today?

25           THE DEFENDANT:  I didn't bring them because I didn't

16

have any way to get them into the court without them being
taken by somebody between here and there because I don't have
this Court's order that they're not to take my paperwork out
of my sight.  That's the only thing I've asked for the Court
to do.  Not that they can't search the stuff.  I don't care if
they search it.  But I've got a transcript in which the
sheriff of McDonald County testified on my behalf.

THE COURT:  Okay.  I'm not interested --

THE DEFENDANT:  -- an attorney testified on my
behalf, and I have --

THE COURT:  That must have been in some different
case.

THE DEFENDANT:  That's the underlying felony which
is driving without a license.  That's public record.

THE COURT:  Is that where these --

THE DEFENDANT:  If the Court takes judicial notice
of that public record --

THE COURT:  Is that where the testimonials come
from, that other case?

THE DEFENDANT:  That's one -- two of them.  I have
testimonials from nine more people.

THE COURT:  Do they come from other cases?

THE DEFENDANT:  They have nothing to do with other
cases.  These are nine people that wrote letters of
recommendation for reduced sentence that -- I had a stack of

1   stuff like this I should have brought with me but I didn't

2   know how to get it here without getting it confiscated.

3           THE COURT:  Well, all right.

4           THE DEFENDANT:  Again --

5           THE COURT:  I take it -- I understand.  But you made

6   a choice --

7           THE DEFENDANT:  I should have had 30 more days since

8   I don't have a copy of my counsel's file, which the Court

9   ordered him to give me.  I don't have copies of --

10          THE COURT:  Mr. Joos?

11          THE DEFENDANT:  -- of numerous things that

12  the prosecutor showed me but wouldn't let me have copies of --

13          THE COURT:  Okay.  We're talking about --

14          THE DEFENDANT:  -- so I explained to the Court

15  what's in there.

16          THE COURT:  -- testimonials.  Testimonials.  Okay?

17  That's all we're going to talk about for the next minute or so

18  here.  Now, as I understand it, you say you have some letters

19  and things from people that are suggesting you should have a

20  lesser sentence?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  And you didn't bring those because you

23  felt like procedurally they'd be taken away from you and you

24  might lose them?

25          THE DEFENDANT:  Yes, sir, just like the only other

18

1  exculpatory evidence I had was taken away from me.

2          THE COURT:  Now, as I understand it, what did you

3  do, leave it over at the jail?

4          THE DEFENDANT:  Yes, sir, it's at the jail.

5          THE COURT:  Okay.  So I can't help you on that

6  because you didn't talk to me or ask me about the procedure

7  and so I'll let you tell me about those testimonials today,

8  but we're not going to delay this trial for you to have more

9  time in regard to the testimonials.

10         THE DEFENDANT:  I filed a half dozen motions with

11 the Court requesting that you order the marshals not to take

12 my legal paperwork, and cops, anybody else, out of my sight so

13 if they take something out, I can see it.

14         THE COURT:  Well, I think I made a ruling on your

15 order, I can't remember exactly what it was, but I am saying

16 this -- do you really have something you want to say?

17         MR. KELLEHER:  If you don't mind, Your Honor.  I

18 can't help but notice Mr. Joos has a table full of papers in

19 front of him so I suspect that had Mr. Joos taken those with

20 him, they would probably be in front of him right now, but he

21 opted not to do so for reasons unclear to me.

22         THE DEFENDANT:  These papers are the motions which I

23 filed with the Court --

24         THE COURT:  Okay.  Mr. Joos --

25         THE DEFENDANT:  -- to delay the sentencing for 30

19

1  days so I could prepare for trial -- prepare for sentencing.

2         THE COURT:  Mr. Joos, tell me about the testimonies.

3  I'll give you time to tell me who said what right now.  If you

4  don't do it, we're going to move on to something else.

5         THE DEFENDANT:  Okay.  No. 1, Attorney Hanson,

6  McDonald County testified at the DWL -- she tried to testify

7  in my defense at the trial and the judge would not allow her

8  to.  The whole trial hinged, just like this trial, upon --

9         THE COURT:  Just tell me what they said.  I'm not

10 going to retry those other cases.  Tell me what the people

11 said that was good about you that you think I should know.

12        THE DEFENDANT:  She said that every time she had a

13 poor client needed help, I would arrange for aid through the

14 church.  She said that I've never been a danger or a threat or

15 harm to anyone.  She said she believed that I had a valid

16 defense in the case because of raising the issue of driving

17 without license is business use of a public right-of-way and

18 has nothing to do with the right to travel, that my right to

19 travel is being denied, and she had reviewed my cases, could

20 find no fault in them.  She testified, I believe, that she

21 didn't think it was fair that the Court was not allowing me to

22 present my testimony.  And then the sheriff of McDonald

23 County, Rob Evenson, testified that when he would take me

24 places like to the dentist, he never even bothered to cuff me

25 up.  I was wearing civilian clothes from the jail to the

                                 20

dentist for an appointment.  He'd leave the car, leave me in it, never had any problem with me.  Any time he needed to see me he called me and I'd come into the jail and talk to him. So I was not a threat or harm to anyone.

I'm just trying to briefly summarize because some of these --

THE COURT:  That's what I want you to do.

THE DEFENDANT:  -- letters are like three and four pages long.  They said all the things I do to help people all the time.

There's a widow woman down there who I helped by taking a huge tree out of her yard.  She was afraid it was going to fall on her house.  I helped her for over 15 years off and on.  She recommended that I be given a lesser sentence.

Former scout master.  I used to be assistant scout master of the troop to Pineville, Missouri.  The scout master wrote a letter for me stating how I helped out with the Boy Scouts and that he would never allow me around his son and his nephew if he thought I was any danger to them.  I helped out with the camp-outs, I helped out with the training.  For four or five years I worked with him.  This is all within the last 10, 15 years all this -- since I've lived in that county.  I'm not going back to the -- you've already seen the -- I don't know if you've even looked at it, my achievement list of

21

```
 1   things that predate my becoming a --

 2             THE COURT:  I've read all that.

 3             THE DEFENDANT:  Okay.  Then there was the -- John

 4   and Connie Arp (ph.).  They wrote a letter.  They live out

 5   there near the church.  They know that the church sells

 6   property to anybody.  There's an American Indian family living

 7   on one of the properties right now.  In the past sold to

 8   Mexican-American families.  So the whole racist lie being put

 9   out by the media is just a bunch of garbage.  It's not

10   verified by my record or what I do for people.  We've -- both

11   the Mexican guy and his family and the Indian people have

12   worked for the church when they needed money, extra time.

13   Also, John Arp, when he needed help with money, we hired him

14   to do work on our vehicles and things because he had trouble,

15   lost his job and was having trouble.

16             There's also the testimony of Michael and Linda

17   Hopping (ph.) which also put in there what we've done to help

18   them and their relatives when they needed help.  Basically,

19   the church has some land that we use to help poor people.  You

20   know, a place for poor people to live, a place where they can

21   buy a place cheap and build something for themselves where

22   they don't have to rent for the rest of their lives.  It's the

23   cheapest place you can live in all of McDonald County that

24   I've been able to find.  And how I helped the Hoppings'

25   sisters.  When they lost their jobs, they were allowed to live
```

on the property for free for six months until they found
another place they wanted to go.  They were crippled up, they
didn't have any way to make a payment to anybody or rent or
anything so we let them use the buildings that were on the
property out there.

There was Dr. Smith who's known me since 1980 and
how I lived with his family and helped his family.  He had
like five children at the time.  Eventually had eight but when
I was there he had five young children, how I helped out with
the family, renovate his house.  He was struggling, a guy with
that many children and his wife taking care of the kids and
not working.

There was, let's see, an elderly couple in Pineville
that I help out on a regular basis because they're too old and
crippled to do the work on their home so I help them out with
that.  I've done that for several other people.

Let's see.  There was one -- I have to do some
calculation in my head here, Judge.  Excuse me a minute.

I think that was all the letters.

THE COURT:  Okay.

THE DEFENDANT:  Now, there was a lot of other people
that probably would've written a letter but they're so
terrified by cops, you know.  Anybody that's on the list, you
know, they got my address book and things from the church,
next thing you know, they're coming around asking them all

23

1    kind of questions about me.  People are -- for no particular
2    reason are just afraid they're going to be drug into something
3    that they have no idea what it is or what it's all about, just
4    like I've been drug into this by this guy Mahon.  Had no idea
5    what he was into.
6            THE COURT:  Okay.  So we've talked about your
7    medical and we've talked about testimonials.  Now, what else
8    would you like to talk about?
9            THE DEFENDANT:  It'll take me a minute here to go
10   through my notes and see what I've got in here.
11           There's the issue of cruel and unusual punishment.
12   I've been in custody for over five years for driving without a
13   license is what this boils down to, refusal to pay a $7.50
14   tax that I don't owe --
15           THE COURT:  Now, you do understand, I can't do
16   anything about your state court sentence?
17           THE DEFENDANT:  No.  What I'm talking about is the
18   sentence that constitutes cruel and unusual punishment under
19   the law because the underlying case is so minor that piling on
20   more and more punishment is considered cruel and unusual
21   punishment by the U.S. Supreme Court.  I have a whole list of
22   cases that I've looked up.
23           THE COURT:  I understand there are cases on cruel
24   and unusual, but now I want you to understand, I'm going to
25   sentence you today not based on a DWI that you had but based

1   on this case --

2           THE DEFENDANT:  That's DWL, sir, not DWI.

3           THE COURT:  Okay.  You know what I'm talking about,

4   though, don't you?

5           THE DEFENDANT:  (Nods head.)

6           THE COURT:  So let's move on to the next point.

7           THE DEFENDANT:  You said you would order your clerk

8   to file a notice of appeal for me?

9           THE COURT:  Yes.  That would come at the end, but do

10  you want me to do that?

11          THE DEFENDANT:  Yes, sir.  I want to make sure that

12  gets done.

13          THE COURT:  Okay.  Just so DWI and DWL doesn't

14  confuse the record, it was without a license as opposed to

15  intoxicated.

16          THE DEFENDANT:  Driving without a license.

17          THE COURT:  I understand.

18          THE DEFENDANT:  The issue is not so much the tax but

19  the violation of the laws of God that says I'm not to make any

20  covenant with the heathen or --

21          THE COURT:  All right.

22          THE DEFENDANT:  -- participate in things of this

23  world.  I don't trespass on the public right-of-way;

24  therefore, I have no reason to have a license.  That's what

25  the license is for.

1          THE COURT:  That issue is not before us.

2          Karen, you'll take care of the notice of appeal?

3          COURTROOM DEPUTY:  Uh-huh.

4          THE DEFENDANT:  We've already covered the failure of
5   counsel to turn over his file, which means I couldn't prepare
6   for this sentencing.

7          Let's see.  Okay.  Could I have a copy of my
8   objections to the PSR -- you've already gone through the -- my
9   objections and --

10         THE COURT:  I have those.  They were filed and I've
11  read through it.

12         THE DEFENDANT:  Okay.  And you have -- I'd like to
13  do argument on the objections but I don't have my copy of the
14  objections here.

15         THE COURT:  Well, we're not going to review those.
16  First of all, I told you that my reading of those indicated
17  that most of those were not proper objections because they
18  deal with the trial and at this point we're not retrying the
19  case but we've moved -- we're past that.

20         THE DEFENDANT:  But the objections have to be -- if
21  they're disputed, you have to make a determination on each
22  one.

23         THE COURT:  I've overruled your objections.

24         THE DEFENDANT:  All of them?

25         THE COURT:  All of them.

THE DEFENDANT: Okay. All right. I want to move to dismiss the case entirely. Go through these again because I'm not sure --

THE COURT: No, that's denied.

THE DEFENDANT: It's just a quick list here. 18 U.S.C. 922, it's unconstitutional on its face.

Second, Fourth, Ninth, Tenth Amendments of Article 4, Section 2 because *Miranda v. Arizona* and *Marbury v. Madison*, U.S. Supreme Court says you cannot amend the constitution by rule or legislation either one.

And you're going to -- you'll rule on these each individually?

THE COURT: Well, you see, Mr. Joos, we're running in circles here. That's already been ruled. You've been tried by a jury, you've been found guilty and now we're talking about sentencing, not about whether or not it was constitutional to try you in the first place. But to the extent you want a ruling on those, your objection is denied.

THE DEFENDANT: Okay. Then the invalid search warrant. Here's a problem I had with --

THE COURT: I've already ruled on that and I'll tell you again, your objections to the search are denied.

THE DEFENDANT: Okay. There's an issue of destructive execution of the search warrant which has not been raised but because counsel would not take pictures when he was

27

1  down at the church, I can't show the damage but all I can do
2  is tell you what the damage was.  They destroyed the office.
3  They broke --

4          THE COURT:  That's denied as far as an issue here,
5  Mr. Joos.

6          THE DEFENDANT:  Okay.

7          THE COURT:  And I'm trying to be patient with you
8  here but now we're not going to circle around and do this over
9  and over here this morning.

10          THE DEFENDANT:  I don't know which of these issues
11  have to be raised at sentencing and which don't.  I'll try to
12  cover them as fast as I can.

13          THE COURT:  Well, sentencing deals with sentencing
14  issues as to what's the appropriate sentence and what I opened
15  up for was to you to comment on the factors that I'm to
16  consider.  And you did real good.  You talked about medical
17  and testimonials and cruel and unusual punishment.  That deals
18  with what we're about to do.  Now you've gotten away from me
19  here and start talking about the trial again.  So let's talk
20  about those factors that deal with sentencing.

21          THE DEFENDANT:  Okay.  I'm not clear on exactly
22  which they are, sir.  I don't have a list in front of me.

23          THE COURT:  Nature and circumstances of the offense,
24  the history and characteristics of you, consideration of the
25  seriousness of the offense, promotion of respect for the law,

28

1  providing a just punishment for this offense, affording
2  adequate deterrence to criminal conduct, protecting the public
3  from further crimes by you, and to consider whether or not you
4  need education or vocational training or medical care, and you
5  told me about the medical care.

6          THE DEFENDANT:  Okay.  Nature and circumstance of
7  the offense.  That's what I'm getting into here.  There was
8  no -- there was no offense.  The jury based their entire
9  verdict off of perjury by the cop.  And because I had no
10 counsel at trial, I had no way to present --

11         THE COURT:  Mr. Joos, we're not going to retry the
12 case, okay?  So quit talking about what you disagree with at
13 the trial because that has nothing to do with what we're doing
14 now.

15         THE DEFENDANT:  Isn't that the nature and --

16         THE COURT:  Not in sentencing.  That's what your
17 appeal is all about.

18         THE DEFENDANT:  Nature and what you said, sir?

19         THE COURT:  Well, the nature and circumstances of
20 the offense.

21         THE DEFENDANT:  Right, nature and circumstances of
22 the offense.

23         THE COURT:  That would deal with the fact that you
24 had a lot of guns out there.  That concerns me.  There were,
25 it says in this report, 19,000 rounds of ammunition.  That

1   concerns me a lot because why would you have that much
2   ammunition?
3          THE DEFENDANT:  I didn't.
4          THE COURT:  Well, jury says you did and so I have to
5   deal with what the jury says.  You can deal with that on
6   appeal.  But if you want to make any points here, you need to
7   try to tell me why that shouldn't be a concern to me.  There's
8   this issue of the Mahon brothers.
9          THE DEFENDANT:  It wasn't mine.  Belonged to the
10  church.  The church has many members.  They were storing
11  stuff, apparently, out there in the office and I didn't know
12  about it.
13         THE COURT:  Well, you know, another thing, if you
14  read that report you'll see that the jury obviously felt that
15  you didn't tell the truth when you testified because you had
16  said certain things and they found different and you got a
17  couple of points for that for obstruction of justice for not
18  telling the truth.  Now --
19         THE DEFENDANT:  But that isn't valid because
20  everything that you use here has to be proven beyond a
21  reasonable doubt.  The jury did not find me guilty of perjury.
22         THE COURT:  All right.  So let's go.  Let's talk
23  about any other factors that you want to talk about.
24         THE DEFENDANT:  Nature of the offense.  There were
25  80 guns found in the David Koresh compound.  There were 80

30

1  adults in the David Koresh compound.  So the number of guns

2  and amount of ammunition is not unreasonable considering the

3  number of people that have been in and out of the church over

4  the past 10 to 15 years.  I don't know how many -- I don't

5  know who all, what or how many each person had but, like I

6  said, it wasn't any of my business to begin with.

7          The -- here's another, jurisdiction according to the

8  U.S. Supreme Court can be raised at any time.

9          THE COURT:  No, that's denied.

10          THE DEFENDANT:  Jurisdiction issue is?

11          THE COURT:  Jurisdiction is denied.  We're past

12  that.

13          THE DEFENDANT:  Okay.  So you don't want to hear any

14  of the jurisdiction issues?

15          THE COURT:  No, that's not what we're talking about

16  today.

17          THE DEFENDANT:  Okay.  The validity of the

18  underlying felony, where did I see that?  That has to be

19  raised at sentencing also.

20          THE COURT:  Okay.  I will rule that I found those to

21  be valid and proper use for you being a felon in possession.

22          THE DEFENDANT:  Okay.  Cruel and unusual punishment.

23  I pulled some sentences off of the -- off of cases, you know,

24  people -- people with violent crimes getting three years or

25  less.  One guy shot up a house with five people in it, he got

31

1  three years' probation.

 2          THE COURT:  You understand the sentencing --

 3          THE DEFENDANT:  Disparity of sentencing is one of

 4  the issues.

 5          THE COURT:  Sentencing guideline says it's

 6  recommended that your custody sentence be between 63 to 78

 7  months.

 8          THE DEFENDANT:  Right.  But the Court does not have

 9  the --

10          THE COURT:  I'm not bound by that but that's

11  certainly a consideration, a strong consideration, and if you

12  want to make any points, you need to be showing me why that's

13  not an appropriate sentence for you.

14          THE DEFENDANT:  Yes, sir.  That's what I'm

15  attempting to do.  But, again, without -- without anything

16  from the prosecutor or counsel, that's hard to do because I

17  can't challenge what they're saying if I don't have a copy of

18  what it is and be able to challenge it.

19          Let's see.  There was -- okay.  As at the trial you

20  denied me my right to defend myself but you wouldn't give me

21  30 days to prepare for trial.  I filed a motion and he did

22  just exactly what he said he was going to do, see to it that I

23  got convicted because the church doesn't have a 501(c)(3) tax

24  number, but you wouldn't give me 30 days to prepare for trial

25  then and you won't give me 30 days to prepare for sentencing

                               32

1   now.  I just want that noted for the record.

2          Let's see.  Relevant conduct.  Okay.  You filed

3   something different -- they filed something different than I

4   did.  The case law I've got says 10 years old.  I think it's

5   *Rita v. U.S.*

6          THE COURT:  I've already covered that when we

7   started out this morning.  That's a matter of record.

8          THE DEFENDANT:  Okay.  I don't have a copy -- well,

9   you've already ruled on the objections.  I objected to

10  hearsay.  I objected to a bunch of stuff.  You ruled on that.

11         Okay.  This is *Custis v. U.S.*, bar sentence

12  enhancement where there was a complete denial of counsel in

13  the prior conviction, which is an issue I raised.  Let's see.

14  Have I got that here?  That's an issue I've attempted to raise

15  in the U.S. District Court.  It's still pending.  I don't know

16  what -- isn't any decision yet.

17         THE COURT:  The fact that your prior conviction was

18  used?

19         THE DEFENDANT:  Yeah, the DWL, the conviction they

20  were using on this case, driving without a license.

21         THE COURT:  I've looked at the way they've used the

22  prior convictions and I feel it's appropriate.  So any

23  objections you have are denied.

24         THE DEFENDANT:  Right.  That was -- the objection

25  was a complete denial of counsel in that case.

                            33

```
 1              THE COURT:  Well --

 2              THE DEFENDANT:  Which --

 3              THE COURT:  -- you can bring that up on appeal but

 4     as far as I'm concerned, any objection you have to the use of

 5     those prior convictions is denied in this Court.

 6              THE DEFENDANT:  Okay.  Yeah, here it is.  *U.S. v.*

 7     *Bradley*, this is the Eighth Circuit in '07, only violent --

 8              THE COURT:  Are you still on the same issue?

 9              THE DEFENDANT:  No, this is the felony conviction,

10     concealed carry.

11              THE COURT:  I told you --

12              THE DEFENDANT:  Only violent felonies can be used to

13     enhance a sentence.

14              THE COURT:  Mr. Joos?

15              THE DEFENDANT:  Can't use a nonviolent felony.

16              THE COURT:  Okay.  I have ruled that the use of

17     convictions in this case I find to be proper.  So you may have

18     a ground for appeal, and if you want to make it, that's fine.

19     My ruling stands.  We don't need to talk about your prior

20     convictions any more.

21              THE DEFENDANT:  Okay.  18 U.S.C. 922 doesn't apply

22     to me.  *Lewis v. U.S.*  It only applies to presumptively

23     dangerous persons.  Driving without a license is not a

24     dangerous felony.  Neither is concealed carry so --

25              I have to go through these because it's -- they're
```

34

1   mixed together and some things you've already ruled on so I

2   have to delete those.

3           THE COURT:  Are you reviewing the same motions that

4   you filed with the Court?

5           THE DEFENDANT:  No.  Some of these are notes that I

6   took after reviewing the discovery.

7           THE COURT:  All right.

8           THE DEFENDANT:  The issue of counsel at this trial,

9   denial of counsel.  Okay.  This is -- well, in addition to

10  refusing to turn over his copy of his files so I could use it

11  for sentencing -- now, the counsel issue negates a conviction,

12  so I just want to quickly run through all the things he did --

13          THE COURT:  No, you can do that on appeal.  But your

14  objection is to your counsel at trial?

15          THE DEFENDANT:  Right.  I was denied counsel.

16          THE COURT:  That's overruled.

17          THE DEFENDANT:  Okay.  According to the U.S. Supreme

18  Court, mitigating circumstances covers a wide range of issues.

19  I want to present some of these and see if this is what you

20  would consider mitigating circumstances because I've been

21  locked up.  In addition to the physical suffering from the

22  denial of treatment for illnesses and injuries, there's also

23  been a denial of proper diet, adequate law computer time, warm

24  clothes.  I sleep on the floor because they don't have bunks

25  available.  I can't even get dental floss to clean my teeth.

35

1  They won't give me anything for severe dermatitis I have on my
2  scalp.  Even though I got it at the other jail at Osceola,
3  they won't give me anything here.  In fact, the doctor hasn't
4  examined my scalp to see what it is to make a determination
5  for himself.
6         Okay.  My life's work for the church is being
7  destroyed by this whole thing.  I'm precluded from teaching
8  God's law to the church and to the public which I do on a
9  regular basis because we have Bible studies whenever -- I
10 mean, at the drop of a hat I'll stop and study the Bible with
11 people if they're interested.  We had a poverty relief program
12 which I supervised which included collecting and distributing
13 donations, providing jobs, housing, food, clothing, et cetera,
14 for people down there, for poor people.  We lost our volunteer
15 workers at the church.  We've lost members and associates.
16 There was destruction of the office and theft of the computer,
17 phones, files.  That's another thing, files.  I found in the
18 trial file that he has other files, you know, miscellaneous
19 files, and in the miscellaneous files is exculpatory evidence,
20 at least the ones that I know are missing from the church,
21 which is my federal habeas corpus file and my parole file.
22 Now, I suspect he has them but since he won't show them to me,
23 I don't know.  That's one of the things I had in my motion for
24 delay of sentencing so that I could see everything he's got.
25         Okay.  The raid on the church by 100 cops and three

36

days of ransacking the property from what I'm hearing has
terrorized the neighbors and that's probably why we've lost a
lot of our members and associates.  This again allowed the
media smear campaign against me to crank up.

Without me there to supervise maintenance, we're
getting insect, animal and weather damage to crops and
buildings, the equipment, the donations.  We've got
deterioration of fields, lawns, gardens, buildings, roads,
bridges, vehicles, tools and equipment all due to lack of
maintenance which I either do myself or I supervise.  We've
got loss of our crops.  The tomato crops, garlic, onions,
herbs, nuts, berries, sunchokes and the honey crop wasn't
harvested last year.  There's no one to answer the phone or
mails, or at least very little, just the church treasurer and
he doesn't do very much because he's working a regular job
now.  There's damage to the unlocked vehicle interior because
the cops smashed out the windows.  I'm not allowed to observe
the holy days, Passover, Pentecost, et cetera.  We had a
community clean-up project where we go around and find where
people dump trash along the side of the roads and I would
supervise those clean-ups.  Then there's weather damage to the
unfinished buildings.  All this is being exacerbated.  The
longer I'm locked up, the longer this damage is going to
continue.  That's all on that one.

One thing I would request the Court, I would like to

1    find out is if the Court ever got my past two or three motions
2    I filed because I've got no notice.
3            THE COURT:  I believe I've got a fistful of motions
4    or a group of them attached to the presentence investigation
5    report.  I can't -- if there's something you filed that isn't
6    here, there's no way for me to know it's not here.  You
7    understand that?
8            THE DEFENDANT:  Right.
9            THE COURT:  I believe everything you've covered I
10   have motions that seem to relate to that, so we'll move on.
11           THE DEFENDANT:  That one in particular about the
12   30-day extension.
13           THE COURT:  Well, 30-day extension is denied.
14           THE DEFENDANT:  Then there was the -- on 2 May '10 I
15   sent out this one which was the motion for sanctions against
16   counsel for refusing to turn over the file.  Is that in the
17   file?
18           THE COURT:  Well, let me make sure we have a ruling
19   on that.  That's denied.
20           THE DEFENDANT:  Okay.  Here's a motion that I want
21   to file with the Court which has to do with return of
22   property.  "Comes now, Robert Joos, for the Sacerdotal Order
23   of the David Company, a/k/a the Church, moves this Court or
24   plaintiff to immediately return all property, computers, two
25   cell phones, files, documents, two dummy rifle grenades, and

38

1   all other items disclosed or undisclosed taken from the church

2   leasehold.  Plaintiff had no right to keep said property

3   except that which is illegal to possess to the church

4   leasehold, arrangements to be made with Jeff Conway,

5   treasurer, or other officer or trustee of the church."

6           THE COURT:  All right.  Now, there's a forfeiture of

7   certain property.

8           THE DEFENDANT:  Right.  But this doesn't --

9           THE COURT:  And all the property that's forfeited

10  would not be returned.

11          Now, let me ask the government, in regard to any

12  property that you have that is not forfeited, what's the

13  disposition of that?

14          MR. KELLEHER:  It depends on what the property is.

15  Ultimately a lot of the stuff is in evidence that he refers

16  to.

17          THE COURT:  Okay.  So I know that what's in evidence

18  stays in the government's possession through the appeal there.

19          MR. KELLEHER:  Correct.

20          THE COURT:  What's forfeited, of course, is not

21  returned.  If there's anything else, what's the disposition of

22  that?

23          MR. KELLEHER:  Eventually it will be returned to a

24  designee of the defendant.

25          THE COURT:  Okay.

39

1          THE DEFENDANT:  But he doesn't know -- the computer,
2    cell phones, files --
3          THE COURT:  Here's what I'll say.  That's a motion.
4    We're not deciding it today.  But what I'm saying is that you
5    have property that was taken in the search.  Some of it's
6    going to be forfeited, some of it's going to be retained
7    because it's still in evidence.  The case will be on appeal.
8    Eventually what's not taken will be returned to somebody that
9    you designate to get it if you're still in prison.
10         THE DEFENDANT:  Okay.  How do I get this filed?
11         THE COURT:  You deal with that at the time when they
12   start dividing it up but not today.  Your motion is premature
13   today.  I'll deny it for today.
14         THE DEFENDANT:  Is there some way to file this with
15   the Court today?
16         THE COURT:  Well, we've got a record of it.  She's
17   making a record, so we have a record.  You made that motion
18   today.  It's been denied.
19         THE DEFENDANT:  All right.  Okay.  This is -- this
20   deals with something that has to be done before sentencing.
21   This is a petition for the -- specifically for firearms.
22   Petition for redress of grievances, return of property.
23   "Comes now the Sacerdotal Order of the David Company, also
24   known as the church, by and through their minister, Robert
25   Joos, pursuant to their right to petition for redress of

                                 40

1  grievances secured by --

 2          THE COURT:  Let me just summarize.  Is this a

 3  petition for the same property you just talked about?

 4          THE DEFENDANT:  No.  No.

 5          THE COURT:  For the guns?

 6          THE DEFENDANT:  Right, for firearms and the --

 7          THE COURT:  Okay.  I can just tell you the same

 8  thing.  I'm going to deny that as premature.  We have a

 9  forfeiture going on and if that property is forfeited, you

10  would not get it back.  The guns are going to be forfeited.

11          THE DEFENDANT:  That's what has to be read into the

12  record before.  This has to be done before I'm sentenced

13  according to the law, so I just need to have the motion on

14  file.

15          THE COURT:  Give it to Karen here.

16          THE DEFENDANT:  Okay.

17          THE COURT:  The marshal will get it.  Okay.  It'll

18  be filed.

19          THE DEFENDANT:  This has to do with exculpatory

20  evidence and mitigating circumstances so --

21          THE COURT:  Well, is it anything you haven't covered

22  before?

23          THE DEFENDANT:  Yeah, I haven't covered this yet.

24  This is what needs to be on the record.  It's just a short --

25  the rest of this motion that she has there.  Because the

                                41

church has no knowledge of any crime, church has no guilt
involved in any crime, no one has come forward to claim
anything as far as the guns and ammunition goes, the firearms
and ammunition that the plaintiff himself admits was taken
from the church property and therefore the property must be
considered abandoned.  As with any property abandoned at the
church, it becomes property of the church unless it is illegal
to possess.  The church doesn't allow bringing let alone
storing anything illegal on the property.  There is nothing
illegal about the church possessing the property.  It is
unlawful to punish the church for the act of a member.  Church
treasurer, Jeff Conway, had no knowledge of the firearms or
ammunition stored at the church office storage building.
That's on page 3 of ATF report No. 7 which I found in the
information that was in his trial file.

        THE COURT:  Okay.  Are you telling me that's --

        THE DEFENDANT:  That's why I'm petitioning the
Court --

        THE COURT:  All right.  Is that a second page of
this motion you filed?

        THE DEFENDANT:  No, that's a copy of what she has
there.

        THE COURT:  Okay.  Well, that's denied.

        THE DEFENDANT:  Okay.  The failure of prosecutor to
turn over everything on discovery.  That I discovered last

1    week.  There were 50 pages missing out of the discovery that
 2    was in his trial file and --
 3              THE COURT:  Okay.  Is there an objection to that?
 4              THE DEFENDANT:  Yeah.  Moving to dismiss this whole
 5    case on the grounds that I was not afforded discovery because
 6    he withheld discovery evidence.
 7              THE COURT:  That's denied.
 8              THE DEFENDANT:  Not just that.  There's that and
 9    then there's also a reference to a whole lot of ATF reports
10    and other things in his file which were not in the discovery
11    he gave me back last week to look at.  There was, like I say,
12    3,000 pages of stuff, yet when he gave me the trial file,
13    there was all kinds of things in there that were not in the --
14    in that -- what he said was the discovery that he gave to
15    Johnson that Johnson gave back to him.
16              THE COURT:  Okay.  To the extent there's an
17    objection here at this sentencing hearing in regard to that,
18    it's denied.  Let's move on.
19              THE DEFENDANT:  Like to request -- I need to know if
20    the Court has actually -- have you read the bomb letter?
21              THE COURT:  Which letter, the bomb letter?
22              THE DEFENDANT:  The so-called bomb letter that
23    explains how to demolish a building, gives all the safety
24    requirements and the requirements to check with the local
25    authorities to see if you need a permit, licenses and --

                                   43

1        THE COURT:  The bomb letter that was in evidence at
2   trial, I've read.
3        THE DEFENDANT:  Okay.  I want that used as
4   exculpatory evidence for mitigating circumstance because they
5   used it to claim I was trying to engage in some kind of
6   criminal activity and it's obvious that I was just telling a
7   guy how to demolish a building.
8        THE COURT:  That's not the charge you were convicted
9   on so --
10        THE DEFENDANT:  No, but was used against me.
11        THE COURT:  I understand.  Let's move on.
12        THE DEFENDANT:  I found out during -- he showed me
13   his trial file that the ATF had gone up to and found where the
14   state highway patrol is storing this phony machine gun they
15   charged me with back 15 years ago.  I wanted that brought to
16   the court to show the Court that there's no way to tell a
17   firearm is a firearm by looking at it and that's what they
18   conned the jury into believing.  I couldn't get the counsel,
19   Johnson here, to subpoena that machine gun.  It could have
20   been found, I'm sure, because the state highway patrol knew
21   where it was.  I told them how to find it.
22        THE COURT:  All right.
23        THE DEFENDANT:  And the jury convicted on the
24   grounds that they think you can tell a firearm is a firearm by
25   looking at it yet even their own expert had to testify that

44

1  every one was test fired in order to insure that it was an
2  operable firearm.

3          THE COURT:  Are you objecting to that evidence at
4  trial?

5          THE DEFENDANT:  I'm objecting to not being allowed
6  to bring this machine gun in here to sentencing to show you
7  that this is the kind of crap I get charged with by the
8  government every time I turn around.

9          THE COURT:  Okay.

10          THE DEFENDANT:  They held those charges on me for
11  two years and finally had to drop it because -- and I noticed
12  today in one of his exhibits he's got a picture of a machine
13  gun, which is how they got me on -- bound over for trial to
14  start with.  They bring in a picture of a machine gun, show it
15  to the guy and he says, "Oh, yeah, that's a machine gun,"
16  which is what they're going to try to do today here apparently
17  because they got a picture of probably the same machine gun.

18          THE COURT:  All right.  The objection that you have
19  to that is denied.

20          THE DEFENDANT:  Let's see.  You've already denied --
21  get this straight, denied my right to have copies of 108 pages
22  that came out of what I found last week to be used here at
23  sentencing and transcripts of about a dozen of those in order
24  to -- because they had transcripts of other people's phone
25  calls --

45

1        THE COURT:  I made my rulings, Mr. Joos.  You went

2   through there.  We're not going to rehash it.  Okay?  Go to

3   your next thing.

4        THE DEFENDANT:  That was the page --

5        THE COURT:  We've been at this about an hour.  I'm

6   trying to be patient with you.

7        THE DEFENDANT:  I'm sorry, sir.

8        THE COURT:  You go through it and then you want to

9   summarize for me and the record speaks for itself.  Let's go

10  to your next issues.

11       THE DEFENDANT:  I want to be clear on this issue.

12  I'm not allowed to have anything -- copies of anything the

13  prosecutor had, is that what you're saying?

14       THE COURT:  No, that's not what I'm saying.  I ruled

15  on it but -- I've made my rulings about what you got from the

16  prosecutor and what you got from your own counsel, so let's

17  quit talking about that and talk about other issues that

18  relate to sentencing.

19       THE DEFENDANT:  Okay.  This relates to sentencing.

20  Moreland, the cop that testified at trial, there's all these

21  letters that were sent to this federal informant, Becka

22  Stevens, which are referred to in his files but which do not

23  appear in there and if I had all those letters, I could show

24  the Court that I was not engaging in any criminal activity;

25  that I was simply trying to convince these people that they

                                    46

1  should quit doing whatever it was they were doing.  They never

2  came out and said what they were doing but they eluded that

3  maybe they were involved in something that wasn't exactly

4  legit.  And my only point in dealing with these people was try

5  to convince them to follow Revelation 18:4, "Come out of her,

6  my people, that ye be not partakers of her sins, and that ye

7  receive not her plagues."

8          THE COURT:  Okay.

9          THE DEFENDANT:  Don't fight the government, just get

10 out and don't deal with what's going on in the government.

11 Those letters would --

12         THE COURT:  To the extent --

13         THE DEFENDANT:  -- be exculpatory evidence I could

14 use here in mitigating circumstances but I don't have access

15 to them.

16         THE COURT:  Any request you have there is denied.

17         THE DEFENDANT:  Okay.  This is another motion I need

18 to give to the clerk.  This is a motion that I sent last week

19 12 May which I don't know if the Court ever got.  This is a

20 motion to delay sentencing, make copies and move my work

21 location.

22         THE COURT:  All right.

23         THE DEFENDANT:  This is a --

24         THE COURT:  You can give it to her.  Your motion in

25 regard to delaying the sentencing has already been denied.

47

1           THE DEFENDANT:  This is a different one that I filed
2   that I sent up after I sent the other one, after I had another
3   day of looking at the records, so there was other things I had
4   to put on there.
5           THE COURT:  This request to extend the sentencing is
6   also denied.
7           THE DEFENDANT:  Okay.
8           THE COURT:  That cover everything?
9           THE DEFENDANT:  I'm running out of pages here,
10  Judge, so I'm almost done.
11          Now, this copy of my case file it says for
12  sentencing as well as request for post-trial relief.  Now, I
13  don't have a copy of the file for sentencing.
14          THE COURT:  We're going to deal with post-trial.
15  I've already ruled on sentencing.
16          THE DEFENDANT:  Right.  Are you going to make him --
17          THE COURT:  I'll decide that.
18          THE DEFENDANT:  -- give me a copy of the file for
19  post-trial?
20          THE COURT:  I'll decide that later.
21          THE DEFENDANT:  Okay.  I'm already losing track.
22  Did I give you the motion to return the firearms and
23  ammunition petition?
24          THE COURT:  I have the Petition for Redress of
25  Grievances Return of Property, about the church.  That's

1    denied.

2              THE DEFENDANT:  Okay.

3              THE COURT:  And you should understand that it's a

4    forfeiture process and if you're claiming --

5              THE DEFENDANT:  If I don't make the objection now,

6    then I can't after sentencing.

7              THE COURT:  There's a claim period for forfeiture,

8    and we'll deal with that in just a little bit.  In turn for --

9    your other motion here that you filed with the Court, Motion

10   for Delay of Sentencing, Copies, Moving Work Location, that's

11   also denied.  I've read both of those.  They're denied.

12             THE DEFENDANT:  I'm just about out of stuff here,

13   Judge.  One other comment I need to make is that because of

14   distance and poverty of our people down at the church, people

15   I've been helping, the ones that wrote me letters, you know,

16   wrote letters -- actually, they weren't addressed to me, they

17   were addressed to the Court or Whom it May Concern -- they

18   just don't have the money -- most of them don't have vehicles

19   reliable enough to come up here all the way from southwest

20   Missouri or they would have been here today to testify for me.

21             THE COURT:  All right.

22             THE DEFENDANT:  But I also want to -- I'm requesting

23   the Court provide me with some way to get the letters to the

24   Court.

25             THE COURT:  The ones you told me about?

                              49

1          THE DEFENDANT:  Right.  Yes, sir.

2          THE COURT:  Well, I'm going to consider what you've

3   told me today on those letters.  I'm going to sentence you

4   today.  I'm not delaying the sentencing.  So to send me the

5   letters after today is not going to make any difference.

6          Is that everything, Mr. Joos?

7          THE DEFENDANT:  That's all I have until the

8   prosecutor comes up with something.

9          THE COURT:  Well --

10         THE DEFENDANT:  I've seen stuff over here I'm going

11  to have to object to because I don't -- I wasn't informed of

12  what these exhibits and stuff are that he plans on presenting

13  today.

14         THE COURT:  Well, we'll see.

15         All right.  See what the U.S. Attorney has to say.

16         MR. KELLEHER:  Your Honor, I'd like to call three

17  witnesses this morning.  I think that's probably the best way

18  to proceed.  Following the witnesses, I'll make my argument in

19  terms of sentencing, if that's acceptable to the Court.

20         THE COURT:  What are these witnesses for?

21         MR. KELLEHER:  To establish -- well, Miles Parks is

22  a former highway patrol officer who had extensive dealings

23  with Mr. Joos in the '90s and can speak to his character,

24  background, some of the other things that went on back then

25  that tie him into violent and white supremacist-type

                              50

1    activities.

2            THE COURT:  Is that really the appropriate thing to

3    do when we have a presentence investigation if we're not

4    proving anything that's in the investigation that's something

5    new and different?  Is this really the way to do this?

6            MR. KELLEHER:  I don't know of any other way, Your

7    Honor.

8            THE COURT:  Well, I would like for us to stick to

9    the presentence investigation because if there was other

10   evidence, it's like new evidence and then it's like we give --

11   we'll delay this further for a response to that and it seems

12   to me that presentence investigation provides relevant conduct

13   and that's what I'm to consider.  It sounds like you're

14   talking about expanding that to additional conduct.

15           MR. KELLEHER:  It goes straight to the 3553 factors,

16   Your Honor.  Obviously, the presentence report is directed

17   towards the actual offense but obviously --

18           THE COURT:  But it's also his criminal history.

19           MR. KELLEHER:  I understand that, but the character

20   goes far beyond criminal history.  The defendant, in fact, has

21   denied ties to the white supremacist movement.  I think that

22   is relevant.  He has denied being a violent person.

23   Obviously, if I can present evidence -- and I can -- that he

24   has engaged in violent activity, that is also relevant to

25   determination of sentence, Your Honor.  In fact, I can

51

1    establish a pattern of violent activities.

2            THE COURT:  Is that what all these witnesses are

3    for?

4            MR. KELLEHER:  With the exception of Kevin

5    Farnsworth.  He would attest to the fact that one of the guns

6    was stolen.  I don't know if an objection was made

7    specifically to that point but given the fact that Mr. Joos is

8    representing himself, I would at least like to make a short

9    record as to that sentencing enhancement so there can be no

10   question that that enhancement was appropriate.

11           THE COURT:  Well --

12           MR. KELLEHER:  And, Your Honor, I will move as

13   expeditiously as I can.

14           THE COURT:  I know, but what I --

15           MR. KELLEHER:  But I do think this is relevant to

16   determination of what the appropriate sentence is.

17           THE COURT:  Are you trying to get something outside

18   of the guidelines?

19           MR. KELLEHER:  I am, Your Honor.  And I don't

20   think -- to be perfectly honest, I don't think the guidelines

21   address a person like Mr. Joos, frankly.

22           THE COURT:  If something's been denied by Mr. Joos,

23   I think it's fair game to put somebody on the stand to testify

24   about.  If we're trying to just enhance the record beyond what

25   was disclosed in the presentence investigation report, I don't

                                  52

1  think that's appropriate at this time and would delay the

2  sentencing, which I really don't want to do.

3         MR. KELLEHER:  I will curtail my -- the testimony to

4  specifically directed towards the denials of Mr. Joos.

5         THE COURT:  I want to stick to what's in the

6  presentence investigation, those issues.  You mentioned the

7  stolen firearm.  I understand that.  But in all fairness,

8  Mr. Joos has had the presentence investigation report.  We've

9  spent over an hour now while he's responded to everything he

10  felt was appropriate.  I don't want to expand this situation

11  beyond that.  I want to get it done today.

12        MR. KELLEHER:  Again, I don't think my presentation

13  will take very long, Your Honor.

14        THE COURT:  It isn't the length of it.  It's the

15  subject matter I'm talking about.  So if we're going to start

16  talking about his activity that's not discussed in the

17  presentence investigation report, for all the reasons I've

18  stated and the circumstance, I'm not going to allow that

19  today.  Okay?

20        MR. KELLEHER:  I understand that, Your Honor, but --

21  and, again, maybe I'm misunderstanding, but you're denying me

22  the opportunity to elaborate on the government's allegations

23  that he's been involved in violent white supremacist acts for

24  the last 20 or 30 years?

25        THE COURT:  Well --

                              53

| 1 | THE DEFENDANT: That's all media hype and hearsay.

| 2 | THE COURT: You know, I'll just say, if you want to

| 3 | do that, we'll continue this and let him have a chance to

| 4 | respond because I'm not going to get in here —— he doesn't

| 5 | have counsel, we've been through all of this and it just —— if

| 6 | there's particular paragraphs in here that I guess you're

| 7 | saying you're elaborating on? I gathered you're talking about

| 8 | something that's not in here that you want me to know about.

| 9 | MR. KELLEHER: That's correct, Your Honor.

| 10 | THE COURT: Now, doesn't a defendant have a chance

| 11 | to respond to things like that, and isn't that the whole idea

| 12 | of the presentence investigation report and this back and

| 13 | forth and the defendant having a chance to object to it so

| 14 | that there's a process that allows things to be sorted out

| 15 | before we get here for the hearing?

| 16 | MR. KELLEHER: You know, I don't know if there's a

| 17 | mechanism to do that. The fact of the matter is, it's ——

| 18 | there is no accident that the government has been making

| 19 | allegations that Mr. Joos is involved in the white supremacist

| 20 | movement or —— we're simply eliciting facts to support that

| 21 | and I think the fact that Mr. Joos has been engaged in violent

| 22 | activity, he certainly can argue or object to the evidence

| 23 | that we admit, but ultimately it's up to the Court to

| 24 | decide —— again, I think the fact that he's been involved in

| 25 | the white supremacist movement, has been associated with

1  violent acts and violent people directly and perhaps directly

2  involved I think should give the Court a wealth of information

3  to inform its sentencing decision.

4  THE COURT: I don't doubt it would be a wealth of

5  information. I'm just talking about procedure here. So if

6  you're going to get into it, I think there's -- in the

7  presentence report there's a statement that he just missed

8  being arrested in regard to a bombing of a gay bar in Colorado

9  or something. If you're talking about that, I guess that's

10  fair game. It's mentioned in here. But I'd like for you to

11  stick to the subject matters that are mentioned -- white

12  supremacy I think is mentioned in here, but I don't want to

13  get us in a situation where we get off into a whole other set

14  of crimes or something that we're going to try to prove here

15  at a sentencing that have never been mentioned before.

16  MR. KELLEHER: Okay. I will --

17  THE COURT: Now, I know that may not be what you

18  want to do. I hope you'll consider all the circumstances

19  we're dealing with here and get this thing accomplished.

20  MR. KELLEHER: I do. I will curtail my presentation

21  dramatically.

22  THE COURT: All right. Let's go.

23  THE DEFENDANT: I object at this point --

24  THE COURT: Sit down, Mr. Joos. We're going to --

25  THE DEFENDANT: -- free speech.

55

```
 1              THE COURT:  -- proceed with it.  Your objection is
 2   overruled.
 3              MR. KELLEHER:  The government at this time would
 4   call Miles Parks to the stand.
 5              THE COURT:  All right.
 6   MILES PARKS, GOVERNMENT WITNESS, SWORN:
 7                         DIRECT EXAMINATION
 8   BY MR. KELLEHER:
 9   Q    Would you please introduce yourself to the Court?
10   A    My name is Miles Parks, retired Missouri highway
11   patrolman.
12   Q    How long did you work for the Missouri Highway Patrol?
13   A    About 39 years.
14   Q    Mr. Parks, are you familiar with Robert Joos?
15   A    Yes.
16   Q    And did you, in fact, have occasion to conduct or
17   participate in a number of investigations of Mr. Joos?
18   A    Yes.
19   Q    I want to direct your attention specifically to September
20   of 1994.  Were you assigned to investigate a shooting of
21   another highway patrol officer by the name of Bobby Harper?
22              THE DEFENDANT:  I'm going to object at this point,
23   Your Honor.  This issue has already been raised before a
24   federal grand jury in January of '03 and the federal grand
25   jury refused to indict anybody after I presented evidence that
```

56

1    they had absolutely nothing on us and it was all fabricated.

 2              THE COURT:  Mr. Joos, I understand you were in jail

 3    at that time.  You're not going to be sentenced for shooting a

 4    highway patrolman today.  So just sit down and we'll --

 5              THE DEFENDANT:  The grand jury already ruled on this

 6    issue.

 7              THE COURT:  Go ahead.

 8    Q    (By Mr. Kelleher) Did you have occasion to investigate

 9    that shooting?

10    A    Yes.

11    Q    Would it be fair to say that Bobby Harper was shot

12    through the window of his home back in September of 1994?

13    A    Yes.

14    Q    And that would have been approximately three months after

15    he arrested Robert Joos, correct?

16    A    Yes.

17    Q    And was a suspect developed in connection with that

18    shooting?

19    A    Yes.

20    Q    And would that have been Timothy Coombs?

21    A    Yes.

22    Q    Where was Mr. Coombs staying back in September of 1994?

23    A    In the McDonald County area and he had been on the Joos

24    property.

25    Q    Did you personally observe him on the Joos property?

                                 57

```
 1   A    Yes.

 2   Q    Predicated on the leads you developed, did you ultimately

 3   conduct a search of Robert Joos' property, including his home?

 4   A    Yes.

 5   Q    During the course of that investigation were some items

 6   seized from Mr. Joos's house?

 7   A    Yes.

 8   Q    And did you, in fact, photograph those items as they were

 9   found and once they were seized?

10   A    Yes, sir.

11   Q    I'm going to show you what's been marked as Government's

12   Exhibit 1 and ask if you can identify that photograph for me?

13   A    It appears to be the living room of the Joos residence

14   depicting electronics equipment as well as books and a rifle

15   by the door.

16        MR. KELLEHER:  I'd move to admit Government's

17   Exhibit 1, Your Honor.

18        THE DEFENDANT:  I'm going to object as to the

19   relevance of this.  I was in jail.  Court knows I was in jail

20   at this time.

21        THE COURT:  I understand.

22        THE DEFENDANT:  I hadn't been there in three months.

23        THE COURT:  I understand.

24        THE DEFENDANT:  I wasn't living there at the time.

25        THE COURT:  Okay.  Objection is overruled.  This is
```

58

just a sentencing hearing.  Exhibit 1 is admitted.

Q    (By Mr. Kelleher) Show you Exhibit 2.

A    This is a photograph of a number of weapons including handguns and rifles seized during the search warrant execution on the Joos property.

Q    What structure in particular were those seized from?

A    His residence.  His house.

Q    The cabin area, if you will?

A    Yes.

THE DEFENDANT:  I'm going to object again as to relevance.

THE COURT:  Okay.  Overruled.

MR. KELLEHER:  I'd move to admit Government's Exhibit 2, Your Honor.

THE COURT:  I know you object to it.  It'll be denied.  It's admitted.

Q    (By Mr. Kelleher) Could you please identify Government's Exhibit No. 3?

A    This is a photograph of a Norinco machine gun.

Q    Was that also found in Mr. Joos's residence?

A    In -- it was on the property in an adjacent bunkhouse.

Q    And was that gun functional at the time it was seized?

A    No.

Q    Did an expert take a look -- evaluate the gun?

A    Yes.

59

1  Q    And did he conclude that it was -- it could be restored

2  to functionality?

3  A    Yes.

4         THE DEFENDANT:  I'm going to object again on the

5  grounds I was not informed of any of this.  I attempted to get

6  that machine gun.  That very gun they're probably talking

7  about -- I can't see the picture, but there's only one I know

8  of that I'm accused of having out there and if I had known --

9  I tried to get that thing brought in here so the Court can see

10 that it cannot be restored.  There are steel plates welded

11 into the receiver housing.

12        THE COURT:  Okay.  That gun is not one of the guns

13 that you're charged with in this case anyway.  The objection

14 is overruled.

15        THE DEFENDANT:  Well, I'm objecting for relevance.

16 It has nothing to do with me.

17        THE COURT:  That's fine.  I'm trusting myself to

18 keep relevancy under control here.

19        MR. KELLEHER:  Move to admit that photograph, Your

20 Honor.

21        THE COURT:  All right.  Exhibit 3 is admitted.

22 Q    (By Mr. Kelleher) And next would be Government's

23 Exhibit S4.

24 A    This is a photograph of dynamite seized from the Joos

25 property.

60

```
 1   Q     Where was that seized from, if you recall?

 2   A     The bunkhouse.

 3             MR. KELLEHER:  Move to admit Government's S4.

 4             THE DEFENDANT:  Object again for relevance.

 5             THE COURT:  Overruled.  Exhibit 4 is admitted.

 6   Q     (By Mr. Kelleher) Next show you Government's S5.  Tell

 7   the Court what that depicts.

 8   A     This is a photograph of the upstairs room in the Joos

 9   home including a drawer -- I think this was a chest of

10   drawer -- including -- one of the shelves or drawers depicts a

11   photograph of some swastikas.

12   Q     Is there also a KKK patch in the middle of that picture?

13   A     Yes, there is.

14   Q     Thank you.

15             MR. KELLEHER:  Move to admit Government's Exhibit

16   S5.

17             THE DEFENDANT:  I'm going to object for relevance

18   and it goes to free speech issues which the Court is not

19   allowed to address at sentencing.

20             THE COURT:  I understand.  And I'm not saying that

21   I'm going to do that but I'm going to admit it for the record

22   so it's in the record.  So Exhibit 5 is admitted.

23   Q     (By Mr. Kelleher) Did you also seize a number of news

24   articles during the search that were found in the Joos

25   residence?
```

61

```
 1  A    Yes.

 2  Q    I'll show you what's been marked as Government's Exhibit

 3  S6.  Are these, in fact, some of the articles that were

 4  seized?

 5           THE DEFENDANT:  I'm going to object to the

 6  prosecutor also keep calling it my residence.  It was not my

 7  residence.  I had been in jail for three months.  It wasn't my

 8  residence.  I wasn't even living there.

 9           THE COURT:  All right.

10           THE DEFENDANT:  Also want to object to they keep

11  calling it the Joos property.  He needs to make it clear that

12  Joos who was on the deed is not me.  That's my parents.

13           THE COURT:  I understand.

14           THE DEFENDANT:  So he can call it the Joos property

15  but he's misleading the Court into thinking it's my property

16  when it's not.

17           THE COURT:  I know your parents own the property.

18           THE DEFENDANT:  Okay.

19  A    They appear to be documents that were seized during that

20  search warrant execution.

21  Q    (By Mr. Kelleher) And specifically is there an article

22  dated Gazette 18 May 1982 out of Colorado detailing a

23  bombing of the ex-wife of the Colorado Springs police

24  officer in which -- in which the KKK were implicated?

25           THE DEFENDANT:  I'm going to object again for
```

62

relevance of that.

A     Yes.

          MR. KELLEHER:  Your Honor, the items contained in
Government's Exhibit S6, I would introduce the two newspaper
articles that were contained in that, one pertaining to a
bombing investigation and one pertaining to the shooting of
Bobby Harper.

          THE COURT:  All right.

          THE DEFENDANT:  I'm going to object for relevance.

          THE COURT:  Okay.  Overruled.  It's admitted.

          MR. KELLEHER:  I think that's all I have, Your
Honor, of this witness.

          THE COURT:  Mr. Joos, do you want to ask Mr. Parks
any questions?  You don't have to.

          THE DEFENDANT:  No, sir, I don't.  He's not a
relevant witness to anything.

          THE COURT:  All right.

          Step down.

          MR. KELLEHER:  Your Honor, at this time I would call
Kevin Farnsworth to the stand.

          THE COURT:  All right.

KEVIN FARNSWORTH, GOVERNMENT WITNESS, SWORN:

                    DIRECT EXAMINATION

BY MR. KELLEHER:

Q     Special Agent Farnsworth, could you please introduce

63

1  yourself for the record?

2  A    I'm a special agent with the Bureau of Alcohol, Tobacco

3  and Firearms.  I'm stationed at the Springfield field office.

4  I've been employed with ATF for the last 22 years.

5  Q    Were you the agent in charge of conducting the

6  investigation of Mr. Joos on the current set of charges?

7  A    Yes.

8  Q    In connection with your duties as an ATF special agent,

9  were you able to determine that the Ruger Mark II .22 caliber

10  pistol that was admitted at trial as Government's Exhibit 20

11  was, in fact, stolen?

12  A    Yes.

13  Q    And how did you go about confirming that?

14  A    When that firearm was stolen in 1998 from a gun shop in

15  Oklahoma, it was reported to ATF per the requirements of the

16  licensee, then that went into the computer and this month I

17  went to that gun shop and interviewed the gun shop owners.

18  Q    Were they able to confirm that that particular gun, the

19  gun that was admitted as Government's Exhibit 20, was, in

20  fact, stolen?

21  A    Yes.  It was one of 46 guns taken during a burglary in

22  1998.

23  Q    As a secondary issue, while you were on the church

24  property, I suppose, when the search warrant was executed, did

25  you have occasion to take notice of a document that's entitled

64

```
 1   Notice of Call to Pastor?

 2   A    Yes.

 3   Q    I'll show you Government's Exhibit S7.  Is that, in fact,

 4   the document, or a copy of the document?

 5   A    Yes.

 6   Q    What does that document purport to do?

 7   A    Would you like me to read it?

 8   Q    If you would.

 9   A    It says, "Notice of Call to Pastor.  I, the undersigned,

10   as Trustee of the Sacerdotal Order of the David Company have

11   the honor of notifying you of my earnest call to you to

12   undertake the Pastoral office of the Order, in accordance with

13   the provisions of the By-Laws of the Order.  If you will

14   accept this call, I look forward to your commencing duties as

15   soon as practicable.  On behalf of the Church, I am confident

16   that your ministrations of the Gospel will be profitable to

17   our religious interest, and I promise and assure you that in

18   the discharge of your duties you will receive my support,

19   encouragement and obedience to the Creed of the Church.  In

20   accordance with the By-Laws of the Order, you are required

21   upon acceptance of this call, to take a vow of poverty and

22   make gift of all your worldly possessions to the Order.

23   Thereafter, the Order will provide for your temporal needs,

24   but no salary or other remuneration will be paid to you by the

25   Church or Order.  In witness whereof, I have signed my name on
```

65

1  this 30th day of October, 1981," and there's a signature of

2  Charles --

3          THE DEFENDANT:  I'm going to object to this on the

4  grounds it calls my religious beliefs into question which are

5  not proper grounds for the Court to address.

6          THE COURT:  Overruled.

7  A    Signed by Charles Howorth.

8          MR. KELLEHER:  Your Honor, I'd move to admit that,

9  S7.

10          THE DEFENDANT:  I object for relevance.

11          THE COURT:  Seven is admitted.

12          MR. KELLEHER:  That's all I have of this witness,

13  Your Honor.

14          THE COURT:  All right.  Do you have any questions of

15  this witness?

16          THE DEFENDANT:  Just thought of one that escaped me.

17                    CROSS-EXAMINATION

18  BY THE DEFENDANT:

19  Q    Did you personally examine -- I believe your name was on

20  the report, the machine gun, so-called machine gun they had at

21  the state highway patrol evidence locker?

22  A    Yes, I did.

23  Q    Did you examine the receiver housing?

24  A    Yes, I did.

25  Q    And what was inside the receiver housing?

                                66

```
 1   A    I don't know.  I wasn't able to function the action of

 2   the firearm.  I wasn't able to open it up, in essence.

 3   Q    Was there even any action in it?  Was there even a

 4   receiver in the housing, that's what my question is?

 5   A    I believe there was, yes.

 6   Q    Okay.

 7              THE DEFENDANT:  Based upon his testimony, Judge, I'd

 8   like to have them produce the machine gun because he just

 9   testified to something that I know for a fact isn't true.

10   There were steel plates welded inside the receiver housing so

11   that no receiver could be put into the housing.

12              THE COURT:  All right.  Now --

13              THE DEFENDANT:  He's just testified --

14              THE COURT:  -- is there an enhancement for machine

15   gun --

16              MR. KELLEHER:  Is there what?

17              THE COURT:  Is there an enhancement for a machine

18   gun in here?

19              MR. KELLEHER:  No, Your Honor.

20              THE WITNESS:  Your Honor, could I explain

21   additionally?

22              THE COURT:  Hang on just a second.

23              Does the machine gun have anything to do with the

24   calculation of the advisory guidelines?

25              MR. KELLEHER:  It does not, Your Honor.
```

67

1          THE COURT:  So, Mr. Joos, I understand what you're

2   saying but it doesn't go into the calculation of the

3   guidelines that I have in front of me here.

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Do you have any other questions?

6          THE DEFENDANT:  No, sir.

7          THE COURT:  Did you want to say something?

8          THE WITNESS:  I just noted the gun had -- the barrel

9   was sealed with, I believe it was led.  I didn't really look

10  at the receiver in great detail but I did note that I couldn't

11  pull the action of the gun but it was nonfunctional based on

12  the fact that the barrel was plugged.

13         THE COURT:  Okay.  Thank you.  You can step down.

14         MR. KELLEHER:  Government calls Tristan Moreland.

15  TRISTAN MORELAND, GOVERNMENT WITNESS, SWORN:

                        DIRECT EXAMINATION

17  BY MR. KELLEHER:

18  Q    Would you please introduce yourself to the Court once

19  again?

20  A    Yes, Tristan Moreland is my name.  I'm a special agent

21  with the Bureau of Alcohol, Tobacco, Firearms & Explosives.

22  I'm currently assigned to Phoenix, Arizona, and I have been

23  with ATF for 21 years, roughly.

24  Q    Now, you testified at trial that you were assigned to

25  investigate a bombing in Arizona for which Dennis and Daniel

                                68

1  Mahon have since been arrested and indicted for, correct?

2  A    That's correct, sir.

3       THE DEFENDANT:  I'm going to object to this whole

4  line of questioning.  What has this got to do with me or this

5  sentencing hearing?

6       THE COURT:  I agree.  And if it doesn't, it won't be

7  considered.  I don't know what's going to be said yet.  Your

8  objection is overruled.

9       Go ahead.

10 Q    (By Mr. Kelleher) As Mr. Joos was speaking earlier, he

11 indicated that he had no idea what the Mahons were up to.

12 A    Correct.

13 Q    Who are the Mahons?

14 A    Dennis and Daniel Mahon are twin brothers from Illinois.

15 They began their white supremacist career as members and Grand

16 Dragons of the Ku Klux Klan.  They evolved during the '80s and

17 began membership with a group called WAR of the White Aryan

18 Resistance which they maintained association with up until the

19 time of their arrest.  To my knowledge they're into all kinds

20 of various causes, anti-abortion of white children, anti-tax,

21 tax protesting, anti-government in general.

22 Q    Now, is Mr. Joos acquainted with the Mahons?

23 A    Yes.

24 Q    And how do you know that?

25 A    I know that from discussions personally with Mr. Joos and

                              69

from discussions with the Mahons.  Then, of course, in either

monitoring or overhearing --

THE DEFENDANT:  I'll stipulate this point, Judge,

that I do know the Mahons.  But, again, I'm objecting for

relevance.

THE COURT:  All right.  Objection is overruled.

Q   (By Mr. Kelleher) Now, are the -- do the Mahons make

any secret of their views?

A   Somewhat publicly with respect to maintaining employment

and things like that but Dennis is very vocal.  Daniel is

somewhat quieter.  But in my relationships with them

personally, no, they're very clear of their views.

Q   And do they, in fact, have -- or did they, in fact,

indicate to you that they used Mr. Joos' residence as a

retreat?

A   That's a word they used, yes.

Q   Did Mr. Joos confirm that to you?

A   Yes, he did.

Q   Now, would it be fair to say that you came into contact

with Mr. Joos through the Mahons?

A   That's correct.

Q   Now, when -- what was your understanding from the Mahons

in terms of Mr. Joos's role with them?

A   He was identified as a member of --

THE DEFENDANT:  I'm going to object.  This is

1  hearsay. He's telling what the Mahons said. If they're going
2  to do that, then I want all this discovery, those 100 pages
3  where the Mahons are talking about me or I'm talking to the
4  Mahons -- I mean, they're bringing up stuff now that I've been
5  denied -- you know, I've been denied the right to present this
6  to the Court, the very issues that they're bringing up now
7  about the Mahon brothers and how they've tried to link me to
8  them to claim I'm one of them when I can prove from the very
9  discovery that I looked at last week that the Mahons and I
10 have fundamental doctrinal differences.
11      THE COURT: Okay. The objection is overruled.
12 A   I'm sorry. Can you repeat the question?
13 Q   (By Mr. Kelleher) What -- when speaking to the Mahons,
14 did they indicate what role Joos played in terms of their
15 organization or their movement?
16 A   Sure. He's identified as generally being in the
17 movement. As Mr. Joos was just stating, many people in the
18 movement have some varying degrees of what their cause is, if
19 you will. Like I mention that the movement is
20 anti-government, it's tax protests, but it also includes
21 things like anti-Jew, anti-black, anti-immigration, Mexican.
22 So to some degree they acknowledge that there are differences
23 between him and them; however, generally speaking, they have
24 similar ideologies.
25      THE DEFENDANT: I object to this as hearsay.

1        THE COURT:  Overruled.

2   A    Mr. Joos has been identified as a person who maintains a

3   large property -- referred to as a retreat a moment ago --

4   where they can go to conduct paramilitary-type training,

5   including explosives and firearms.  He's been an individual

6   that's been identified as somebody who does a lot of teaching

7   for them in the past and facilitating the teaching of others

8   by allowing the use of the property and so forth.

9   Q    (By Mr. Kelleher) Now --

10       THE DEFENDANT:  I object to that as hearsay, Judge.

11  It should be stricken from the record.  This is stuff that

12  Mahons made up.  I can prove it from the records that he's got

13  that he wouldn't give me copies of.

14       THE COURT:  Overruled.

15  Q    (By Mr. Kelleher) Now, with regard to Mr. Joos's

16  involvement in the white supremacy movement in general,

17  during the course of --

18       THE DEFENDANT:  I'm going to object.  That's

19  attempting to prove guilt by association.

20       THE COURT:  Overruled.

21  Q    (By Mr. Kelleher) During the course of the ATF's

22  investigation of Mr. Joos, did they come across what is

23  essentially a KKK roster?

24  A    Yes, like a list of individual members of the KKK, or at

25  least one of their various cells, if you will.

72

Q    Was Mr. Joos identified on this roster as being a member

of the KKK?

A    Yes, he was.

Q    Was that roster taken during a search warrant executed in

connection with a bomb-making syndicate, if you will, back in

Colorado in the '80s, I believe?

A    Yes, it was, the early '80s in Colorado; Colorado

Springs, Colorado.

Q    And in terms of that bombing --

         THE DEFENDANT:  I'm going to object to that as not

being the actual roster.  That's some kind of copy that

somebody's made of who knows what.

         THE COURT:  All right.  Overruled.

Q    (By Mr. Kelleher) Now, back in the '80s, in '82 there

was a bombing in Colorado Springs.  Were you able to

determine that Mr. Joos lived in Colorado Springs at that

time?

A    Yes.

Q    Was he, in fact, a member of the KKK, according to the

documents seized from Charles Howarth's house?

A    That's correct, he was.

         THE DEFENDANT:  I'm going to object.  There's no

evidence that I lived there at that time.  In fact, I didn't.

I was living in southwest Missouri in 1982.  And if I had

known he was going to present this today, I could have had

73

1  witnesses here or at least got affidavits from people --

2  Dr. Smith, who I was living with down there at that time.  I

3  was not living there.

4          THE COURT:  Mr. Joos, the objection is overruled.

5  But I can say to you, I'm not going to sentence you today

6  based on rosters or whatever that existed in 1982.

7  Q    (By Mr. Kelleher) I'll show you what's been marked as

8  Government's Exhibit 8, and if you would, can you please

9  identify that document?

10 A    Yes.  That's one of the two lists that I've seen that has

11 Mr. Joos' name listed in some columns to the right talking

12 about security risk, hindrance of a wife, things like that.

13 Appears to be members of the -- I can't remember if it's

14 called a -- well, the group, but Howarth being the head of

15 that particular group, Charles Howarth.

16 Q    So Charles Howarth was, in fact, the -- does he actually

17 have a title?

18 A    Yeah.  According to the records, he would have been

19 referred to as either the Imperial Wizard or the Exalted

20 Cyclops, I think were the two titles I think that he used.

21 Q    So he was a leader of the Ku Klux Klan?

22 A    Yes, for the United Klan of America.

23 Q    And you heard just moments ago that Special Agent

24 Farnsworth seized a document called Notice of Call to Pastor

25 executed by Charles Howarth?

                                    74

```
1    A    Yes.

2    Q    Do they appear to be one in the same person?

3    A    Yes.

4              MR. KELLEHER:  Your Honor, I'd move to admit

5    Government's Exhibit S8.

6              THE DEFENDANT:  I'm going to object to this, Your

7    Honor, because I did not have any notice of this.

8              THE COURT:  I understand.

9              THE DEFENDANT:  If I had, I could have got a copy of

10   the records from the McDonald County courthouse where we have

11   severed ties -- we severed ties back in the early '80s with

12   Howarth and the parent church over doctrinal differences.

13             THE COURT:  Okay.  The objection is overruled.  The

14   exhibit's admitted.

15   Q    (By Mr. Kelleher) Now, finally, in connection with your

16   investigation into Mr. -- the Mahon brothers and Mr. Joos,

17   did you also execute a search warrant at the residence of

18   Tom Metzger?

19   A    I did.

20   Q    And who is Tom Metzger with relation to this -- the white

21   supremacy movement?

22             THE DEFENDANT:  I'm going to object again, Your

23   Honor.  I don't even know Tom Metzger.

24             THE COURT:  Okay.  Objection is overruled.

25   A    Tom Metzger is a former Ku Klux Klan Grand Dragon from
```

75

the state of California.  He evolved during the '80s and
organized his own group which became the White Aryan
Resistance.  In 2005 or '06 that group changed names to become
The Insurgent, which he runs out of the state of Indiana.
He's probably one of the most recognized leaders in the white
supremacist movement in the world today, certainly the top
three or four.

Q    Now, in connection with this investigation did -- you
indicate you executed a search warrant at his house?

A    (Nods head.)

Q    Was there anything that you found there that directly
linked -- or that had a direct link to both the Mahons and
Mr. Joos?

A    Yes.

Q    And what was that?

A    There was a videotape that was filmed on the Joos
property circa 1993-'94, in that era, we believe, possibly '95
based on the footage, depicting members of --

         THE DEFENDANT:  I object again to the relevance of
this, Judge.

         THE COURT:  Okay.  Overruled.

A    -- members of the WAR, or White Aryan Resistance, to
include Dennis Mahon and several others disguised in
balaclavas and so forth shooting weapons.  It was -- the
narration by Dennis Mahon explains that it's training being

done, it's clearly on the Joos property where I've been on
more than one occasion, and -- to include some other footage
of the mocking of the execution of an FBI agent who's been
discovered by the group, you know, surveiling them.

MR. KELLEHER:  Your Honor, I've marked that video as
Government's Exhibit S9.  I'd ask leave of the Court to play
it for the Court now.

THE DEFENDANT:  I'm going to object to that being
entered as relevant, Judge.

THE COURT:  How long is the video?

MR. KELLEHER:  It's not very long.  I've cued it up
to a part where we can -- maybe ten minutes.

THE COURT:  Is there any relationship to the
defendant here other than it's recognized to be on his
property?

MR. KELLEHER:  Yes, Your Honor.  I think the fact
that --

THE COURT:  Is he shown in the video anywhere?

MR. KELLEHER:  He's not.

THE COURT:  Is he speaking anywhere in the video?

MR. KELLEHER:  No, Your Honor.  Some of the people
are in disguise, however, so --

THE COURT:  Well --

MR. KELLEHER:  But, Judge, I do think --

THE COURT:  -- that would be speculation, right?

77

1          MR. KELLEHER:  Judge, it would be.  But, Judge, I

2    think this is incredibly relevant.  This is what goes on at

3    Mr. Joos's property and for him to deny that he's not involved

4    in the white supremacist movement and he's not familiar with

5    the Mahons --

6          THE COURT:  Okay.  I'm going to deny your request to

7    show the video.

8          MR. KELLEHER:  Note the government's objection, Your

9    Honor.

10          THE COURT:  That'll be noted.

11          MR. KELLEHER:  Nothing further.

12          THE COURT:  All right.

13          Do you have any questions of him?

14          THE DEFENDANT:  Yes.

15                        CROSS-EXAMINATION

16    BY THE DEFENDANT:

17    Q    What's the exact date of this video?

18    A    I told you I'm not sure.  Between roughly 1993 and '95.

19    Q    So it's quite possible it was filmed while I was in jail,

20    because I was in jail from '94 through '97.

21    A    It's possible if that's true, sir.

22    Q    Okay.

23          THE COURT:  All right.  You can step down.

24          All right.  What else does the government have?

25          MR. KELLEHER:  That's it, Your Honor.  Just

                                78

1   argument.

2          THE COURT:  All right.  Then let's hear what you got

3   to say.

4          MR. KELLEHER:  The government's position is that the

5   guidelines in no way address the type of person that Mr. Joos

6   is.  As we know, Mr. Joos is extraordinarily intelligent and

7   he at some point went off track, profoundly off track.  He got

8   involved with the white supremacist movement in Colorado where

9   the article demonstrates that a police officer's wife was a

10  victim of a bombing.  The very group that Mr. Joos was a part

11  of was suspected of perpetrating that bombing.

12         Mr. Joos has never left this community.  He has

13  continually had contact with white supremacists.  He has

14  continually offered his aid and support, and as you heard at

15  trial, most recently he offered his expertise in bomb building

16  to a special agent with ATF who portrayed himself as a white

17  supremacist who portrayed himself as someone who wanted to

18  cause damage to send a messages to the Canaanites; Jews.

19         Mr. Joos has for his -- or after going off the track

20  has done everything in his power to stick his thumb in the eye

21  of the government.  He has shown a willingness to offer his

22  assistance to the most radical, most violent members of

23  society.  He has been careful not to get caught but it's quite

24  clear that from what they have -- every time they go out to

25  that church where he's resided for the last 20-some-odd years,

                                79

1    they come away with guns and explosives.

2              Your Honor, I think in this particular case the

3    guidelines are woefully deficient in setting an appropriate

4    penalty for Mr. Joos.  Woefully.  The fact of the matter is,

5    he will never conform himself to the expectations of society.

6    He will never stop the violence.  He continually refers to

7    this church, but it is a church of hate.  That is the sole

8    basis for this church.  It was formed at the direction of

9    Charles Howarth, a bigwig in the KKK.  As far as I can tell,

10   the only association Mr. Joos had with Mr. Howarth was being a

11   member of that particular sect or that particular subdivision

12   of the KKK.  That's how he got his start with the church.  It

13   was formed with the intent to cause violence to people who

14   didn't look like Mr. Joos, who didn't worship in the same way

15   he did, and Mr. Joos has continually, continually exhibited

16   his willingness to assist in that movement.  In fact, Your

17   Honor, had it not been for Mr. Joos's willingness to

18   participate in these types of activities, he wouldn't be here

19   today.

20             Mr. Joos lives on a fairly substantial tract of land

21   in a rural area in a distant corner of the state of Missouri

22   and had he not drawn attention to himself, had he not made

23   himself a suspect in the bombing of an African-American man,

24   we wouldn't be here today.  But Mr. Joos was the very first

25   call the Mahon brothers called after they left a bomb in a

80

1  public library.  Mr. Joos is an integral part of this
2  organization.  And I recognize the fact that what he did to be
3  here today is simply possess guns and explosives, but I ask
4  the Court to consider why he feels the need to have this many
5  guns, 20,000 rounds of ammunition, blasting caps, fuse,
6  instructions on bomb making.  I ask the Court to consider that
7  in assessing an appropriate sentence.
8         I'm asking the Court to consider the fact that
9  Mr. Joos has had adequate opportunity to turn away from this,
10 to disavow these extremists, to simply not have them on his
11 property, and he has chosen not to.  He has chosen to maintain
12 this course.  He has chosen to make hate his religion.
13        Your Honor, it is for those reasons the government
14 suggests that a sentence within the 15-year range is
15 appropriate to insure that Mr. Joos is no longer capable of
16 aiding and abetting the most dangerous elements of society.
17        THE COURT:  All right.  Well, you know --
18        THE DEFENDANT:  Do I get to rebut that, Judge?
19        THE COURT:  No.
20        As we've seen in this almost two-hour hearing and
21 the trial that we had, this is a case that is simply a felon
22 in possession of firearms and explosive materials.  Now,
23 there's no question that the defendant is on the fringe of a
24 lot of unsavory characters and bad behavior.
25        THE DEFENDANT:  Sir, may I just --

81

```
 1            THE COURT:  No.  Just listen to me, Mr. Joos.  I'm
 2   telling you what my sentence is going to be.  And if you'll
 3   just listen, I'm giving you the benefit of the doubt on some
 4   things as well.
 5            And as tempting as it would be to put Mr. Joos away
 6   forever -- 15 years as the government says -- in all fairness
 7   I can't do that, not the way I see this case.  Because, yes,
 8   Coombs, Joos, arrest, those circumstances certainly raise a
 9   lot of innuendo towards you, Mr. Joos.
10            THE DEFENDANT:  Yes, sir, but I can refute that with
11   the evidence.
12            THE COURT:  Just sit down and listen to me.
13            You weren't charged.  There's no conviction.  You
14   were in jail, which is about as good an alibi as far as you
15   doing it as a person could have.  And while I can look at that
16   and say it certainly seems like there ought to be fire where
17   there's smoke, but sentencing you is something that I have to
18   be careful to not let emotion get involved with the facts that
19   I have before me.
20            Now, the fact he's got swastikas and KKK
21   paraphernalia on his wall, that's not a crime.  The fact that
22   he talks the talk with these guys and has beliefs that might
23   be an affront to society are protected by our free speech, so
24   I hope everybody here remembers that.  And that's something
25   that I have to consider when it comes time, as it is right
```

82

1  now, for me to sentence Mr. Joos.

2          Now, what I do see in this case is a serious crime

3  and I told you about that at the start and that's the number

4  of weapons and the extreme amount of ammunition.  And the

5  fringe activity with the Mahons and bomb making certainly are

6  cause for concern.  And you, Mr. Joos, certainly seem to have

7  a strong history of disrespect for the law.  Now, you say you

8  believe different but that's not an excuse.

9          THE DEFENDANT:  Don't I get allocution here, Judge?

10         THE COURT:  You've had it.

11         Now, the -- looking at the guidelines, I think the

12  guidelines are a reasonable range for you.  And I know the

13  government says it doesn't reflect the seriousness of the

14  conduct.  If Mr. Joos had a lawyer instead of representing

15  himself, his lawyer would probably be pointing out that the

16  criminal history of four is possibly overstated because it

17  deals with not having a driver's license on much of the

18  offense which is not of the level of a lot of other things

19  that Mr. Joos is involved in but that's what his criminal

20  history is based on.  But all things considered, I think the

21  guideline range is reasonable.  I think there is a need to

22  deter future conduct.  I think there's a need to protect the

23  public.

24         So, Mr. Joos, I'm going to sentence you --

25         THE DEFENDANT:  I'm going to object at this time,

```
 1   Judge.
 2              THE COURT:  You don't get to --
 3              THE DEFENDANT:  You're assuming facts not in
 4   evidence.  I can take his discovery and prove --
 5              THE COURT:  Mr. Joos --
 6              THE DEFENDANT:  -- that what he said in closing
 7   was -- those are lies.
 8              THE COURT:  -- just sit down and listen.  This is
 9   your sentence.  Whatever is said from now on, you don't get to
10   object to any more.  You can take it up on appeal.  Okay?
11              THE DEFENDANT:  Yes, sir.
12              THE COURT:  And you might think a little bit about
13   whether or not I'm being fair with you or if I maybe could
14   have sentenced you according to the motion here which would be
15   a heck of a lot more than what you're about to get.  Do you
16   understand?
17              THE DEFENDANT:  I can prove that --
18              THE COURT:  I --
19              THE DEFENDANT:  -- what he said -- you're assuming
20   facts not in evidence, Judge.  You're going on the lies he
21   told you --
22              THE COURT:  You're not listening to me.
23              THE DEFENDANT:  -- which in his own discovery I can
24   prove are lies.
25              THE COURT:  You're not listening to me.  If I assume
```

84

1    the facts not in evidence, you'd be looking at a huge sentence
2    here.  I'm going to sentence you to the 78 months which is the
3    high end of the guideline.  So stand up, Mr. Joos.

4              It is the judgment of the Court that the defendant,
5    Robert Joos, is hereby committed to the custody of the Bureau
6    of Prisons for 78 months on each of Counts 1 and 2 of the
7    indictment to be served concurrently.  Upon release from
8    imprisonment you shall be placed on supervised release for
9    three years.  This consists of three years on each of Counts 1
10   and 2.  They'll run concurrently.  The Court finds you do not
11   have the ability to pay a fine, the fine is waived.  It's
12   further ordered that you shall pay to the United States a
13   special assessment of $100 on each of Counts 1 and 2 for a
14   total of $200 which shall be due immediately.

15             As to the forfeiture allegation, now, I was going to
16   finalize that but -- are you able, Mr. Kelleher, to speak on
17   forfeiture?  I know that's a different U.S. Attorney but -- he
18   has filed a motion here.  He really should have filed a claim
19   in regard to the forfeiture.  Is there any reason why I can't
20   leave that open for 30 more days for a claim to be filed if
21   it's going to be filed and make it final at that time?

22             MR. KELLEHER:  That, I don't know, but I suspect --

23             THE COURT:  I think I have --

24             MR. KELLEHER:  I think there's been publication and
25   I believe we've gone through all the necessary steps.

```
 1            THE COURT:  It's been gone through.

 2            I'm going to leave it open for 30 days, Mr. Joos.

 3   You don't file it with me.  You file your claim in regard to

 4   the notice that's been given out in regard to the forfeiture.

 5   There's a preliminary order of forfeiture.  It'll be made

 6   final in 30 days unless you prove somebody else has a claim

 7   for it.

 8            THE DEFENDANT:  Under the same case number?

 9            THE COURT:  We will provide you a copy of the

10   notice.  My clerk will make sure we do that.  Not right now.

11            THE DEFENDANT:  Sir?

12            THE COURT:  You'll be provided a copy of the notice.

13   You'll need to respond to it.

14            THE DEFENDANT:  Okay.

15            THE COURT:  I'm giving you a break here.  It's not

16   you.  You don't get to claim -- it's being forfeited from you.

17   But if this church is a different organization and it's going

18   to make a claim, then it can do it.

19            Now, be careful what you ask for, be careful what

20   you file.  I'll just tell you that.  Okay?

21            THE DEFENDANT:  Yes, sir.

22            THE COURT:  You be sure you don't get yourself in

23   deeper with false claims or something if that's what you start

24   doing.  You understand me?

25            THE DEFENDANT:  No, it's a legitimate church.  We've
```

86

1    got all of our paperwork filed at the county courthouse.

2              THE COURT:  You'll have 30 days to file it in the

3    proper manner.

4              All right.  And it may be we can take your motion

5    and file it for you in that matter and that'll count, but

6    we'll let you know.

7              Now, while on supervised release you shall comply

8    with the mandatory and standard conditions that have been

9    adopted by this Court.  In addition, you shall comply with the

10   following special conditions:  You shall submit your person,

11   residence, office or vehicle to a search conducted by a U.S.

12   probation officer at a reasonable time, in a reasonable

13   manner, based upon reasonable suspicion of contraband or

14   evidence of a violation of a condition of release.  Failure to

15   submit to a search may be grounds for revocation.  You shall

16   warn any other residents that the premises may be subject to

17   searches pursuant to this condition.  And it's ordered that

18   you be remanded to custody for service of the sentence

19   imposed.

20             Now, you have a right to appeal.  You've already

21   told me you want to appeal; is that right?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Do you want my clerk to file your notice

24   of appeal?

25             THE DEFENDANT:  Yes, sir.

1    THE COURT: All right. Your notice of appeal will
2 be filed. You have 14 days to file it but I'm telling you we
3 will get it filed within the next few days.
4    THE DEFENDANT: Yes, sir. Since I don't have
5 counsel, I'd like to also request the Court to inform me if
6 there's any other things I need to file before the notice of
7 appeal is filed.
8    THE COURT: We're going to file a notice of appeal.
9 That's all I'm dealing with. If there's anything else you
10 want to file, you have to deal with that.
11    In regard to his post-trial file, Mr. Johnson, can
12 you get him the file he's entitled to for his appeal?
13    MR. JOHNSON: Yes, sir, Your Honor, but it's in the
14 possession of the U.S. Attorneys. Deliver the entire file
15 over there.
16    THE COURT: Between the two of you, get back to him
17 what he's entitled to for the appeal.
18    MR. KELLEHER: The difficulty here is logistically
19 speaking, I don't know if Mr. Joos will -- if I delivered it
20 to him at the county jail, I don't know if the Bureau of
21 Prisons would let him take it to wherever he's going.
22    THE COURT: I'm saying he's entitled to have
23 something to do his appeal with. I'm asking counsel -- this
24 is not the first case that's gone up on appeal. So let's get
25 it --

88

1      MR. KELLEHER:  I understand that, but it may very
2  well be the first case I've dealt with where the defendant has
3  represented himself.
4      THE COURT:  I know.  But other people in your office
5  have dealt with it.  We can sort this out.  I'm just asking
6  that you get it done.  He's going to represent himself.
7      MR. KELLEHER:  I will.  Your Honor, is Mr. Joos
8  representing himself on appeal?  Is that his desire?
9      THE COURT:  Yes, at this point he is.
10     THE DEFENDANT:  Yes, sir.  And, sir, I don't need
11  3500 pages, just the pages I put in my --
12     THE COURT:  They're going to be working on it.
13     THE DEFENDANT:  -- in my motion.
14     THE COURT:  All right.  You all work it out.
15     THE DEFENDANT:  Sir, did I give you that?  It's a
16  three-page motion that has all the pages listed.  Did I give
17  that to you?
18     THE COURT:  On the forfeiture?
19     THE DEFENDANT:  No, no, it was a different one.
20  This is the one for today for postponing this hearing.
21     THE COURT:  I've already denied that, Mr. Joos.
22     THE DEFENDANT:  Yeah, I know, but --
23     MR. KELLEHER:  Judge, if I may, this might make it
24  easier for the government to comply because literally we have
25  a box of documents that -- and if Mr. Joos only needs a

1  limited amount of documentation, it will be infinitely easier
2  for me to give him 100 pages rather than 3,000 pages.
3            THE COURT:  Here's what we're going to do.
4            Mr. Joos, listen to me.  If there's something you
5  want to get to the government to reflect that, get it to them.
6  I'm done today.  Okay?
7            Does the government have anything else for the
8  record?
9            MR. KELLEHER:  No, Your Honor.
10            THE DEFENDANT:  This is a motion for the Court, sir,
11  that he should get a copy of but I need it filed in court to
12  show what I wanted today for the hearing.
13            THE COURT:  I've ruled on everything you've asked me
14  about already.  This I thought you said was to --
15            THE DEFENDANT:  This is the motion today to get
16  that -- I was -- this is today's motion that I argued but I
17  didn't give you the copy of it.
18            THE COURT:  Give Karen a copy of it.
19            THE DEFENDANT:  Everything's not in there which I
20  need --
21            THE COURT:  Give her a copy of it.
22            THE DEFENDANT:  -- to make my record on appeal, sir.
23            MR. JOHNSON:  Your Honor, I would like to make an
24  oral motion to withdraw from this case.
25            THE COURT:  All right.  That will be sustained.

90

1            THE DEFENDANT:  Sir, I'd also like to make a motion

2   to be put in a prison where I can get medical treatment and

3   close enough to southwest Missouri where maybe somebody can

4   visit me.  I heard that the Court can make a recommendation on

5   prison.

6            THE COURT:  No.  That may be true, but for the

7   record I'm not going to direct the Bureau of Prisons where to

8   place you.  They have several considerations to make, security

9   risk, medical needs, various things.  You let them know.

10  They'll make the decision.  I'm not going to tell them.

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  All right.

13           (Proceedings concluded at 10:41 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:09-cr-05022-MDH    Document 105    Filed 06/08/10    Page 91 of 92

<u>CERTIFICATE</u>

          I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____       _____
      Date                      Jeannine M. Rankin, CCR, CSR, RPR